UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

```
----------------------------------------------------------
                                )
Skky, Inc.,                     )  File No. CV-13-2072
                                )           (PJS/JJG)
        Plaintiff,              )
                                )
vs.                             )  St. Paul, Minnesota
                                )  March 5, 2014
Thumbplay Ringtones, LLC,       )
                                )  DIGITAL RECORDING
        Defendant.              )
                                )
----------------------------------------------------------
                                )
Skky, Inc.,                     )  File No. CV-13-2083
                                )           (PJS/JJG)
        Plaintiff,              )
                                )
vs.                             )  St. Paul, Minnesota
                                )  March 5, 2014
Dada Entertainment, Inc.,       )
                                )  DIGITAL RECORDING
        Defendant.              )
                                )
----------------------------------------------------------
                                )
Skky, Inc.,                     )  File No. CV-13-2086
                                )           (PJS/JJG)
        Plaintiff,              )
                                )
vs.                             )  St. Paul, Minnesota
                                )  March 5, 2014
Manwin USA, Inc. and Manwin     )
Holding, s.ar.l,                )  DIGITAL RECORDING
                                )
        Defendants.             )
                                )
----------------------------------------------------------
```

```
1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
2

3        ------------------------------------------------------------
                                        )
4        Skky, Inc.,                    )   File No. CV-13-2087
                                        )             (PJS/JJG)
5                  Plaintiff,           )
                                        )
6        vs.                            )   St. Paul, Minnesota
                                        )   March 5, 2014
7        Vivid Entertainment, LLC,      )
                                        )   DIGITAL RECORDING
8                  Defendant.           )
                                        )
9        ------------------------------------------------------------
                                        )
10       Skky, Inc.,                    )   File No. CV-13-2089
                                        )             (PJS/JJG)
11                 Plaintiff,           )
                                        )
12       vs.                            )   St. Paul, Minnesota
                                        )   March 5, 2014
13       Playboy Enterprises, Inc.,     )
                                        )   DIGITAL RECORDING
14                 Defendant.           )
                                        )
15       ------------------------------------------------------------

16

17             BEFORE THE HONORABLE JEANNE J. GRAHAM
             UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
18
                         (MOTIONS HEARING)
19

20

21

22

23

24
             Proceedings recorded by digital recording; transcript
25       produced by computer.
```

```
1 │   APPEARANCES

2 │     For the Plaintiff:        Robins, Kaplan, Miller & Ciresi
  │                               BECKY R. THORSON, ESQ.
3 │                               RYAN M. SCHULTZ, ESQ.
  │                               2800 LaSalle Plaza
4 │                               800 LaSalle Avenue
  │                               Minneapolis, Minnesota 55402
5 │
  │                               Parker Rosen, LLC
6 │                               ANDREW D. PARKER, ESQ.
  │                               DANIEL N. ROSEN, ESQ.
7 │                               Suite 888
  │                               123 North Third Street
8 │                               Minneapolis, Minnesota 55401

9 │     For Defendants Thumbplay  Jones Day
  │     Ringtones, LLC and Dada   TIMOTHY HEVERIN, ESQ.
10│     Entertainment, Inc.:      77 West Wacker
  │                               Chicago, Illinois 60601
11│
  │                               Faegre Baker Daniels, LLP
12│                               THEODORE M. BUDD, ESQ.
  │                               Suite 2200
13│                               90 South Seventh Street
  │                               Minneapolis, Minnesota 55402
14│

15│     For Defendants Manwin     Venable LLP
  │     USA, Inc.; Manwin         TODD M. NOSHER, ESQ.
16│     Holding, s.ar.l; Vivid    24th Floor
  │     Entertainment, LLC; and   1270 Avenue of the Americas
17│     Playboy Enterprises,      New York, New York 10020
  │     Inc.:
18│                               Berens & Miller
  │                               JUSTI R. MILLER, ESQ.
19│                               Suite 3720
  │                               80 South Eighth Street
20│                               Minneapolis, Minnesota 55402

21│     Transcriber:              LORI A. SIMPSON, RMR-CRR
  │                               1005 U.S. Courthouse
22│                               300 South Fourth Street
  │                               Minneapolis, Minnesota 55415
23│

24│

25│
```

1          **P R O C E E D I N G S**

2                            **IN OPEN COURT**

3                    THE COURT:  We are here today in the matter of

4     Skky vs. Thumbplay Ringtones and several other defendants,

5     Civil File No. -- excuse me one moment, please -- 13-2072.

6     This is assigned to Patrick Schiltz as the district court

7     judge.  And I am Jeanne Graham.  I'm the magistrate judge.

8     We are here today on defendants' motion for disqualification

9     of one of the plaintiff's attorney's firms.

10                   May I have appearances, please, first for the

11    plaintiff's side.

12                   MS. THORSON:  Good afternoon, Your Honor.  Becky

13    Thorson with Robins, Kaplan, Miller & Ciresi here on behalf

14    of Skky, Inc.  With me here today is my colleague Ryan

15    Schultz from Robins, Kaplan, Miller & Ciresi and co-counsel

16    Daniel Rosen from the Parker Rosen law firm.  We also have

17    with us here today Andrew Parker --

18                   THE COURT:  All right.  Thank you.

19                   MS. THORSON:  -- from the Parker Rosen law firm.

20                   THE COURT:  All right.

21                   MS. THORSON:  Thank you.

22                   THE COURT:  And who is here for --

23                   MR. NOSHER:  Good afternoon, Your Honor.  Todd

24    Nosher from Venable on behalf of Manwin, Vivid, and Playboy.

25    And I will let my co-counsel introduce themselves.

| | |
|---|---|
| 1 | MS. MILLER:  Justi Miller from Berens & Miller. |
| 2 | MR. BUDD:  Ted Budd from Faegre Baker Daniels. |
| 3 | MR. HEVERIN:  And Tim Heverin from Jones Day on |
| 4 | behalf of Dada and the Thumbplay defendants. |
| 5 | THE COURT:  Okay.  All right.  I'm going to -- I |
| 6 | don't know how long your presentations were going to be.  I |
| 7 | usually plan about 20 minutes each on a nondispositive |
| 8 | motion.  Were you going longer? |
| 9 | UNIDENTIFIED SPEAKER:  No, Your Honor.  We will |
| 10 | actually be much shorter than that. |
| 11 | THE COURT:  Okay.  Well, good.  Then kind of the |
| 12 | way we'll do it is we will allow the defense to go first. |
| 13 | When you go ahead and come up to the microphone, make sure |
| 14 | you remind us all who is arguing. |
| 15 | UNIDENTIFIED SPEAKER:  Sure. |
| 16 | THE COURT:  And then -- not for me so much as the |
| 17 | record.  And then I'll certainly allow plaintiffs a |
| 18 | response.  Who is going to argue on behalf of plaintiffs? |
| 19 | MS. THORSON:  I will, Your Honor. |
| 20 | THE COURT:  Okay, Ms. Thorson.  And then I'll |
| 21 | allow a brief reply on behalf of the defense.  I won't keep, |
| 22 | you know, real -- I won't do the minute by minute, then, if |
| 23 | it looks like all parties can probably get it done in about |
| 24 | that time. |
| 25 | All right.  Go ahead. |

1          MR. NOSHER:  Thank you, Your Honor.

2          THE COURT:  From the defense first.

3          MR. NOSHER:  Like I said, we prepared a handful of

4    slides to hopefully clarify the issues for the Court.  I'll

5    be handling the slides --

6          THE COURT:  Do we have copies of those slides?

7          MS. MILLER:  Your Honor, can I approach?

8          THE COURT:  There we go.  And the other side, do

9    you have, Ms. Thorson --

10          MS. THORSON:  I have [inaudible].

11          THE COURT:  Oh, you have them in your hands.

12    Okay.  Delivery being made.

13          MS. THORSON:  Thank you.

14          THE COURT:  All right.

15          MR. NOSHER:  Thank you, Your Honor.  This motion

16    is about the risk to defendants' confidential information as

17    a result of the relationship between Skky, Inc. and the

18    Parker Rosen law firm.  The relationship is complex and

19    still layered with many questions.

20          There are four material facts that are relevant to

21    this hearing and these are relevant facts that, frankly,

22    were only recently disclosed and discovered partially

23    because of defendants' research into the issues.

24          The first material fact is that Andrew Parker, one

25    of two named partners of the Parker Rosen law firm and

1       litigation counsel to Skky in these actions, from July 31st

2       of 2013 to very recently, January 23rd of 2014, is Skky's

3       chief operating officer who handles the day-to-day

4       operations of that company.

5              Mr. Parker receives at least two forms of

6       compensation from Skky for his role as COO.  He receives

7       stock and an undisclosed monthly stipend that is paid to his

8       firm.

9              The third relevant fact is that Mr. Parker and his

10      partner, Mr. Rosen, control an unnamed company that owns

11      stock in Skky.

12             And finally, the fourth material fact is that Skky

13      moved its corporate headquarters into the Parker Rosen law

14      firm on an undisclosed date in November of 2013.

15             Now, a nonpracticing entity occupying outside

16      counsel's office is very concerning to defendants and it

17      appears to be unprecedented.  This information, again, came

18      to light as a result of defendants' own research.

19             Thankfully we discovered material fact number one,

20      which, again, is the fact that Andrew Parker is COO of Skky,

21      by virtue of defendants' own research, but it is unclear

22      whether defendants still have all the relevant facts.  New

23      admissions in Skky's opposition raise additional questions

24      and concerns.

25             Here the risk of defendants' confidentiality

1     outweighs the harm to Skky if the motion is granted.  To be

2     clear, Skky is represented by two firms, Robins Kaplan and

3     Parker Rosen.  And Robins Kaplan is admittedly the lead

4     counsel in this case, they handle all the day-to-day

5     operations of the case, and therefore we believe a

6     disqualification of the Parker Rosen firm will have little

7     to no impact on Skky.

8              So if we can take a look at the slides that we've

9     prepared.  Let's take a closer look at the relationship

10    between Parker Rosen and Skky.

11             Again, Andrew Parker and Daniel Rosen are the

12    named partners at the Parker Rosen law firm.  This firm has

13    one location, Suite 888, Colwell Building at 123 North Third

14    Street in Minneapolis.  The firm has three other attorneys

15    and some support staff.

16             Now, Mr. Parker, again, he's the COO of Skky.  He

17    receives multiple forms of compensation for his role as COO.

18    As you see on the top left, his firm receives an unknown

19    monthly stipend.  We don't know the amount.  We don't know

20    anything else other than it's a monthly stipend.  He

21    receives stock and his firm receives rental payments by

22    virtue of the fact that Skky is operating now out of the

23    Parker Rosen firm.

24             Now, like Mr. Parker, Mr. Rosen controls an

25    unknown company that owns stock in Skky.  Skky is silent on

1    the specifics here.  We don't know the name of this

2    corporation.  We don't know the company address.  We don't

3    know the relationship between this unnamed corporation and

4    Skky and Parker Rosen.  We don't know the titles or the

5    roles of Mr. Parker or Mr. Rosen or if -- some of the other

6    employees that may be involved with this unnamed

7    corporation.  And, frankly, we don't know if there is common

8    usage between the computer network systems between this

9    corporation and the Parker Rosen firm and Skky, Inc.

10           Now, as is typical of a nonpracticing entity,

11   Skky and its predecessor, 4 Media, Inc., have shuffled

12   corporate addresses since their inception in what we

13   believe is 2001.

14           Here, only weeks after certifying a different

15   address in their amended complaint, Skky moved its corporate

16   headquarters into the Parker Rosen firm.  Skky still

17   provides no specific date for this move.  All we know is

18   that it happened at some point in November of 2013.

19           Now, Skky apparently -- I'm just going to move to

20   the next slide here -- Skky apparently rents an office from

21   the Parker Rosen law firm, but tellingly, there's no listing

22   of Skky on the 888 Colwell Building marquee.  It only shows

23   Parker Rosen, again, at that 888 location.

24           And defendants actually last week discovered that

25   the Skky -- that Skky and the firm even share the same phone

1    number.  What is unclear is what else do they share.  Do

2    they share the same network, the same computer system, same

3    e-mail system, printers, copiers, mail delivery, filing

4    cabinet, support staff?  We don't know any of this.  We just

5    know that they operate out of the same shared suite and that

6    they now apparently share the same phone number.  Here we

7    have obvious concerns because our confidential and highly

8    confidential information will be sent to this shared suite

9    throughout the litigation.

10            Now, the next slide I would like to share with the

11   Court, and again -- the next slide I would like to share

12   with the Court is a timeline.  What this timeline shows is

13   from July of 2013 to last month what was happening at Skky,

14   Inc., on the top and what was happening in this litigation

15   on the bottom.  And I'm not going to go into every single

16   box here because there are a lot of entries, but what I

17   would like to do is highlight a couple of the most important

18   items for the Court.

19            Here we have on July 1st of 2013 Andrew Parker

20   becomes the COO of Skky.  Tellingly, that same month Skky

21   brings its first patent infringement cases as a

22   nonpracticing entity.  Those cases are these present cases

23   before Your Honor.

24            The second thing I would like to highlight here is

25   the fact that while the parties were negotiating the

1    protective order in this case, which began in mid to late

2    October and ending right on the eve of the Rule 26(f)

3    conference, at that same time we had a number of meet and

4    confers, correspondence back and forth.  It was a hotly

5    negotiated protective order.  But at that same time Skky

6    moved into the Parker Rosen law firm at some date between

7    November and December.

8              At no time during the negotiations did we find out

9    about Mr. Parker's role as COO or did we find out that Skky

10   had moved into its outside counsel's law firm.  We didn't

11   find this out despite the fact that those facts were highly

12   relevant to the negotiations.

13             Now, Skky should have disclosed these material

14   facts for two reasons.  One, again, they were highly

15   relevant to the negotiations of the protective order and

16   these facts eviscerated key safeguards to defendants'

17   confidentiality in that order.  We believed that the order

18   was being negotiated in good faith and would have liked to

19   have had this information brought to our attention.

20             The second reason and perhaps more compelling is

21   that on November 7, 2013 Manwin actually served discovery

22   requests on Skky and I will highlight Request No. 6 and

23   Request No. 7.  Request No. 6 calls for corporate

24   organizational charts.  Certainly if these documents were

25   produced we would have learned about Mr. Parker's role as

1    COO.  And Request No. 7 called for various governmental

2    filings.

3              Again, remember the date here.  That was

4    November 7, 2013.  Thirty days later we received responses

5    to these requests and we received no information regarding

6    the material facts.  We still haven't received any

7    information about the relevant facts.

8              THE COURT:  You mean relevant facts, material

9    facts as to this motion that you've been --

10             MR. NOSHER:  That's right.  The four material

11   facts that I began the presentation with, we did not receive

12   any of that information.  And, again, it's information that

13   first came out as a result of our research and has come out

14   in piecemeal fashion since our initial find.

15             And, Your Honor, our last slide, again, is just

16   the relevant Minnesota Rules of Professional Conduct and

17   here I would just draw the Court's attention to the fact

18   that Rule 1.8(k) imputes 1.8(i) onto an entire firm.

19             The only other issue that we have here, we have

20   moved for alternate relief in the form of a modified

21   protective order.  We would be happy to consider going back

22   and revisiting the protective order, but frankly, we would

23   need all the relevant facts, unlike last time.  We

24   definitely need more facts to be able to decipher what we

25   need to do to the current protective order.

1           I will say that Skky's current proposal is not

2    appropriate and it really turns the initial proposed --

3    initial protective order on its head.

4           And with that, I will close, Your Honor.

5           THE COURT:  Why don't you close now and then we'll

6    have them and then I may have some questions depending on --

7           MR. NOSHER:  Sure.

8           THE COURT:  -- how this pans out with the

9    response.

10          Ms. Thorson on behalf of Skky.

11          MS. THORSON:  Thank you, Your Honor.  May it

12    please the Court, Becky Thorson representing Skky, Inc.

13          Defendants have taken a hypothetical issue

14    regarding access to documents and documents that they have

15    not yet produced and turned it into some scandalous attorney

16    misconduct issue.

17          Andrew Parker, who is seated here at counsel

18    table, is a long-standing member of this court's bar.  He

19    has not violated the Minnesota Rules of Professional

20    Responsibility.

21          With no violation of the rules, there's no basis

22    to disqualify Mr. Parker, Mr. Rosen, or the Parker Rosen law

23    firm.  At most this is a dispute about whether the

24    protective order should be modified to create additional

25    limitations or protections.

1          At the outset I want to address a couple of

2     background issues and factual issues that are presented in

3     the materials because this motion goes to Mr. Parker's

4     credibility and his appearance as a lawyer in this

5     community.

6          Skky did not agree to remove Mr. Parker as outside

7     counsel in this case because it believed Mr. Parker had done

8     anything wrong.

9          They try to paint Skky as this evil nonpracticing

10    entity, you know, no address up on the marquee, Mr. Parker

11    has a COO title, but there's nothing sinister about the

12    relationship that Mr. Parker has and it certainly doesn't

13    create any violation of the Rules of Professional

14    Responsibility.

15         It's also important for me to remind the Court

16    that there's been no allegation and no violation of the

17    protective order here.  In fact, there couldn't be because

18    Skky has not received one document in response to its

19    discovery requests that were issued at the end of October.

20    So we don't have public documents, we don't have any

21    confidential documents or highly confidential documents in

22    response to our discovery requests.

23         We have offered during the pendency of this motion

24    for defendants to send their responsive discovery to the

25    Robins, Kaplan, Miller & Ciresi law firm.  Even though we

1    don't think that the Parker Rosen law firm should be

2    excluded from being able to look at documents, and I'll get

3    into that a little bit later, we have offered to work with

4    the defendants to say, all right, let's not stall discovery,

5    let's move it along.  And they have refused to do that.

6         So rather than figure out a way to work together,

7    the defendants have instead pushed the nuclear bomb button

8    and argued that there's some misconduct -- attorney

9    misconduct going on here.  And in the words of Judge

10   Rosenbaum in the FDIC vs. Amundson case, what they're doing

11   is attempting to slay a colleague because there's some

12   dispute over access to documents.

13        As their sword they're invoking 1.8(i) and it's

14   telling that there was no discussion about how 1.8(i) would

15   even apply in their situation -- I apologize for the

16   microphone.

17        THE COURT:  I do that all the time.

18        MS. THORSON:  -- how 1.8 even applies here, 1.8(i)

19   even applies.

20        "A lawyer shall not acquire a proprietary interest

21   in the cause of action or subject matter of litigation the

22   lawyer is conducting for a client."  This rule of

23   professional responsibility which defendants say Mr. Parker

24   violated is a rule that is designed to protect the client.

25   It's designed to protect situations where an attorney may

1    have an interest so great in the cause of action that the

2    attorney cannot exercise good judgment on behalf of the

3    client.  That's the rule.

4          And it's questionable whether defendants, as third

5    parties, even have standing to invoke this rule.  Of course

6    we totally accept that the Court has inherent authority to

7    monitor the activities of lawyers and to make sure that they

8    are conducting themselves consistent with the rules, but

9    whether defendants have standing to assert this rule when

10   it's a rule between a client and the client's attorney.

11         So let's look at the rule.  Does Mr. Parker have a

12   proprietary interest in the cause of action or the subject

13   matter of the action?  His role as COO is not a proprietary

14   interest in the cause of action.

15         His very small share of stock -- and the company

16   makes this even more far removed.  Mr. Parker and Mr. Rosen

17   have equal interest in a company that shares 2.5 percent

18   stock with Skky.  His very small share or his share of stock

19   is not a proprietary interest in the litigation.

20         There are two cases, Your Honor, that we've cited

21   in our brief and we gave to the defendants before they even

22   filed this motion.  It's the Syscon Corp. vs. United States

23   case and the Eon Streams, Inc. vs. Clear Channel

24   Communication case.

25         In Syscon the lawyer was a founder of Syscon and

1  general counsel and a member of its board of directors.  He

2  owned a portion of Syscon's stock.  The lawyer's stock

3  ownership did not constitute proprietary interest in the

4  litigation.

5         In the Eon Streams case there was an attempt to

6  disqualify a law firm because members of the law firm had an

7  interest, stock ownership interest, in the client and that

8  stock ownership interest was about 3.11 to 3.5.  That stock

9  ownership interest was not an interest in the litigation.

10        Those two cases support Skky's position that

11  there's no violation of 1.8(i).

12        So even if there wasn't a case out there that says

13  no proprietary interest when there's a stock ownership

14  interest, let's step back and look back at the rule.

15        And, again, the question in the 1.8 analysis is:

16  Was the interest that the lawyer had clearly likely to cause

17  an adverse effect on the lawyer's ability to exercise free

18  judgment on the client's behalf?  Will the interest make it

19  difficult for the client to discharge or fire the attorney

20  without jeopardizing his or her case?

21        In answering this question, looking at the

22  material facts, the answer is no.  Mr. Parker's relationship

23  with Skky does not pull him away from the interests of Skky.

24  If anything, Mr. Parker's interests are aligned with Skky.

25        Skky has the right to be represented by its

1    counsel of choice.  Skky chose Andrew Parker and the Parker

2    Rosen law firm along with the Robins Kaplan law firm.

3          An attorney should be disqualified only if there's

4    a reasonable possibility that some specifically identifiable

5    impropriety actually occurred and, in light of the interests

6    underlying the standard of ethics, the social need for

7    ethical practice outweighs the party's right to choose

8    counsel of its choice.  And that quote comes, Your Honor,

9    from the Carlsen v. Thomas case that's cited in our

10   materials.

11         As I mentioned, defendants probably don't even

12   have standing to raise 1.8(i).  This is a rule that governs

13   the relationship between an attorney, Mr. Parker, and his

14   client, Skky.

15         There's no attorney misconduct.  If this Court

16   looks at this issue through its inherent authority, there's

17   no misconduct.  There's no showing of misconduct.  The

18   burden is high and there's strict scrutiny.  They have not

19   come close to meeting the burden and Mr. Parker should not

20   have to have this hanging over his head.  He has not

21   committed attorney misconduct.

22         So the protective order seems to be the issue

23   here.  The protective order was raised for the first time in

24   the motion, so there was no meet and confer once they say

25   these material facts arose.  And we've offered compromises

1    in looking at how the protective order could maybe be

2    modified to address concerns.

3          But before we get into that, let's look at the

4    protective order.  The protective order requires attorneys

5    who are bound by it to follow it.  The idea that Mr. Parker,

6    Mr. Rosen, and the Parker Rosen law firm couldn't do that is

7    groundless and it's insulting.  All of us, all the attorneys

8    who have to follow a protective order, have to filter what

9    information we can take in and who we can relay that to.

10         Mr. Parker signed off on that protective order and

11   he knew that if he received confidential information, that

12   he had to handle it appropriately.  There is no basis to

13   suggest that he would do otherwise.

14         The protective order protects the defendants.

15   Mr. Parker, Mr. Rosen, and the Parker Rosen law firm can't

16   use that information.  They have to have a filter.  They

17   can't use that information for anything other than the

18   litigation.

19         There's a prosecution bar that prohibits anyone

20   from receiving highly confidential information from

21   participating in the prosecution of the patents.  Who can

22   receive that highly confidential information?  It's not just

23   the outside counsel.

24         So if you look at, and this is actually, Your

25   Honor, on the Court's docket at document number 32, the

1    protective order, Section 8, the court of course looks at --

2    can receive these documents, attorneys and their associates,

3    court reporters, outside experts, but importantly, in this

4    protective order defendants can have two in-house counsel

5    receiving documents.  So they can designate two people

6    in-house to receive our confidential documents.

7            We've never questioned that they wouldn't receive

8    those documents inside the walls of the defendant.  We've

9    never assumed that they're going to be evil.  We've assumed

10   that they would handle the documents as attorneys bound by

11   the protective order.  The same courtesy, the same

12   assumption should be given to Mr. Parker, Mr. Rosen, and the

13   Parker Rosen law firm.

14           So we think that the protective order covers any

15   concerns.  We absolutely think this Court should rule and

16   rule quickly that Mr. Parker did not engage in attorney

17   misconduct.

18           We're willing to work with the defendants on a

19   protective order, but that should not preclude the Parker

20   Rosen law firm from having access to highly confidential

21   information and confidential information.

22           The idea that Parker Rosen is opening its office

23   doors to let anyone wander around, that they don't know how

24   to segregate documents, that a small firm is different from

25   a big firm, this Court should reject that notion and accept

1     that an officer of this court, Mr. Parker, will handle

2     himself appropriately.

3              Your Honor, we ask you to deny the motion to

4     disqualify Mr. Parker and the Parker Rosen law firm.  Thank

5     you.

6              THE COURT:  Okay.  Thank you.

7              Reply or brief response.

8              MR. NOSHER:  Thank you, Your Honor.  Just a few

9     rebuttal points.

10             I think I'll start with the protective order

11    issue.  Our concern is not only with Mr. Parker, but the

12    individuals at Skky who are apparently working out of the

13    Parker Rosen firm.  We don't know who's working there.  We

14    don't know what their role is.  We don't know if there are

15    shared systems, e-mail system, printers, copiers.  All we

16    know is that our confidential information is going to go to

17    this shared suite.  Beyond that we don't know.

18             Going back to a point that counsel mentioned, I do

19    want to clarify the record that no public documents were

20    produced by the defendants.  Defendants have actually

21    produced over 7,000 pages of documents to date.  That is

22    double what Skky has produced.  It's only by chance and luck

23    that defendants discovered this information before any AEO

24    materials were disclosed because, frankly, if they were

25    disclosed we would be in a whole another mess right now.

1          As to the stipulation, counsel for Skky did offer

2     verbally to screen the Parker Rosen firm.  We asked Skky to

3     enter into a stipulation that mirrored that verbal offer.

4     They refused to sign that stipulation.  Instead they

5     returned a four-page stipulation that included a lot of pork

6     relating to discovery disputes that we did not think was

7     relevant as to our proposed stipulation.  Again, our

8     proposed stipulation stands.  If counsel would like to sign

9     that, it is a mirror image of their offer to screen Parker

10    Rosen.

11          The final point is --

12          THE COURT:  Explain that one more -- explain that

13    in more detail, what you're talking about there.

14          MR. NOSHER:  I'm sorry?

15          THE COURT:  Please explain in more detail what

16    you're talking about as far as your stipulation and what

17    happened there.

18          MR. NOSHER:  Okay.  Sure.  In an effort to move

19    discovery along in these cases, the parties discussed what

20    we could do short of going to court in order to keep

21    defendants' confidentiality intact.  Skky offered verbally

22    to screen the Parker Rosen firm until Your Honor ruled on

23    defendants' motion.  We thought --

24          THE COURT:  Tell me what that -- tell me what

25    you're saying there, "screen the Parker Rosen firm."

1              MR. NOSHER:  To screen --

2              THE COURT:  What did they say?

3              MR. NOSHER:  Frankly to keep Mr. Parker,

4    Mr. Rosen, and the firm from viewing any confidential and

5    highly confidential information as the Court rules on our

6    motion.

7              THE COURT:  Okay.

8              MR. NOSHER:  That was our interpretation of what

9    screening of the firm would be.

10             THE COURT:  Okay.

11             MR. NOSHER:  And of course that would change

12   subject to what Your Honor --

13             THE COURT:  Sure.

14             MR. NOSHER:  -- rules on the motion.

15             THE COURT:  Okay.

16             MR. NOSHER:  We, frankly, thought that was a good

17   idea so that we could move along with discovery and offered

18   a stipulation that essentially mirrored that offer.  It was

19   a one-page stipulation that said that Parker Rosen would be

20   screened going forward until Your Honor ruled.  Again, Skky

21   refused to sign that stipulation and instead responded with

22   a four-page stipulation adding on all sorts of pork with

23   discovery disputes that we did not think were relevant.

24             THE COURT:  All right.  Now I follow you.

25             MR. NOSHER:  And then as to counsel's final point

 1    on whether the parties raised in the meet and confer this

 2    issue of the protective order, we've raised this issue with

 3    the protective order a number of times during the meet and

 4    confer conversations with opposing counsel.  And I just

 5    wanted to clarify that for the record.

 6              THE COURT:  You mean as far as this motion?

 7              MR. NOSHER:  That's right.

 8              THE COURT:  The meet and confer --

 9              MR. NOSHER:  Our moving papers are certainly not

10    the first time that counsel heard about our concerns with

11    the protective order.

12              THE COURT:  Okay.

13              MR. HEVERIN:  Your Honor, may I --

14              THE COURT:  On behalf of?

15              MR. HEVERIN:  On behalf of Dada and Thumbplay.

16    Tim Heverin on behalf of Dada and Thumbplay.  I just wanted

17    to respond to a couple of points that were made by the

18    plaintiffs.

19              The plaintiffs mentioned that Mr. Parker signed

20    off on the protective order that excluded company executives

21    from seeing confidential information and that as a lawyer he

22    knows how to execute that.  I think it is important to point

23    out that when he signed off on that he was an executive at

24    Skky undisclosed but to us and only found out later.

25              The plaintiff also made the point that the

1    protective order -- and I really think this is a

2    confidentiality issue.  We're not -- plaintiff used words

3    like "evil," "sinister," "scandalous," that we're trying to

4    slay a colleague, that we have gone nuclear, that there's

5    attorney misconduct.  Those aren't our words.  We're trying

6    to resolve this issue, which is, we think, a violation of

7    1.8, but also and predominantly a confidentiality concern.

8            When plaintiff's counsel described the protective

9    order as providing for two in-house counsel to see

10   confidential information, that's true.  Those in-house

11   counsel are not executives that run the day-to-day business

12   of the company.  And also that was negotiated and fully

13   disclosed at the time of negotiations.

14           If plaintiff would have told us that Mr. Parker

15   was an executive of Skky, then we would have treated him

16   like an executive of Skky and excluded him from the

17   protective order.

18           So to the extent that the plaintiffs are painting

19   this as an issue that could have been negotiated in the

20   protective order originally, that might be true.  The

21   problem is that we did not know that Mr. Parker and his firm

22   had a proprietary interest in Skky, it wasn't disclosed to

23   us, and we negotiated the protective order without full

24   disclosure on that issue.

25           THE COURT:  Okay.

1          MR. HEVERIN:  I think that's it, Your Honor.

2     Thank you.

3          THE COURT:  No one else is going to argue?  Then

4     you get a response to that since there was a second argument

5     or you get, I guess, the final -- the final-final.

6          MS. THORSON:  Thank you, Your Honor.  Your Honor

7     had questions about the stipulation because we wanted to at

8     least move discovery along.

9          Defendants asked us to sign a stipulation where we

10    would temporarily receive documents only at the Robins,

11    Kaplan, Miller & Ciresi law firm and Parker Rosen would not

12    have access to those documents.

13         We were willing to sign a stipulation if we knew

14    they were about ready to produce documents.  And where this

15    fell apart was when we said we will file a stipulation with

16    the court when you tell us you'll produce the documents the

17    next day.  So you can have what you want, but we didn't want

18    to have a stipulation on file without the benefit of

19    receiving any discovery.

20         Our requests for discovery have been outstanding

21    since October.  The documents that they produced, none of

22    them were in response to our discovery requests.  The

23    documents they produced were public prior art documents that

24    they intended to use.

25         So we have not received any discovery from the

1    defendants and when we said we'll sign a stipulation but you

2    need to produce discovery, we were told no.

3                    THE COURT:  Okay.

4                    MS. THORSON:  Thank you, Your Honor.

5                    THE COURT:  Very good.  I am going to take this

6    under advisement and I'll issue an order as soon as I can.

7    I think that's it.  We'll be in recess.  Thank you.

8                    UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

9          (Court adjourned.)

10                            *      *      *

11

12

13

14

15          I, Lori A. Simpson, certify that the foregoing is a

16    correct transcript to the best of my ability from the

17    digital recording in the above-entitled matter.

18

19                  Certified by:   *s/ Lori A. Simpson*

20                                Lori A. Simpson, RMR-CRR

21

22

23

24

25