# EXHIBIT 1

**Kabat, Andrew J.**

| | |
|---|---|
| **From:** | Schultz, Ryan M. |
| **Sent:** | Wednesday, March 12, 2014 3:16 PM |
| **To:** | Nosher, Todd M.; Linden, Benjamen C.; 'Emily M Wood' |
| **Cc:** | 'Timothy J. Heverin'; 'David L. Witcoff'; Gasparo, Frank M.; Bentz, Tamany V.; 'Budd, Theodore (Ted) M.'; 'Johnson, Laura L.'; 'bberens@berensmiller.com'; 'jmiller@berensmiller.com'; Schutz, Ronald J.; Thorson, Becky R.; Bornstein, William; Kabat, Andrew J.; Junker, Chrisann J. |
| **Subject:** | Skky Litigation |
| **Attachments:** | Skky - Stip regarding discovery v2.DOCX |

Counsel,

I write to follow up on yesterday's meet and confer.  During the meeting, Defendants requested that Skky provide a particular date to provide supplemental document production.  As Defendants know, Defendants have refused at every turn to reciprocate and provide an actual date for their respective first responsive document production.  In an effort to move the case forward, Skky will provide a substantial document production responsive to Defendants' discovery requests by the end of the day on March 28, 2014.  Skky will continue to make document productions on a rolling basis as it continues to obtain, review, and process responsive documents.

As to the various categories of documents mentioned in Ms. Wood's Feb. 12 letter and discussed at the meet and confer, most of the categories seek privileged documents, to the extent those documents exist, and Skky will not be producing privileged documents.  Nevertheless, it is anticipated that responsive, non-privileged documents to some of these categories will be included in the March 28 production.  As we are still in the process of reviewing the documents, I cannot state with certainty today which categories responsive, non-privileged documents will be produced, only that responsive documents to some categories will be produced.  Again, Skky will timely supplement its document production with additional responsive, non-privileged documents, to the extent they exist.

In Defendants' respective responses filed yesterday to Skky's Motion to Compel, Defendants characterize Skky as unwilling to enter into a stipulation to resolve Defendants' confidentiality issue while the Motion to Disqualify is pending.  This is not consistent with the facts.  We have on several occasions, including yesterday, proposed entering a stipulation (which I have attached again here), whereby Defendants produce responsive information, including confidential and highly confidential documents, only to Robins, Kaplan, Miller & Ciresi L.L.P.  We will not share or disclose these documents to the lawyers at Parker Rosen until the Motion to Disqualify is resolved.  Again, these representations are reflected in the attached stipulation, which is almost identical to the one provided by Defendants.  However, there is no need for entering such stipulation until Defendants are actually going to provide confidential and/or highly confidential information.

In light of the foregoing, we propose that Defendants agree to supplement interrogatory responses and produce responsive documents also on March 28.  During a meet and confer, it was Skky's understanding that all Defendants could make a substantial production within 10-14 days of entry of the stipulation.  Under the proposal offered here, Defendants would have that amount of time to be in a position to produce responsive documents and supplement interrogatory responses.  If Defendants agree and provide confirmation of a readiness to produce documents on March 28, Skky will enter and file the attached stipulation on March 27, 2014 (assuming the motion to disqualify is not resolved by then).  If the motion to disqualify is resolved by then, Defendants can still proceed with production on March 28 in accordance with any changes or modifications made by the Court in its order.  This proposal allows both sides to have an expectation of when they will receive further supplementation

If Defendants would like to meet to discuss this proposal further, we are generally available the rest of this week.

Regards,

Ryan

Ryan M. Schultz
Patent Attorney
**Robins, Kaplan, Miller & Ciresi L.L.P.**
800 LaSalle Avenue | 2800 LaSalle Plaza | Minneapolis, MN 55402
Direct: 612.349.8408 | Fax: 612.339.4181
rmschultz@rkmc.com| www.rkmc.com

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

## MARSHALL DIVISION

| | | |
|---|---|---|
| EXITEXCHANGE CORP. | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 2:13-CV-396-JRG |
| v. | § | |
| | § | **LEAD CASE** |
| FRIENDFINDER NETWORKS, INC. et al. | § | |
| | § | |
| Defendants. | § | |

## PROTECTIVE ORDER

The parties, by and through their respective counsel, have agreed to this Protective Order to facilitate document disclosure and production under the Local Rules of this Court and the Federal Rules of Civil Procedure.

The parties to this litigation contend that public dissemination and disclosure of Confidential and/or Confidential Attorneys' Eyes Only Information (as defined below) could severely injure or damage the party disclosing or producing the Confidential and/or Confidential Attorneys' Eyes Only Information and could place that party at a competitive disadvantage.

## IT IS THEREFORE ORDERED THAT:

1.  **Confidential Designation.**     Confidential Information shall mean all information or material which is produced for or disclosed to a receiving party by a producing party (including any party to this action and any non-party producing information or material voluntarily or pursuant to a subpoena or court order) that constitutes confidential or proprietary technical, scientific, or business information that is not generally known, that would not normally be revealed to third parties, for which its disclosure would be detrimental to the conduct of the designating party's business, and which is not included in the exceptions to eligibility identified below.  Any Confidential Information obtained by any party from any person pursuant to discovery in this litigation may be used only for purposes of litigation of this matter.

2.  **Confidential Attorneys' Eyes Only Designation.**     Confidential Attorneys' Eyes Only Information shall include information that constitutes proprietary financial or technical or commercially sensitive competitive information that the producing party maintains as highly confidential in its business, including information obtained from a non-party pursuant to a current Nondisclosure Agreement ("***NDA***"), information relating to future products not yet commercially released, strategic plans, code, technical documents that would reveal trade secrets, and settlement agreements or settlement communications, the disclosure of which, if disclosed to the receiving party, would create a substantial risk of harm to the competitive position of the producing party.

3.      **Protected Material.**    Documents, discovery responses and other information containing Confidential Information or Confidential Attorneys' Eyes Only Information disclosed or produced by a producing party in this litigation are referred to as "***Protected Material***." Protected Material and any information contained therein shall be used solely for the prosecution of this litigation.

4.      **Exceptions to Eligibility for Designation.**     Protected Material shall not include the following:

(a) documents or information that the disclosing party has submitted to any governmental entity without request for confidential treatment;

(b) documents or information that, at the time of the disclosure hereunder, were generally known to the public, or the document containing the information is already in the public record by publication or otherwise;

(c) documents or information that, since the time of disclosure hereunder, have become, through no act or failure to act by the receiving party, part of the public domain by publication or otherwise;

(d) documents or information that, at the time of disclosure, were already in the possession of the receiving party and were not acquired directly or indirectly from the producing party or from any third party under obligation of confidence to the producing party;

(e) documents or information that, after disclosure hereunder, were acquired by the receiving party from a third party lawfully possessing the same and having no obligation to the producing party; and

(f) documents or information that the disclosing party agrees may be disclosed to a third party under no obligation of confidentiality.

5.      **Marking**.        The designation of Protected Material shall occur by visibly marking it as "Confidential" or "Confidential-Attorneys' Eyes Only" (or suitable substitutes such as "Highly Confidential – Counsel's Eyes Only").  Counsel shall agree on a mutually acceptable manner for the identification of protected information that cannot be readily or easily marked in a visible manner.

6.      **Production of Originals for Inspections**.       If the recipient of produced documents has a good faith basis for seeking to inspect original documents either after receiving copies of them or before deciding whether to obtain a copy of some or all of them, the recipient shall request such an inspection, and the producing party shall make reasonable and good faith efforts to produce original files and records for inspection.  No confidential marking need be made by the producing party in advance of the inspection.  For purposes of the inspection, all documents within the produced files and records shall be considered "Confidential-Attorneys' Eyes Only." When the recipient has designated which documents it wants copied, the producing party shall mark the originals (or, at its option, copies for production) of such documents with appropriate "Confidential" or "Confidential-Attorneys' Eyes Only" designations before copies are made for the inspecting party.

7.      **Challenges to Designation.**    At any time after the delivery of Protected Material, the party or parties receiving the Protected Material may challenge the Confidential or Confidential Attorneys'

Eyes Only designation of all or any portion thereof by providing written notice thereof to the party disclosing or producing the Protected Material. The parties will engage in a good faith effort to try to resolve the dispute on an informal basis. If the parties are unable to resolve the dispute informally, the party or parties receiving the Protected Material may apply to the Court for relief. The party or parties producing the Protected Material shall have the burden of establishing that the disputed Protected Material is entitled to confidential treatment. All Protected Material is entitled to confidential treatment pursuant to the terms of this Protective Order until and unless the parties formally agree in writing to the contrary, or a determination is made by the Court material is not entitled to confidential treatment.

8. **Confidential Treatment.** Protected Material and any information contained therein shall not be used or shown, disseminated, copied, or in any way communicated to anyone for any purpose whatsoever, except as provided for below.

9. **Access to Confidential Materials.** Protected Material and any information contained therein shall be disclosed only to the following persons ("***Qualified Persons***"):

(a) Counsel of record in this action for the party or party receiving Protected Material or any information contained therein;

(b) Employees of such counsel assigned to and necessary to assist such counsel in the preparation and trial of this action;

(c) Litigation support vendors retained by counsel including jury consultants, mock jurors, graphics consultants, mediators, translators, document duplication providers, coding, imaging or scanning service providers;

(d) Testifying and consulting experts (but only after meeting the requirements set forth in Paragraph 11) and the employees, contractors, assistants, or students working under the supervision of such experts;

(e) The Court, its personnel, jurors, and court reporters, stenographers and videographers transcribing or recording testimony at depositions, hearings or the trial of this action.

(f) Four designated employees of each of the parties can receive Protected Material (excluding Confidential Attorneys' Eyes Only and Confidential Attorneys' Eyes Only - Source Code information), so long as the employee has executed the undertaking set forth in Exhibit B.

(g) Persons identified in the Protected Material as an author of the document in part or in whole, or persons to whom a copy of such Protected Material was sent or that reviewed such Protected Material prior to its production in this action; and

(h) Any other person with the prior written consent of the producing party.

10. **Disclosure in Certain Circumstances.** Nothing in this Order shall preclude a party or its attorneys from:

(a) showing a document designated as Protected Material to an individual who appears to have been an author or recipient of the Protected Material, as evident from its face or reasonably certain in view of other testimony or evidence;

(b) disclosing or using, in any manner or for any purpose, any information or documents from the party's own files that the party itself has designated as Protected Material; or

(c) examining at trial or deposition any person currently employed by a party or retained as an expert by a party concerning any Discovery Materials designated by that party as Protected Materials. The showing to a deponent of Protected Material pursuant to this paragraph shall not otherwise affect the status and treatment of such Protected Material.

11. **Approval of Proposed Experts and Consultants.**

(a) Testifying and consulting experts ("Experts") may receive Protected Material only after the following conditions have been satisfied:

(i) the proposed Expert has executed an agreement to abide by the Protective Order in the form attached hereto as Exhibit A;

(ii) the executed Agreement, the proposed Expert's curriculum vitae (including his/her business address, business title, business or profession), identification of the individual's previous or current relationship (personal or professional) with any of the parties, a list of other cases in which the individual has testified (at trial or deposition) within the last four years, and a list of all companies with which the individual has consulted or by which the individual has been employed within the past six years, have been served on all parties; and

(iii) the parties have approved of the proposed Expert, or the Court has ruled that the proposed Expert may receive Protected Material.

(b) A producing party shall have seven (7) calendar days from the date of facsimile or electronic mail service of the materials and information served pursuant to Paragraph 11(a) to object to a proposed Expert. Such objection must be for good cause based on that party's good faith belief that disclosure of its Protected Material to the Expert substantially risks non-trivial competitive business or economic harm to that party (under any safeguards proposed if the Expert is allowed access). Such objection must state with particularity the reasons for the objection and must describe with particularity the harm risked by the disclosure of the Protected Materials, and must be in writing served on all parties. Failure to object within the period referenced in this Paragraph shall constitute approval. If a written notice of objection is served, no Protected Material of the producing party shall be disclosed to the proposed Expert until the objection is resolved by agreement or by an order of the Court.

(c) The objecting producing party shall have the burden of demonstrating by a preponderance of the evidence why the proposed expert or consultant should not be permitted to receive Protected Material.

12.     The term "*copy*" as used herein means any photographic, mechanical or computerized copy or reproduction of any document or thing, or any verbatim transcript, in whole or in part, of such document or thing.

13.     **Litigation Attorney's Communications with Clients.** This Order shall not bar or otherwise restrict any attorney of record from rendering advice to his or her client with respect to this litigation, and referring to or relying generally upon his or her examination of documents or information designated as Protected Discovery Material, provided, however, that in communicating with his or her client, the attorney shall not disclose the content or source of such Protected Discovery Material contrary to the terms of this Order.

14.     **Third Parties.** Any non-party, whether an individual or an entity, from whom discovery is sought will automatically obtain the protection of this Protective Order.

15.     **Use of Protected Material in Depositions.**     Protected Material may be used during the deposition of any witness who otherwise is permitted access to such material pursuant to the terms of this Order.  With respect to all other deponents, such material may be used to examine a witness in any deposition only with the prior consent of the designating party (which consent shall not be unreasonably withheld); in the absence of prior consent, such use may only be by court order. Showing Protected Material to a deponent pursuant to this paragraph shall not otherwise affect the status and treatment of such Protected Material. If a designating party withholds consent to disclose Protected Material to a deponent during a deposition, the party seeking disclosure may move the Court for an appropriate order.  The designating party shall have the burden of demonstrating that the Protected Material is entitled to protection; the party seeking disclosure shall have the burden of demonstrating the need for disclosure to the particular deponent.

16.     **Use of Protected Material in Court Proceedings.**     Protected Material may be offered in evidence at trial or any court hearing, provided that the proponent of the evidence gives reasonable advance notice to counsel for the party or person that designated the information as Protected Material.  Before such materials are disclosed, any party or third-person may move the Court for an order that the evidence be received in camera or under other conditions to prevent public disclosure. The Court will then determine whether the proffered evidence should continue to be treated as confidential information and, if so, what protection, if any, may be afforded to such information at the trial or hearing.

17.     **Court Reporters.**     Any court reporter or transcriber who reports or transcribes testimony in this action shall agree that all "confidential" information designated as such under this Protective Order shall remain "confidential" and shall not be disclosed by them, except pursuant to the terms of this Protective Order, and that any notes or transcriptions of such of documents or information designated as Protected Discovery Material, provided, however, that in communicating with his or her client, the attorney shall not disclose the content or source of such Protected Discovery Material contrary to the terms of this Order.

18.     **Designation of Deposition Transcripts.**     A party or third-party deponent may designate deposition testimony that qualifies as Confidential or Confidential-Attorneys' Eyes Only under this order by identifying on the record, before the close of the deposition, such testimony. Such Party or non-Party may also invoke on the record (before the deposition or proceeding is concluded) a right to have up to 20 days from receipt of the deposition transcript to identify in writing the specific portions

of the testimony as to which protection is sought and to specify the appropriate confidential designation.    If the 20 day period is invoked during a deposition, all the deposition testimony shall be treated as if it were designated "Confidential-Attorneys' Eyes Only" until the 20 day period has passed.

19.    **Inadvertent Production.**    Inadvertent or unintentional production of documents or information containing Confidential and/or Confidential Attorneys' Eyes Only Information which are not designated "confidential" shall not be deemed a waiver in whole or in part of a claim for confidential treatment. Additionally, the inadvertent or unintentional production of documents containing privileged information shall not be deemed to waive any privileges. Upon learning of the inadvertent or unintentional production of a document or information which a party believes should not have been produced because of a privilege, the producing party must request return of such document or information within twenty-one (21) calendar days so as to not waive any privileges.

20.    **Filing Under Seal.**    If a party intends to file with the Court any documents constituting or containing any Protected Material designated as Confidential Information or Confidential Attorneys' Eyes Only Information, that party shall take all steps necessary to file such documents under seal, following the procedure required by Local Rule CV-5(a)(7).

21.    **Source Code.**  To the extent production of computer instructions and data definitions expressed in a form suitable for input to an assembler, compiler, other translator, or other data processing module ("*Source Code*") becomes necessary to the prosecution or defense of the litigation, a producing party may designate Source Code as "Confidential Attorneys' Eyes Only - Source Code" if it comprises or includes confidential, proprietary, and/or trade secret Source Code. All Source Code produced pursuant to this Protective Order that is marked as Confidential Attorneys' Eyes Only - Source Code shall be entitled to be treated as Confidential Attorneys' Eyes Only Protected Material, in addition to the other protections afforded such Source Code herein. Nothing in this Protective Order shall be construed as a representation or admission that Source Code is properly discoverable in this action, or to obligate any party to produce any Source Code. Discovery Material designated as "Confidential Attorneys' Eyes Only - Source Code" is subject to the provisions set forth below and may be disclosed only to Qualified Persons excluding any person identified pursuant to Section 9(f).  Any source code that is produced by any party in this case shall be made available for inspection in electronic format at the office of its counsel designated in the table below or any other location mutually agreed by the parties.

| Party | Counsel | Office |
|---|---|---|
| EXITEXCHANGE CORP. | Capshaw DeRieux | Longview, TX |
| FriendFinder Networks, Inc. | Ramey & Flock, P.C. | Tyler, TX |
| Motherless, Inc. | Theodora Oringher PC | Los Angeles, CA |
| Quasar Data Center, Ltd. | Sutton McAughan Deaver PLLC | Houston, TX |
| Kayak Software Corporation | Jackson Walker LLP | Dallas, TX |
| Travelocity.com LP | Jackson Walker LLP | Dallas, TX |
| TripAdvisor LLC | Jackson Walker LLP | Dallas, TX |
| WZ Communications, Inc. | Ramey & Flock, P.C. | Tyler, TX |
| Lemuria Communications, Inc. | Ramey & Flock, P.C. | Tyler, TX |
| Manwin USA, Inc. | Ramey & Flock, P.C. | Tyler, TX |

| Manwin D.P. Corp. | Ramey & Flock, P.C. | Tyler, TX |

Prior to the first inspection of any requested piece of source code, the requesting party shall provide fourteen (14) calendar days notice of the source code that it wishes to inspect. The requesting party shall provide ten (10) calendar days notice prior to any additional inspections. Source code that is designated "Confidential Attorneys' Eyes Only - Source Code" shall be produced for inspection and review subject to the following provisions, unless otherwise agreed by the producing party:

(a) The producing party will produce the source code so that it may be reviewed on a computer ("Viewing Computer") and in a format or formats that are computer searchable. All source code shall be made available by the producing party to the receiving party's outside counsel and/or experts in a secure room on a secured computer without Internet access or network access to other computers and with all input/output ports (such as USB) blocked to the extent necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal, or other transfer of any source code outside or away from the Viewing Computer.

(b) The receiving party's outside counsel and/or experts shall be entitled to take notes relating to the source code but may not copy the source code into the notes and may not take such notes electronically or on any electronic device. Each page of any such notes containing Source Code information (and any additional notes, analyses, or descriptions relating thereto) must be marked as "Confidential Attorneys' Eyes Only – Source Code." No copies of all or any portion of the source code may leave the room in which the source code is inspected except as otherwise provided herein. Further, no other written or electronic record of the source code is permitted except as otherwise provided herein. The producing party may visually monitor the activities of the receiving party's representatives during any source code review, but only to ensure that no unauthorized electronic records of source code are being created or transmitted in any way.

(c) The Producing Party shall install tools that are sufficient for viewing and searching the code produced, on the platform produced, if such tools exist and are presently used in the ordinary course of the Producing Party's business. The Receiving Party's outside counsel and/or experts may make a reasonable request that commercially available software tools for viewing and searching source code be installed on the secured computer, provided, however, that such other software tools are reasonably necessary for the Receiving Party to perform its review of the source code consistent with all of the protections herein. The Receiving Party must provide the Producing Party with the CD or DVD containing such licensed software tool(s) at least five (5) days in advance of the date upon which the Receiving Party wishes to have the additional software tools available for use on the Source Code Computer, or otherwise indicate where such licensed software tools(s) are readily available for downloading and installing by the Producing Party on the Source Code Computer.

(d) The receiving party shall make reasonable efforts to restrict its requests for such access to the Viewing Computer to normal business hours, which for purposes of this paragraph shall be 8:00 a.m. through 6:00 p.m Monday to Friday. However, upon reasonable notice from the receiving party, the producing party shall make reasonable efforts to accommodate the receiving party's request for access outside of normal business hours.

PROTECTIVE ORDER - 7

(e) The receiving party may designate to be copied portions of the source code that are reasonably necessary to facilitate the receiving party's preparation of court filings, expert reports, and related drafts and correspondence.  In no event may the receiving party request the printing of more than 25 consecutive pages of a continuous block of Source Code, or an aggregate total of more than 500 pages of Source Code during this case without good cause shown.  The producing party shall make one paper copy of the designated portions and produce it to the receiving party within seven (7) business days of the request, or such additional time as necessary due to volume requested, unless objected to as discussed below.  The copy will be designated "Confidential Attorneys' Eyes Only – Source Code" by the producing party. At the receiving party's request, up to three additional sets (or subsets) of printed Source Code may be requested and provided by the producing party in a timely fashion.  The receiving party shall not print Source Code in order to review blocks of Source Code elsewhere in the first instance, i.e., as an alternative to reviewing the Source Code electronically on the Source Code Computer, as the parties acknowledge and agree that the purpose of the protections herein would be frustrated by printing portions of Source Code for review and analysis elsewhere, and that printing is permitted only when necessary to prepare Source Code Documents as discussed below.

 (f) Any printed pages of Source Code, and any other documents or things reflecting Source Code that have been designated by the producing party as "Confidential Attorneys' Eyes Only – Source Code" may not be copied, digitally imaged, or otherwise duplicated, except in limited excerpts necessary to attach in an exhibit, expert report, discovery document, deposition exhibit, exhibit at trial, or other Court document, provided that the source code is appropriately marked under this Order, restricted to those who are entitled to have access to them as specified herein, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures and orders.

(g) All persons who will review a producing party's Source Code on behalf of a receiving party shall be identified in writing to the producing party at least five (5) business days in advance of the first time that such person reviews such source code.  All persons viewing Source Code shall sign on each day they view Source Code a log that will include the names of persons who enter the Source Code viewing room to view the Source Code and when they enter and depart.  The producing party shall be entitled to a copy of the log.  Proper identification of all authorized persons shall be provided prior to any access to the secure room or the computer containing Source Code.  Proper identification requires showing, at a minimum, a photo identification card sanctioned by the government of any state of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship.

(h) Unless otherwise agreed in advance by the parties in writing, following each day on which inspection is done under this Protective Order, the receiving party's outside counsel and/or experts shall remove all notes, documents, laptops, and all other materials from the room that may contain work product and/or attorney-client privileged information.  The producing party shall not be responsible for any items left in the room following each inspection session, and the receiving party shall have no expectation of confidentiality for any items left in the room following each inspection session without a prior agreement to that effect.

(i) The receiving party's outside counsel of record and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices in a manner that prevents duplication of or unauthorized access to the Source Code, including, without limitation, storing the Source Code in a locked room or cabinet at all times when it is not in use.

(j) All paper copies of Source Code shall be securely destroyed in a timely manner if they are no longer in use (e.g., at the conclusion of a deposition). Copies of Source Code that are marked as deposition exhibits shall not be provided to a court reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers.

22.     **Prosecution Activity.** Prosecution Activity shall mean: (1) prepare or otherwise aid in the drafting of patent claim(s) on behalf of a patentee or assignee of patentee's rights; and (2) for a patent application, reissue, on behalf of the patentee or assignee of patentee's rights, provide advice, counsel or suggestions regarding claim scope and/or language, embodiment(s) for claim coverage, claim(s) for prosecution, or products or processes for coverage by claim(s). For the avoidance of doubt, preparing an analysis of prior art as compared to the claims of a patent or preparing a nonobviousness analysis as compared to the claims of a patent would not be Prosecution Activity. For the avoidance of doubt, prosecution activity does not include reexamination proceedings.

23.     **Prosecution Bar.**

        (a)     Plaintiff shall create an "Ethical Wall" between those persons with access to another party's Protected Material that is designated CONFIDENTIAL -- OUTSIDE ATTORNEYS' EYES ONLY -- SOURCE CODE and/or technical Protected Material designated CONFIDENTIAL – ATTORNEYS' EYES ONLY that is less than ten (10) years old (collectively "Highly Sensitive Material"), and any individuals who, on behalf of Plaintiff or its acquirer, successor, predecessor, or other affiliate, prepare, prosecute, supervise or assist in the preparation or prosecution of any patent application pertaining to the field of invention of the patent-in-suit. For the avoidance of doubt, the prosecution bar does not include reexamination proceedings.

        (b)     Any attorney representing Plaintiff, whether in-house or Outside Counsel, and any person associated with Plaintiff and permitted to receive another Producing Party's Highly Sensitive Material, who obtains, receives, has access to, or otherwise learns, in whole or in part, the contents of Highly Sensitive Material produced by another Producing Party may not prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application on behalf of any entity, whether party to this action or not (other than on behalf of the Producing Party who produced the Highly Sensitive Material at issue) pertaining to the field of the invention of the patent-in-suit. The above prohibitions shall continue for the field of the invention of the patent-in-suit during the pendency of this Action and including one (1) year following either the entry of a final non-appealable judgment or order, or the complete settlement of all claims against the Producing Party or Producing Parties whose Highly Sensitive Material was received or reviewed, or one (1) year following the withdraw from the litigation by an attorney, whichever is earlier. For the avoidance of doubt, the prosecution bar does not include reexamination proceedings.

        (c)     The prosecution bar described herein shall not be imputed to partners, associates, or other colleagues of a person who is subject to the prosecution bar and who did not actually receive or

learn of the contents of any Highly Sensitive Material.  For the avoidance of doubt, the prosecution bar does not include reexamination proceedings.

24.     **Survival After Termination.**  After termination of this litigation, the provisions of this Protective Order shall continue to be binding, except with respect to those documents and information that become a matter of public record.  This Court retains and shall have continuing jurisdiction over the parties and recipients of the Protected Material for enforcement of the provisions of this Protective Order following termination of this litigation.

25.     **Destruction or Return of Protected Material.** Upon termination of this action by dismissal, judgment, or settlement, within sixty (60) days of conclusion of this action, counsel for the party or parties receiving Protected Material shall return the Protected Material to the counsel for the party or parties disclosing or producing the Protected Material.  In lieu of returning Protected Material, a party may destroy all such Protected Material within sixty (60) days of the conclusion of this action and certify to the producing party that it has destroyed the Protected Material. Notwithstanding this provision, outside litigation counsel of record are not required to delete information that may reside on their respective firm's electronic back-up systems that are over-written in the normal course of business.

26.     **Work Product.** The outside counsel of record receiving the Protected Material shall keep their attorney work product which refers or relates to any Protected Material.  Attorney work product may be used in subsequent litigation provided that such use does not disclose Protected Material or any information contained therein.

27.     This Protective Order shall be binding upon the parties and their attorneys, successors, executors, personal representatives, administrators, heirs, legal representatives, assigns, subsidiaries, divisions, employees, agents, independent contractors, or other persons or organizations over which they have control.

28.     **Modification.**  This Protective Order is entered without prejudice to the right of any party to apply to the Court at any time for additional protection, or to relax or rescind the restrictions of this Protective Order, when convenience or necessity requires.


**So ORDERED and SIGNED this 2nd day of October, 2013.**



_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF TEXAS**

**MARSHALL DIVISION**

| | | |
|---|---|---|
| EXITEXCHANGE CORP. | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 2:13-CV-396-JRG-RSP |
| v. | § | |
| | § | **LEAD CASE** |
| FRIENDFINDER NETWORKS, INC. et al. | § | |
| | § | |
| Defendants. | § | |

EXHIBIT A

AGREEMENT TO ABIDE BY PROTECTIVE ORDER

I, _____ state that:

1.     My address is _____

_____.

2.     My present employer is _____,

and the address of my present employment is _____

_____.

3.     My present occupation or job description is _____

_____

_____.

4.     I have attached hereto my current curriculum vitae and, to the best of my knowledge, a complete list of any present or former relationships or engagements between myself and any party to the above-captioned action (the "***Action***") or any known competitor thereof.

5.     I hereby acknowledge that I have read the Protective Order in this Action, that I am familiar with the terms thereof, and that I agree to be bound by the terms thereof.

6.     I hereby acknowledge that, pursuant to the PROTECTIVE ORDER, I may receive information designated as CONFIDENTIAL, CONFIDENTIAL ATTORNEYS' EYES ONLY or CONFIDENTIAL ATTORNEYS' EYES ONLY - SOURCE CODE in this Action, and certify my understanding that such information is provided to me pursuant to the terms and restrictions of the PROTECTIVE ORDER.  I agree not to reveal any information designated as CONFIDENTIAL, CONFIDENTIAL ATTORNEYS' EYES ONLY or CONFIDENTIAL ATTORNEYS' EYES ONLY

- SOURCE CODE or any notes containing information designated as CONFIDENTIAL, CONFIDENTIAL ATTORNEYS' EYES ONLY or CONFIDENTIAL ATTORNEYS' EYES ONLY - SOURCE CODE to anyone not authorized to receive such information pursuant to the terms of the PROTECTIVE ORDER, and I agree not to use, directly or indirectly, or allow the use of any information designated as CONFIDENTIAL, CONFIDENTIAL ATTORNEYS' EYES ONLY or CONFIDENTIAL ATTORNEYS' EYES ONLY - SOURCE CODE for any purpose other than directly associated with my duties in this litigation.

7.      I understand that I am to retain all copies of the materials that I receive which have been designated as containing or reflecting information designated as CONFIDENTIAL, CONFIDENTIAL ATTORNEYS' EYES ONLY or CONFIDENTIAL ATTORNEYS' EYES ONLY - SOURCE CODE in a container, cabinet, drawer, room or other safe place in a manner consistent with the PROTECTIVE ORDER.  I understand that all copies of any such materials are to remain in my custody until the conclusion of this Action or the completion of my assigned duties, whereupon the copies are to be destroyed or returned to the producing party.  Such return or destruction shall not relieve me from the obligations imposed upon me by the PROTECTIVE ORDER.  I further agree to notify any support personnel (such as paralegals, administrative assistants, secretaries, clerical and administrative staff) who are necessary to assist me of the terms of the PROTECTIVE ORDER and of their obligation not to reveal any information designated as CONFIDENTIAL, CONFIDENTIAL ATTORNEYS' EYES ONLY or CONFIDENTIAL ATTORNEYS' EYES ONLY - SOURCE CODE to anyone not authorized to receive such information pursuant to the terms of the PROTECTIVE ORDER.

8.      I understand that I shall be subject to the jurisdiction of the U.S. District Court for the Eastern District of Texas in any proceeding relating to my performance under, compliance with, or violation of the PROTECTIVE ORDER.

Signature: _____

Date: _____

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

## MARSHALL DIVISION

| | | |
|---|---|---|
| EXITEXCHANGE CORP. | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 2:13-CV-396-JRG-RSP |
| v. | § | |
| | § | **LEAD CASE** |
| FRIENDFINDER NETWORKS, INC. et al. | § | |
| | § | |
| Defendants. | § | |

## EXHIBIT B

### AGREEMENT TO ABIDE BY PROTECTIVE ORDER

I, _____ state that:

1.      My address is _____.

2.      My present employer is _____,

and the address of my present employment is _____
_____.

3.      My present occupation or job description is _____
_____
_____.

4.      I hereby acknowledge that I have read the Protective Order in this Action, that I am familiar with the terms thereof, and that I agree to be bound by the terms thereof.

5.      I hereby acknowledge that, pursuant to the PROTECTIVE ORDER, I may review information designated as CONFIDENTIAL in this Action, and certify my understanding that such information is provided to me pursuant to the terms and restrictions of the PROTECTIVE ORDER.  I agree not to reveal any information designated as CONFIDENTIAL or any notes containing information designated as CONFIDENTIAL to anyone not authorized to receive such information pursuant to the terms of the PROTECTIVE ORDER, and I agree not to use, directly or indirectly, or allow the use of any information designated as CONFIDENTIAL for any purpose other than directly associated with my duties in this litigation.

Signature: _____

Date: _____

# EXHIBIT 3

| | |
|---|---|
| **George Ernest Hunt**  *Appellant* | **George Ernest Hunt**  *Appelant* |
| *v.* | *c.* |
| **Lac d'Amiante du Québec Ltée, formerly known as Lake Asbestos Company Limited, Asbestos Corporation Limited, Atlas Turner Inc., Bell Asbestos Mines Limited, JM Asbestos Inc., the Quebec Asbestos Mining Association and National Gypsum Co.**  *Respondents* | **Lac d'Amiante du Québec Ltée, auparavant connue sous le nom de Lake Asbestos Company Limited, Société Asbestos Limitée, Atlas Turner Inc., Bell Asbestos Mines Limited, JM Asbestos Inc., l'Association des mines d'amiante du Québec et National Gypsum Co.**  *Intimées* |
| and | et |
| **T&N, plc, Carey Canada Inc., formerly known as Carey-Canadian Mines Ltd., Flintkote Mines Limited and The Flintkote Co.**  *Defendants* | **T&N, plc, Carey Canada Inc., auparavant connue sous le nom de Carey-Canadian Mines Ltd., Flintkote Mines Limited et The Flintkote Co.**  *Défenderesses* |
| and | et |
| **Workers' Compensation Board and Henfrey Sampson Belair Ltd., Receiver-Manager for Victoria Machinery Depot Company Limited**  *Third Parties* | **Workers' Compensation Board et Henfrey Sampson Belair Ltd., administrateur séquestre de Victoria Machinery Depot Company Limited**  *Tiers appelés* |
| and | et |
| **The Attorney General for Ontario and the Attorney General of Quebec**  *Interveners* | **Le procureur général de l'Ontario et le procureur général du Québec**  *Intervenants* |

INDEXED AS: HUNT *v.* T&N PLC

RÉPERTORIÉ: HUNT *c.* T&N PLC

File No.: 22637.

Nº du greffe: 22637.

1992: October 7; 1993: November 18.

1992: 7 octobre; 1993: 18 novembre.

Present: Lamer C.J. and La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory and McLachlin JJ.

Présents: Le juge en chef Lamer et les juges La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory et McLachlin.

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

EN APPEL DE LA COUR D'APPEL DE LA COLOMBIE-BRITANNIQUE

*Conflict of laws — Civil procedure — Discovery of documents — Plaintiff in civil action in British Columbia seeking discovery of documents from Quebec defendants — Quebec statute prohibiting removal from province of documents of business concerns — Whether*

*Droit international privé — Procédure civile — Communication de documents — Demandeur dans une action civile en Colombie-Britannique sollicitant la communication de documents par des défenderesses du Québec — Loi québécoise interdisant de transporter*

290 CASE 0:13-cv-02086-PJS-HB   Document 69-1   Filed 03/20/14   Page 20 of 62 [1993] 4 S.C.R.

HUNT v. T&N PLC

*blocking statute provides "lawful excuse" for not complying with demand for discovery — Business Concerns Records Act, R.S.Q., c. D-12 — British Columbia Rules of Court, rr. 2(5), 26.*

*Constitutional law — Statutes — Validity — Quebec statute prohibiting removal from province of documents of business concerns — Whether blocking statute ultra vires province as being in relation to matter outside province — Whether blocking statute constitutionally inapplicable to judicial proceedings in another province — Business Concerns Records Act, R.S.Q., c. D-12.*

*Courts — Jurisdiction — Superior courts — British Columbia courts declining to rule on constitutionality of Quebec statute — Whether British Columbia courts had jurisdiction to deal with constitutional issue.*

*Courts — Jurisdiction — Supreme Court of Canada — British Columbia courts declining to rule on constitutionality of Quebec statute — Whether British Columbia courts had jurisdiction to deal with constitutional issue — Whether Supreme Court of Canada restricted to powers and procedures of courts appealed from — Supreme Court Act, R.S.C., 1985, c. S-26, s. 45.*

The appellant suffers from cancer which he alleges was caused by the inhalation of asbestos fibres to which he was exposed while working as an electrician in British Columbia. These fibres were allegedly contained in products manufactured and sold by the respondents, which are Quebec companies involved in the production and distribution of asbestos. The appellant sued the respondents for damages in British Columbia. He requested production of documents relating to the action. The Quebec *Business Concerns Records Act* prohibits the removal from the province of documents relating to any business concern in Quebec pursuant to any requirement of a judicial authority outside the province. When the respondents did not respond, the appellant served demands for discovery of documents on them under Rule 26(1) of the British Columbia *Rules of Court*. In response to these demands, certain of the respondents asserted that the Act prevented compliance; the others made no reply. The Quebec Provincial Court

*a*

*Droit constitutionnel — Lois — Validité — Loi québécoise interdisant de transporter hors de la province des documents d'entreprises — Une loi qui prohibe la communication de documents outrepasse-t-elle la compétence de la province du fait qu'elle se rapporte à une matière hors de la province? — Une loi qui prohibe la communication de documents est-elle constitutionnellement inapplicable à des procédures judiciaires dans une autre province? — Loi sur les dossiers d'entreprises, L.R.Q., ch. D-12.*

*hors de la province des documents d'entreprises — Une loi qui prohibe la communication de documents fournit-elle une «excuse légitime» pour ne pas se conformer à une demande de communication de documents? — Loi sur les dossiers d'entreprises, L.R.Q., ch. D-12 — Rules of Court de la Colombie-Britannique, art. 2(5), 26.*

*b*

*c*

*Tribunaux — Compétence — Cours supérieures — Refus des tribunaux de la Colombie-Britannique de statuer sur la constitutionnalité d'une loi québécoise — Les tribunaux de la Colombie-Britannique avaient-ils compétence pour statuer sur une question constitutionnelle?*

*d*

*Tribunaux — Compétence — Cour suprême du Canada — Refus des tribunaux de la Colombie-Britannique de statuer sur la constitutionnalité d'une loi québécoise — Les tribunaux de la Colombie-Britannique avaient-ils compétence pour statuer sur une question constitutionnelle? — La compétence de la Cour suprême du Canada est-elle limitée aux pouvoirs et aux procédures des tribunaux dont les décisions sont portées en appel? — Loi sur la Cour suprême, L.R.C. (1985), ch. S-26, art. 45.*

*e*

*f*

L'appelant souffre d'un cancer qui, selon lui, a été causé par l'inhalation de fibres d'amiante auxquelles il a été exposé pendant qu'il travaillait comme électricien en Colombie-Britannique. Ces fibres auraient été contenues dans des produits fabriqués et vendus par les intimées qui sont des entreprises québécoises de production et de distribution d'amiante. L'appelant a intenté, en Colombie-Britannique, une action en dommages-intérêts contre les intimées. Il a demandé la production de documents liés à l'action. La *Loi sur les dossiers d'entreprises* québécoise interdit de transporter hors du Québec des documents relatifs à une entreprise au Québec, à la suite d'une réquisition émanant d'une autorité judiciaire extérieure à cette province. Les intimées n'ayant pas répondu à la demande qui leur était faite, l'appelant leur a fait signifier des demandes de communication de documents, conformément au par. 26(1) des *Rules of Court* de la Colombie-Britannique. En réponse à ces demandes, certaines intimées ont affirmé que la

*g*

*h*

*i*

*j*

granted orders preventing the respondent companies from sending documents out of the province. The appellant then applied to the British Columbia Supreme Court for an order compelling production of the documents. Rule 2(5) empowers the trial court to strike out a statement of defence for failure "without lawful excuse" to comply with the Rules. The application was dismissed, and the Court of Appeal upheld that judgment. Both courts acted on the basis that the Quebec Act was valid, ruling that the British Columbia courts did not have jurisdiction over the constitutional validity of a Quebec statute. This appeal is to determine whether the provisions of the Quebec Act provide a "lawful excuse" under Rule 2(5). The fundamental issue is whether this statute is *ultra vires* the province as being in relation to a matter outside the province, or constitutionally inapplicable to judicial proceedings in other provinces.

*Held*: The appeal should be allowed.

At common law the issue of what is foreign law is a question of fact to be determined by the trial judge, and the Quebec statute was clearly a material fact, and its constitutionality is therefore equally material. Courts may consider constitutional arguments in determining foreign law that incidentally arises in the course of litigation. A foreign court in making a finding of fact should not be bound to assume that the mere enactment of a statute necessarily means that it is constitutional. The fact that there is no mandatory provision for advising the appropriate Attorney General does not make the procedure invalid. The courts below were thus in error in believing that the rules of conflicts law prevented consideration of the constitutionality of the laws of another jurisdiction. That both jurisdictions in question are part of the same Canadian federation and governed by the same Constitution reinforces and possibly augments the powers of the superior courts to consider the constitutional issues.

The guiding element in the determination of an appropriate forum must be principles of order and fairness. In view of the essentially unitary nature of the Canadian court system, the process is basically fair, all the more so since it is subject to the supervisory jurisdiction of this Court. This is especially true where, as here, the issue relates to the constitutionality of the legislation of a province that has extraprovincial effects,

Loi les empêchait d'y acquiescer; les autres n'ont pas répondu. La Cour provinciale du Québec a accordé des ordonnances empêchant les sociétés intimées d'envoyer des documents hors de la province. L'appelant a alors demandé à la Cour suprême de la Colombie-Britannique de délivrer une ordonnance enjoignant de produire les documents. Le paragraphe 2(5) habilite le tribunal de première instance à rendre une ordonnance radiant la défense pour refus «sans excuse légitime» de se conformer aux règles. La requête a été rejetée et la Cour d'appel a confirmé cette décision. Les deux tribunaux ont tenu pour acquis que la loi québécoise était valide, statuant que les tribunaux de la Colombie-Britannique n'ont pas compétence pour se prononcer sur la constitutionnalité d'une loi québécoise. Le présent pourvoi vise à déterminer si les dispositions de la loi québécoise fournissent une «excuse légitime» au sens du par. 2(5). La question fondamentale est de savoir si cette loi outrepasse la compétence de la province du fait qu'elle se rapporte à une matière hors de la province ou si elle est constitutionnellement inapplicable à des procédures judiciaires dans d'autres provinces.

*Arrêt*: Le pourvoi est accueilli.

En common law, la question de ce qui constitue une loi étrangère est une question de fait qui doit être tranchée par le juge du procès; la loi québécoise était clairement un fait pertinent et sa constitutionnalité est donc également pertinente. Les tribunaux peuvent examiner des arguments d'ordre constitutionnel pour statuer sur une loi étrangère qui est soulevée accessoirement dans un litige. Le tribunal étranger qui tire une conclusion de fait ne devrait pas être tenu de présumer qu'une loi est constitutionnelle du simple fait de son adoption. L'absence de disposition obligeant à aviser le procureur général compétent ne rend pas la procédure invalide. Les tribunaux d'instance inférieure ont commis une erreur en croyant que les règles du droit international privé empêchaient d'examiner la constitutionnalité des lois d'un autre ressort. Le fait que les deux ressorts en question font partie de la même fédération canadienne et sont régis par la même constitution vient renforcer et peut-être augmenter les pouvoirs qu'ont les cours supérieures d'examiner les questions constitutionnelles.

Ce sont les principes d'ordre et d'équité qui doivent nous guider dans le choix d'un tribunal compétent. Étant donné la nature essentiellement unitaire du système judiciaire canadien, le processus est fondamentalement équitable, d'autant plus qu'il est soumis au pouvoir de surveillance de notre Cour. Cela est particulièrement vrai si, comme en l'espèce, le point litigieux se rapporte à la constitutionnalité d'une loi provinciale qui a des

and that constitutionality has never been and is unlikely to be challenged in the other province's courts. Because of the far-reaching impact of such rulings, however, the courts should restrict themselves to hearing constitutional challenges to the legislation of other provinces only where there is a real interest affected in their province.

Since the courts of British Columbia had jurisdiction to deal with the constitutional issue, so has this Court. Moreover, this Court is not restricted to the identical powers and procedures of the lower courts from which an appeal is taken. It may take judicial notice of all laws prevailing in every province, even in cases where such laws have not been proved in evidence in the courts below, so long as they were pleaded at first instance.

The courts must consider appropriate policy in relation to recognition and enforcement of judgments issued in other provinces in light of the legal interdependence under the scheme of confederation established in 1867. The old common law rules relating to recognition and enforcement were rooted in an outmoded conception of the world that emphasized sovereignty and independence, often at the cost of unfairness. Greater comity is required in our modern era when international transactions involve a constant flow of products, wealth and people across the globe. Moreover, it is inherent in the structure of the Canadian federation that the courts in each province should give "full faith and credit" to the judgments of the courts of other provinces.

While a province is not debarred from enacting any legislation that may have some effect on litigation in other provinces, it must respect minimum standards of order and fairness. The statute at issue here does not meet those standards. The whole purpose of a blocking statute is not to keep documents in the province, but to impede successful litigation in other jurisdictions by refusing recognition and compliance with orders issued there. While this is no doubt part of sovereign right, it certainly runs counter to comity. This Court's decision in *Morguard* requires that the rules of private international law be adapted to the structure of the Canadian federation. Since courts are required, by constitutional restraints, to assume jurisdiction only where there are real and substantial connections to that place, the pres-

*a*    effets dans une autre province, et si la constitutionnalité d'une telle loi n'a jamais été et ne sera probablement jamais attaquée devant les tribunaux de cette autre province. Cependant, en raison de l'impact considérable de ces décisions, les tribunaux devraient se limiter à n'entendre les contestations constitutionnelles des lois d'autres provinces que si un intérêt véritable est touché dans leur province.

*b*    Puisque les tribunaux de la Colombie-Britannique étaient compétents pour statuer sur la question constitutionnelle, notre Cour l'est aussi. De plus, la compétence de notre Cour n'est pas limitée aux pouvoirs et procédures identiques des tribunaux d'instance inférieure dont les décisions sont portées en appel. Elle peut prendre connaissance d'office de toutes les lois de chaque province, même dans les cas où ces lois n'ont pas fait l'objet d'une preuve devant les tribunaux d'instance inférieure, pourvu qu'elles aient été invoquées en première instance.

*c*

*d*    Les tribunaux doivent réfléchir à la ligne de conduite qu'il convient d'adopter sur le plan de la reconnaissance et de l'exécution des jugements rendus dans d'autres provinces, compte tenu de l'interdépendance juridique qui existe sous le régime de confédération établi en 1867. Les anciennes règles de common law relatives à la reconnaissance et à l'exécution avaient leur origine dans une conception périmée du monde qui mettait l'accent sur la souveraineté et l'indépendance, souvent au détriment de l'équité. Une plus grande courtoisie est nécessaire à l'époque moderne où les opérations internationales impliquent une circulation constante de produits, de richesses et de personnes partout dans le monde. Par ailleurs, une caractéristique inhérente de la fédération canadienne est qu'il devrait y avoir de la part des tribunaux de chaque province une «reconnaissance totale» des jugements des tribunaux des autres provinces.

*e*

*f*

*g*

*h*    Bien qu'il ne soit pas interdit à une province d'adopter une loi qui peut avoir un effet sur les litiges dans d'autres provinces, elle doit respecter des normes minimales d'ordre et d'équité. La loi en cause ici ne satisfait pas à ces normes. Une loi qui prohibe la communication de documents a pour objet non pas de garder des documents dans la province, mais d'empêcher qu'il y ait des litiges couronnés de succès dans d'autres ressorts en refusant de reconnaître et de respecter les ordonnances qui y sont rendues. Ces mesures font sans doute partie de la souveraineté, mais elles vont certainement à l'encontre de la courtoisie. L'arrêt *Morguard* de notre Cour exige que les règles de droit international privé soient adaptées à la structure de la fédération canadienne. Puisque les tribunaux sont tenus, en vertu de contraintes

*i*

*j*

ence of such blocking statutes is an anachronism that is definitely inimical to interprovincial litigation if applied on the interprovincial level. Discovery is a very important tool of civil litigation, especially in cases of this type where there are allegations of some sort of product liability. The Quebec *Business Concerns Records Act* is therefore constitutionally inapplicable to other provinces and thus to this case. Given this finding, it is unnecessary to consider whether the Act is wholly unconstitutional because in pith and substance it relates to a matter outside the province. Nor is it necessary to consider whether the statute could properly be "read down" to permit its application to jurisdictions outside the country or to consider the public policy issue raised.

constitutionnelles, de ne se déclarer compétents que s'il y a des liens réels et substantiels avec cet endroit, l'existence de telles lois prohibant la communication de documents est un anachronisme certainement défavorable aux litiges interprovinciaux, si on les applique au niveau interprovincial. La communication de la preuve est un outil très important dans les procès au civil, notamment dans des cas comme la présente affaire, où on allègue un certain genre de responsabilité du fabricant. La *Loi sur les dossiers d'entreprises* québécoise est constitutionnellement inapplicable aux autres provinces et, en conséquence, inapplicable en l'espèce. Vu cette conclusion, il n'est pas nécessaire d'examiner si la Loi est entièrement inconstitutionnelle parce que, de par son caractère véritable, elle se rapporte à une matière à l'extérieur de la province. Il n'est pas nécessaire non plus d'examiner si on pourrait à bon droit donner à la loi une interprétation «atténuée» de manière à en permettre l'application à l'étranger, ou encore d'étudier la question de l'ordre public qui a été soulevée.

## Cases Cited

**Considered:** *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077; **disapproved:** *2632-7602 Québec Inc. v. Pizza Pizza Canada Inc.*, [1991] R.J.Q. 2951; **referred to:** *Hunt v. Carey Canada Inc.*, [1990] 2 S.C.R. 959; *Hunt v. T&N, plc*, B.C.S.C., Vancouver Reg. No. C885383, June 30, 1989; *Québec (Procureur général) v. Lac d'Amiante du Québec Ltée* (1989), 24 Q.A.C. 235, leave to appeal refused, [1989] 2 S.C.R. viii; *Asbestos Corp. v. Eagle-Picher Industries Inc.*, [1984] C.A. 151; *Reference re Upper Churchill Water Rights Reversion Act*, [1984] 1 S.C.R. 297; *Renault v. Bell Asbestos Mines Ltd.*, [1980] C.A. 370, rev'g [1976] C.P. 284; *Benesh, Friedlandler, Coplan & Aronoff v. Nesmith*, [1983] C.S. 790; *Attorney General of Canada v. Canard*, [1976] 1 S.C.R. 170; *Buck v. Attorney-General*, [1965] 1 All E.R. 882; *Manuel v. Attorney General*, [1982] 3 All E.R. 786; *Douglas/Kwantlen Faculty Assn. v. Douglas College*, [1990] 3 S.C.R. 570; *Cuddy Chicks Ltd. v. Ontario (Labour Relations Board)*, [1991] 2 S.C.R. 5; *Northern Telecom Canada Ltd. v. Communication Workers of Canada*, [1983] 1 S.C.R. 733; *Ontario (Attorney General) v. Pembina Exploration Canada Ltd.*, [1989] 1 S.C.R. 206; *Attorney General of Canada v. Law Society of British Columbia*, [1982] 2 S.C.R. 307; *Valin v. Langlois* (1879), 3 S.C.R. 1; *R. v. Thomas Fuller Construction Co. (1958) Ltd.*, [1980] 1 S.C.R. 695; *Thorson v. Attorney General of Canada*, [1975] 1 S.C.R. 138; *Moran v. Pyle National (Canada) Ltd.*, [1975] 1 S.C.R. 393; *Bank of Montreal v. Metro-*

## Jurisprudence

**Arrêt examiné:** *Morguard Investments Ltd. c. De Savoye*, [1990] 3 R.C.S. 1077; **arrêt critiqué:** *2632-7602 Québec Inc. c. Pizza Pizza Canada Inc.*, [1991] R.J.Q. 2951; **arrêts mentionnés:** *Hunt c. Carey Canada Inc.*, [1990] 2 R.C.S. 959; *Hunt c. T&N, plc*, C.S.C.-B., greffe de Vancouver n° C885383, le 30 juin 1989; *Québec (Procureur général) c. Lac d'Amiante du Québec Ltée* (1989), 24 Q.A.C. 235, autorisation de pourvoi refusée, [1989] 2 R.C.S. viii; *Asbestos Corp. c. Eagle-Picher Industries Inc.*, [1984] C.A. 151; *Renvoi relatif à la Upper Churchill Water Rights Reversion Act*, [1984] 1 R.C.S. 297; *Renault c. Bell Asbestos Mines Ltd.*, [1980] C.A. 370, inf. [1976] C.P. 284; *Benesh, Friedlandler, Coplan & Aronoff c. Nesmith*, [1983] C.S. 790; *Procureur général du Canada c. Canard*, [1976] 1 R.C.S. 170; *Buck c. Attorney-General*, [1965] 1 All E.R. 882; *Manuel c. Attorney-General*, [1982] 3 All E.R. 786; *Douglas/Kwantlen Faculty Assn. c. Douglas College*, [1990] 3 R.C.S. 570; *Cuddy Chicks Ltd. c. Ontario (Commission des relations de travail)*, [1991] 2 R.C.S. 5; *Northern Telecom Canada Ltée c. Syndicat des travailleurs en communication du Canada*, [1983] 1 R.C.S. 733; *Ontario (Procureur général) c. Pembina Exploration Canada Ltd.*, [1989] 1 R.C.S. 206; *Procureur général du Canada c. Law Society of British Columbia*, [1982] 2 R.C.S. 307; *Valin c. Langlois* (1879), 3 R.C.S. 1; *R. c. Thomas Fuller Construction Co. (1958) Ltd.*, [1980] 1 R.C.S. 695; *Thorson c. Procureur général du Canada*, [1975] 1 R.C.S. 138; *Moran c. Pyle National*

*politan Investigation & Security (Canada) Ltd.*, [1975] 2 S.C.R. 546; *John Morrow Screw and Nut Co. v. Hankin* (1918), 58 S.C.R. 74; *Logan v. Lee* (1907), 39 S.C.R. 311; *Pettkus v. Becker*, [1980] 2 S.C.R. 834; *Cooper v. Cooper* (1888), 13 App. Cas. 88; *R. v. Gardiner*, [1982] 2 S.C.R. 368; *Argentina v. Mellino*, [1987] 1 S.C.R. 536; *Attorney General for Ontario v. Scott*, [1956] S.C.R. 137; *Aetna Financial Services Ltd. v. Feigelman*, [1985] 1 S.C.R. 2; *Black v. Law Society of Alberta*, [1989] 1 S.C.R. 591; *Indyka v. Indyka*, [1969] 1 A.C. 33; *Boxer v. Reesor* (1983), 43 B.C.L.R. 352; *Cie Financière et Commerciale du Pacifique v. Peruvian Guano Co.* (1882), 11 Q.B.D. 55.

*(Canada) Ltd.*, [1975] 1 R.C.S. 393; *Banque de Montréal c. Metropolitan Investigation & Security (Canada) Ltd.*, [1975] 2 R.C.S. 546; *John Morrow Screw and Nut Co. c. Hankin* (1918), 58 R.C.S. 74; *Logan c. Lee* (1907), 39 R.C.S. 311; *Pettkus c. Becker*, [1980] 2 R.C.S. 834; *Cooper c. Cooper* (1888), 13 App. Cas. 88; *R. c. Gardiner*, [1982] 2 R.C.S. 368; *Argentine c. Mellino*, [1987] 1 R.C.S. 536; *Attorney General for Ontario c. Scott*, [1956] R.C.S. 137; *Aetna Financial Services Ltd. c. Feigelman*, [1985] 1 R.C.S. 2; *Black c. Law Society of Alberta*, [1989] 1 R.C.S. 591; *Indyka c. Indyka*, [1969] 1 A.C. 33; *Boxer c. Reesor* (1983), 43 B.C.L.R. 352; *Cie Financière et Commerciale du Pacifique c. Peruvian Guano Co.* (1882), 11 Q.B.D. 55.

## Statutes and Regulations Cited

*Business Concerns Records Act*, R.S.Q., c. D-12, ss. 1, 2, 3, 4 [am. 1988, c. 21, s. 66], 5 [*idem*].
*Constitution Act, 1867*, ss. 92(13), (14), (16), 101.
*Constitution Act, 1982*, s. 52(1).
*Evidence Act*, R.S.B.C. 1979, c. 116.
Rules of Court [British Columbia], rr. 2(5), 26.
*Special Procedure Act*, R.S.Q., c. P-27.
*Supreme Court Act*, R.S.C. 1970, c. S-19, s. 41(1).
*Supreme Court Act*, R.S.C., 1985, c. S-26, ss. 40(1), 45.

## Lois et règlements cités

*Evidence Act*, R.S.B.C. 1979, ch. 116.
*Loi constitutionnelle de 1867*, art. 92(13), (14), (16), 101.
*Loi constitutionnelle de 1982*, art. 52(1).
*Loi sur certaines procédures*, L.R.Q., ch. P-27.
*Loi sur la Cour suprême*, S.R.C. 1970, ch. S-19, art. 41(1).
*Loi sur la Cour suprême*, L.R.C. (1985), ch. S-26, art. 40(1), 45.
*Loi sur les dossiers d'entreprises*, L.R.Q., ch. D-12, art. 1, 2, 3, 4 [mod. 1988, ch. 21, art. 66], 5 [*idem*].
Rules of Court [Colombie-Britannique], art. 2(5), 26.

## Authors Cited

Black, Vaughan. "The Other Side of *Morguard*: New Limits on Judicial Jurisdiction" (1993), 22 *Can. Bus. L.J.* 4.
Black, Vaughan, and John Swan. "New Rules for the Enforcement of Foreign Judgments: *Morguard Investments Ltd. v. De Savoye*" (1991), 12 *Advocates' Q.* 489.
Finkle, Peter, and Claude Labrecque. "Low-Cost Legal Remedies and Market Efficiency: Looking Beyond *Morguard*" (1993), 22 *Can. Bus. L.J.* 58.
Groffier, Ethel. *Précis de droit international privé québécois*, 4e éd. Cowansville: Yvon Blais, 1990.
Hogg, Peter W. *Constitutional Law of Canada*, 3rd ed. Scarborough, Ont.: Carswell, 1992.
Strayer, Barry L. *The Canadian Constitution and the Courts*, 3rd ed. Toronto: Butterworths, 1988.

## Doctrine citée

Black, Vaughan. «The Other Side of *Morguard*: New Limits on Judicial Jurisdiction» (1993), 22 *Can. Bus. L.J.* 4.
Black, Vaughan, and John Swan. «New Rules for the Enforcement of Foreign Judgments: *Morguard Investments Ltd. v. De Savoye*» (1991), 12 *Advocates' Q.* 489.
Finkle, Peter, and Claude Labrecque. «Low-Cost Legal Remedies and Market Efficiency: Looking Beyond *Morguard*» (1993), 22 *Can. Bus. L.J.* 58.
Groffier, Ethel. *Précis de droit international privé québécois*, 4e éd. Cowansville: Yvon Blais, 1990.
Hogg, Peter W. *Constitutional Law of Canada*, 3rd ed. Scarborough, Ont.: Carswell, 1992.
Strayer, Barry L. *The Canadian Constitution and the Courts*, 3rd ed. Toronto: Butterworths, 1988.

APPEAL from a judgment of the British Columbia Court of Appeal (1991), 56 B.C.L.R. (2d) 365, 81 D.L.R. (4th) 763, [1991] 5 W.W.R. 475, 48 C.P.C. (2d) 247, 3 B.C.A.C. 138, 7 W.A.C. 138,

POURVOI contre un arrêt de la Cour d'appel de la Colombie-Britannique (1991), 56 B.C.L.R. (2d) 365, 81 D.L.R. (4th) 763, [1991] 5 W.W.R. 475, 48 C.P.C. (2d) 247, 3 B.C.A.C. 138, 7 W.A.C.

affirming a judgment of Esson C.J.S.C. (1990), 43 B.C.L.R. (2d) 390, 67 D.L.R. (4th) 687, [1990] 3 W.W.R. 558, dismissing an application for an order compelling the production of documents. Appeal allowed.

*J. J. Camp, Q.C., David Church* and *Steven Antle*, for the appellant.

*W. S. Berardino, Q.C., Avon Mersey* and *Michael Sobkin*, for the respondent Lac d'Amiante du Québec Ltée.

*Jack Giles, Q.C.,* and *Robert J. McDonell*, for the respondents Asbestos Corporation Limited, Atlas Turner Inc. and Bell Asbestos Mines Limited.

*Henry S. Brown, Q.C.,* and *Richard B. Lindsay*, for the respondent JM Asbestos Inc.

*Louis J. Zivot*, for the respondent the Quebec Asbestos Mining Association.

*John L. Finlay*, for the respondent National Gypsum Co.

*Michel Hélie*, for the intervener the Attorney General for Ontario.

*Alain Gingras*, for the intervener the Attorney General of Quebec.

The judgment of the Court was delivered by

LA FOREST J. — Legal systems and rules are a reflection and expression of the fundamental values of a society, so to respect diversity of societies it is important to respect differences in legal systems. But if this is to work in our era where numerous transactions and interactions spill over the borders defining legal communities in our decentralized world legal order, there must also be a workable method of coordinating this diversity. Otherwise, the anarchic system's worst attributes emerge, and individual litigants will pay the inevitable price of unfairness. Developing such coordi-

138, qui a confirmé un jugement du juge en chef Esson de la Cour suprême (1990), 43 B.C.L.R. (2d) 390, 67 D.L.R. (4th) 687, [1990] 3 W.W.R. 558, qui avait rejeté une requête visant à obtenir une ordonnance enjoignant de produire des documents. Pourvoi accueilli.

*J. J. Camp, c.r., David Church* et *Steven Antle*, pour l'appelant.

*W. S. Berardino, c.r., Avon Mersey* et *Michael Sobkin*, pour l'intimée Lac d'Amiante du Québec Ltée.

*Jack Giles, c.r.,* et *Robert J. McDonell*, pour les intimées Société Asbestos Limitée, Atlas Turner Inc. et Bell Asbestos Mines Limited.

*Henry S. Brown, c.r.,* et *Richard B. Lindsay*, pour l'intimée JM Asbestos Inc.

*Louis J. Zivot*, pour l'intimée l'Association des mines d'amiante du Québec.

*John L. Finlay*, pour l'intimée National Gypsum Co.

*Michel Hélie*, pour l'intervenant le procureur général de l'Ontario.

*Alain Gingras*, pour l'intervenant le procureur général du Québec.

Version française du jugement de la Cour rendu par

LE JUGE LA FOREST — Les systèmes juridiques et les règles de droit reflètent et expriment les valeurs fondamentales d'une société. Pour respecter la diversité des sociétés, il importe donc de respecter les différences entre les systèmes juridiques. Mais pour que cela soit possible à notre époque où de nombreuses opérations et interactions débordent les frontières qui séparent les ressorts juridiques dans notre ordre juridique mondial décentralisé, il faut également disposer d'un moyen pratique de coordonner ces régimes divers, sans quoi les pires aspects d'un système anarchique font surface,

CASE 0:13-cv-02086-PJS-HB    Document 69-1    Filed 03/20/14    Page 26 of 62

nation in the face of diversity is a common function of both public and private international law. It is also one of the major objectives of the division of powers among federal and provincial governments in a federation. This appeal raises issues that lie at the confluence of private international law and constitutional law. In seeking to find a workable balance between diversity and uniformity, one must be aware of the similarities but also the differences that exist in the balances represented in the rules in these two areas of law.

The immediate issue in this appeal is whether the provisions of the Quebec *Business Concerns Records Act*, R.S.Q., c. D-12, a "blocking statute", provide a "lawful excuse" under Rule 2(5) of the British Columbia *Rules of Court*, such that Quebec defendants to a civil action in British Columbia can refuse to comply, as required by Rule 26 of the British Columbia *Rules of Court*, with a demand for discovery of documents. The Quebec statute prohibits *inter alia* the removal from the province of documents of business concerns in Quebec that are required pursuant to judicial processes outside the province. The fundamental issue is whether this statute is *ultra vires* or whether it is constitutionally inapplicable to a judicial proceeding in another province.

During various stages of the proceedings, the appellant has claimed that the Act does not provide an excuse from production of the documents sought in British Columbia for the following reasons: (1) the Act is *ultra vires* the National Assembly of Quebec, or, alternatively, it is constitutionally inapplicable to a judicial proceeding in another province; (2) the Act is contrary to the public policy of British Columbia; or (3) the Act is not mandatory and failure to comply with discovery constituted bad faith on the part of the respondents. In connection with the first issue, the Chief

*a*

*b*

*c*

*d*

*e*

*f*

*g*

*h*

*i*

*j*

entraînant inévitablement une injustice pour les justiciables. Cette coordination face à la diversité ressortit tant au droit international privé qu'au droit international public. Elle constitue aussi l'un des principaux objectifs du partage des compétences entre les gouvernements fédéral et provinciaux dans une fédération. Le présent pourvoi soulève des questions qui se situent à la limite du droit international privé et du droit constitutionnel. Dans la recherche d'un équilibre pratique entre la diversité et l'uniformité, il faut être conscient des similitudes mais également des différences qui existent sur le plan de l'équilibre atteint dans les règles de ces deux branches du droit.

La question qui se pose immédiatement dans le présent pourvoi est d'abord de savoir si les dispositions de la *Loi sur les dossiers d'entreprises* du Québec, L.R.Q., ch. D-12, qui est une loi qui prohibe la communication de documents, fournissent une «excuse légitime» au sens du par. 2(5) des *Rules of Court* de la Colombie-Britannique, de sorte que les défendeurs du Québec dans une action civile intentée en Colombie-Britannique puissent refuser de se conformer à une demande de communication de documents fondée sur l'art. 26 des *Rules of Court* de la Colombie-Britannique. La loi québécoise interdit notamment de transporter hors de la province des documents d'entreprises qui sont exigés relativement à des procédures judiciaires à l'extérieur de la province. La question fondamentale est de savoir si cette loi est inconstitutionnelle ou si elle est constitutionnellement inapplicable à des procédures judiciaires dans une autre province.

À divers stades des procédures, l'appelant a soutenu que la Loi n'exempte pas de produire les documents demandés en Colombie-Britannique pour les motifs suivants: (1) la Loi outrepasse la compétence de l'Assemblée nationale du Québec ou, subsidiairement, elle est constitutionnellement inapplicable à des procédures judiciaires dans une autre province, (2) la Loi est contraire à l'ordre public de la Colombie-Britannique, ou (3) la Loi n'est pas impérative et l'omission de communiquer les documents requis constituait de la mauvaise foi de la part des intimées. Quant à la première ques-

Justice on June 2, 1992 stated the following constitutional question:

Is s. 2 of the Quebec *Business Concerns Records Act*, R.S.Q., c. D-12, *ultra vires* the National Assembly of Quebec or constitutionally inapplicable because its pith and substance is a derogation from extraprovincial rights?

The respondents contest all these issues, and also contest the jurisdiction of this Court to hear the constitutional question. They claim that this Court can only exercise the powers the British Columbia courts could, and that the latter lacked jurisdiction to rule on the constitutionality of a Quebec statute.

Background

The appellant, George Hunt, suffers from cancer which he alleges was caused by the inhalation of asbestos fibres to which he was exposed while working as an electrician at the Victoria Machinery Depot in Victoria, British Columbia. These fibres, it is further alleged, were contained in products designed, manufactured, packaged, advertised, distributed, promoted and sold by a number of companies, including the respondents, which are Quebec companies involved in the production and distribution of asbestos.

The appellant and a number of other plaintiffs, supported by the Workers' Compensation Board of British Columbia, brought action against the respondents for damages, alleging negligent manufacture, negligent failure to warn against dangerous effects of the fibres, and conspiracy to hide the dangers of asbestos from the public. An earlier application to strike the appellant's statement of claim was dismissed by this Court in *Hunt v. Carey Canada Inc.*, [1990] 2 S.C.R. 959. The respondents then challenged the jurisdiction of the British Columbia Supreme Court and sought a stay of proceedings; see *Hunt v. T&N, plc*, Vancouver Reg. No. C885383, June 30, 1989. The British Columbia Supreme Court dismissed the application, and leave to appeal that decision to the British

tion, le Juge en chef a, le 2 juin 1992, formulé la question constitutionnelle suivante:

L'article 2 de la *Loi sur les dossiers d'entreprises*, L.R.Q., ch. D-12, outrepasse-t-il la compétence de l'Assemblée nationale du Québec ou est-il constitutionnellement inapplicable pour le motif qu'il constitue, de par son caractère véritable, une dérogation à des droits extraprovinciaux?

Les intimées contestent toutes ces allégations ainsi que la compétence de notre Cour pour entendre la question constitutionnelle. Elles affirment que notre Cour ne peut exercer que les pouvoirs dont sont investis les tribunaux de la Colombie-Britannique et que ceux-ci n'étaient pas compétents pour statuer sur la constitutionnalité d'une loi québécoise.

Les faits

L'appelant George Hunt souffre d'un cancer qui, selon lui, a été causé par l'inhalation de fibres d'amiante auxquelles il a été exposé pendant qu'il travaillait comme électricien au Victoria Machinery Depot à Victoria, en Colombie-Britannique. Il allègue aussi que ces fibres étaient contenues dans des produits conçus, fabriqués, emballés, annoncés, distribués, promus et vendus par un certain nombre de sociétés, dont les intimées qui sont des entreprises québécoises de production et de distribution d'amiante.

L'appelant et un certain nombre d'autres demandeurs, appuyés par la Workers' Compensation Board de la Colombie-Britannique, ont intenté une action en dommages-intérêts contre les intimées, dans laquelle ils alléguaient qu'il y avait eu négligence dans la fabrication des produits, que l'on avait fait preuve de négligence en omettant d'avertir des effets dangereux des fibres et qu'il y avait eu complot en vue de cacher au public les dangers de l'amiante. Dans l'arrêt *Hunt c. Carey Canada Inc.*, [1990] 2 R.C.S. 959, notre Cour a rejeté une requête antérieure en radiation de la déclaration de l'appelant. Les intimées ont ensuite contesté la compétence de la Cour suprême de la Colombie-Britannique et demandé l'arrêt des procédures; voir *Hunt c. T&N, plc*, greffe de Vancouver

Columbia Court of Appeal was denied (July 26, 1989).

The appellant then requested production of documents related to the action. The respondents did not respond to this request. On September 11, 1989, the appellant served a demand for discovery of documents under Rule 26(1) of the British Columbia *Rules of Court* on the respondents Atlas Turner Inc. ("Atlas"), Bell Asbestos Mines Limited ("Bell"), Asbestos Corporation Limited ("ACL") and the Quebec Asbestos Mining Association and National Gypsum Co. ("QAMA"). A demand for discovery had been served on Johns-Manville Amiante Canada Inc. on June 23, 1989. JM Asbestos Inc. ("JM") was later substituted for the latter defendant. In response to these demands, both JM and QAMA asserted that the Act prevented compliance with the demands; the other respondents made no reply. On October 2, 1989, the principal shareholders of the respondents Atlas, Bell and ACL petitioned the Quebec Provincial Court for an order, pursuant to s. 4 of the Act, preventing the companies from sending documents out of the province. Bell also petitioned for a similar order against QAMA. On November 17, 1989, the principal shareholder of JM made a similar petition. All these orders were granted. In 1980, the Attorney General of Quebec had applied for an order pursuant to the Act against the respondent Lac d'Amiante du Québec Ltée ("Lac d'Amiante") with respect to another action. On April 26, 1989, Lac d'Amiante appealed that order to the Quebec Court of Appeal. The appeal was dismissed; see *Québec (Procureur général) v. Lac d'Amiante du Québec Ltée* (1989), 24 Q.A.C. 235. An application for leave to appeal to this Court was dismissed on November 23, 1989: [1989] 2 S.C.R. viii.

On October 3, 1989, the appellant served Atlas, Bell, ACL and QAMA with a notice of motion for an order compelling discovery of lists of docu-

n° C885383, le 30 juin 1989. La Cour suprême de la Colombie-Britannique a rejeté la requête et la Cour d'appel de la Colombie-Britannique a refusé l'autorisation d'en appeler de cette décision (26 juillet 1989).

L'appelant a alors demandé la production de documents liés à l'action. Les intimées n'ont pas répondu à cette demande. Le 11 septembre 1989, l'appelant a fait signifier une demande de communication de documents aux intimées Atlas Turner Inc. («Atlas»), Bell Asbestos Mines Limited («Bell»), Société Asbestos Limitée («SAL»), l'Association des mines d'amiante du Québec («AMAQ») et National Gypsum Co., conformément au par. 26(1) des *Rules of Court* de la Colombie-Britannique. Une demande de communication avait été signifiée à Johns-Manville Amiante Canada Inc. le 23 juin 1989. JM Asbestos Inc. («JM») a été substituée plus tard à cette dernière défenderesse. En réponse à ces demandes, JM et l'AMAQ ont affirmé que la Loi les empêchait d'y acquiescer; les autres intimées n'ont pas répondu. Le 2 octobre 1989, les principaux actionnaires des intimées Atlas, Bell, et SAL ont demandé à la Cour provinciale du Québec de rendre, conformément à l'art. 4 de la Loi, une ordonnance empêchant les sociétés d'envoyer des documents hors de la province. Bell a demandé qu'une ordonnance similaire soit rendue contre l'AMAQ. Le 17 novembre 1989, l'actionnaire principal de JM a présenté une requête semblable. Toutes ces ordonnances ont été accordées. En 1980, le procureur général du Québec avait demandé qu'une ordonnance soit rendue, conformément à la Loi, contre l'intimée Lac d'Amiante du Québec Ltée («Lac d'Amiante») relativement à une autre action. Le 26 avril 1989, Lac d'Amiante en a appelé de cette ordonnance devant la Cour d'appel du Québec. L'appel a été rejeté; voir *Québec (Procureur général) c. Lac d'Amiante du Québec Ltée* (1989), 24 Q.A.C. 235. Une demande d'autorisation de pourvoi devant notre Cour a été rejetée le 23 novembre 1989: [1989] 2 R.C.S. viii.

Le 3 octobre 1989, l'appelant a signifié à Atlas, Bell, SAL et AMAQ un avis de requête visant à obtenir une ordonnance leur enjoignant de commu-

ments. Notice was served on JM on October 10, 1989. Both applications were adjourned at the request of the respondents. On October 12, 1989, Atlas, Bell and ACL gave "lists of documents" listing no documents, claiming that the orders under the Quebec statute prevent disclosure. JM had done the same earlier. The appellant then applied to the Supreme Court of British Columbia for an order compelling the production of the documents. The chambers judge, Esson C.J.S.C., dismissed the application: (1990), 43 B.C.L.R. (2d) 390, 67 D.L.R. (4th) 687, [1990] 3 W.W.R. 558. The appellant unsuccessfully appealed to the Court of Appeal of British Columbia: (1991), 56 B.C.L.R. (2d) 365, 81 D.L.R. (4th) 763, [1991] 5 W.W.R. 475, 48 C.P.C. (2d) 247, 3 B.C.A.C. 138, 7 W.A.C. 138. Leave to appeal to this Court was granted on January 16, 1992: [1992] 1 S.C.R. viii.

niquer des listes de documents. Un avis a été signifié à JM le 10 octobre 1989. Les deux requêtes ont été ajournées à la demande des intimées. Le 12 octobre 1989, Atlas, Bell et SAL ont remis des «listes de documents» qui ne faisaient état d'aucun document, prétendant que les ordonnances rendues en vertu de la loi québécoise en interdisaient la communication. JM avait fait de même auparavant. L'appelant a alors demandé à la Cour suprême de la Colombie-Britannique de délivrer une ordonnance enjoignant de produire les documents. Le juge en chef Esson de la Cour suprême, siégeant en chambre, a rejeté cette requête: (1990), 43 B.C.L.R. (2d) 390, 67 D.L.R. (4th) 687, [1990] 3 W.W.R. 558. L'appelant a interjeté sans succès un appel devant la Cour d'appel de la Colombie-Britannique: (1991), 56 B.C.L.R. (2d) 365, 81 D.L.R. (4th) 763, [1991] 5 W.W.R. 475, 48 C.P.C. (2d) 247, 3 B.C.A.C. 138, 7 W.A.C. 138. L'autorisation de pourvoi devant notre Cour a été accordée le 16 janvier 1992: [1992] 1 R.C.S. viii.

Judicial History

Historique des procédures judiciaires

*Supreme Court of British Columbia* (1990), 43 B.C.L.R. (2d) 390

*Cour suprême de la Colombie-Britannique* (1990), 43 B.C.L.R. (2d) 390

After reviewing the history of the Act, Esson C.J.S.C. defined the basic issue as "whether considerations of comity require this court to respect the law of another province by accepting, as an excuse for not complying with the ordinary requirements of our rules, the prohibition in that law" (p. 394). He declined to rule on the constitutional validity of the Quebec statute, stating that he was not aware of any precedent where provincial legislation had been struck down by a court in another province. In any event, he would not entertain such a submission without hearing from the Attorney General or other appropriate representative of Quebec. He therefore proceeded on the assumption that the legislation was valid.

Après avoir fait l'historique de la Loi, le juge en chef Esson a affirmé que la question fondamentale était de savoir [TRADUCTION] «si notre cour est tenue, pour des motifs de courtoisie, de respecter la loi d'une autre province en acceptant, comme excuse pour ne pas se conformer aux prescriptions ordinaires de nos règles, la prohibition contenue dans cette loi» (p. 394). Il a refusé de statuer sur la constitutionnalité de la loi québécoise, en affirmant qu'il ne connaissait aucun précédent par lequel une loi provinciale avait été invalidée par un tribunal d'une autre province. De toute façon, il n'aurait pas examiné un tel argument sans entendre le procureur général ou un autre représentant compétent du Québec. Il a donc tenu pour acquis que la loi en question était valide.

The Chief Justice observed that the orders under s. 4 of the Act had been obtained at the petition of shareholders in the companies, and not by the

Le Juge en chef a fait observer que les ordonnances fondées sur l'art. 4 avaient été obtenues à la demande des actionnaires des sociétés et non par le

Attorney General. He observed that he could not "resist the inference that this was a case of deliberately courting legal impediments to production" (p. 396), but he felt that deliberate courting of legal impediment was of no significance if an effective legal impediment existed in any event. He referred to the reasons of Kaufman J.A. in *Lac d'Amiante*, *supra*, which found that s. 4 of the Act merely gives the prohibition in s. 2 "greater teeth". He stated that other Quebec authorities had also interpreted the Act broadly, referring to the Quebec Court of Appeal decision in *Asbestos Corp. v. Eagle-Picher Industries Inc.*, [1984] C.A. 151, which indicated that the prohibition in the Act extended to any form of indirect disclosure as well, for example, even delivery of a list of documents. While the affidavit evidence of a Quebec attorney filed as evidence in the earlier application for a stay of proceedings expressed the opinion that the Act was of more limited application, Esson C.J.S.C. did not consider that he should interpret the Act differently from the cases he had examined. He, therefore, found that the prohibition in the Act is wide and extends to the making of lists of documents, and was not prepared to order that the companies break the Quebec law.

Based on his reading of the cases, the Chief Justice held that the doctrine of comity required the court not to compel the circumvention of the law of another jurisdiction. He noted that while significant, discovery was considerably less vital to civil actions than the ability to compel evidence at trial. Furthermore, he noted that the appellant's ultimate course would be an order striking out the defence for non-compliance with discovery under Rule 2(5). He indicated that this discretionary remedy would not be given where, as in this case, the non-

Procureur général. Il a fait remarquer qu'il ne pouvait pas [TRADUCTION] «s'empêcher de conclure qu'il s'agissait d'un cas où l'on recherchait délibérément des obstacles légaux à la production» (p. 396), mais il a estimé que la recherche délibérée d'un obstacle légal était sans importance si, de toute façon, il existait effectivement un obstacle légal. Il s'est référé aux motifs du juge Kaufman de la Cour d'appel dans l'arrêt *Lac d'Amiante*, précité, qui avait conclu que l'art. 4 de la Loi venait simplement [TRADUCTION] «renforcer» la prohibition énoncée à l'art. 2. Il a dit que la Loi avait aussi été interprétée libéralement ailleurs dans la jurisprudence québécoise, notamment dans l'arrêt de la Cour d'appel du Québec *Asbestos Corp. c. Eagle-Picher Industries Inc.*, [1984] C.A. 151, où l'on a indiqué que la prohibition contenue dans la Loi visait aussi toute forme de communication indirecte, par exemple, même la remise d'une liste de documents. Bien que, dans un affidavit déposé en preuve lors de la requête antérieure visant l'obtention d'un arrêt des procédures, un avocat du Québec ait exprimé l'avis que l'application de la Loi était plus limitée, le juge en chef Esson n'a pas estimé qu'il devrait donner à la Loi une interprétation différente de celle donnée dans les causes qu'il avait étudiées. Il a donc conclu que la prohibition énoncée dans la Loi est générale et qu'elle vise la préparation de listes de documents et il n'était pas disposé à ordonner que les sociétés enfreignent la loi québécoise.

Le Juge en chef s'est fondé sur son interprétation de la jurisprudence pour conclure que la théorie de la courtoisie contraignait la cour à ne pas exiger que l'on contourne l'application de la loi d'un autre ressort. Il a fait remarquer que, même si la communication de la preuve était importante, elle était beaucoup moins indispensable à une action civile que la capacité de contraindre des personnes à témoigner au procès. De plus, il a souligné que le recours ultime de l'appelant consisterait à invoquer le par. 2(5) pour demander une ordonnance radiant la défense pour refus de communiquer des documents. Il a indiqué que ce redressement discrétionnaire ne serait pas accordé

compliance to provide discovery of documents was based on a legal prohibition.

*British Columbia Court of Appeal* (1991), 56 B.C.L.R. (2d) 365

Gibbs J.A., for a unanimous Court of Appeal, accepted the ruling of Esson C.J.S.C. that the British Columbia courts do not have jurisdiction over the constitutional validity of a Quebec statute, and that he could not be faulted for not entertaining the matter without hearing from the Attorney General of Quebec. Gibbs J.A. noted that in order to be heard on the appeal, the Attorney General would have to apply for intervener status and would have to accept the record below unless leave to introduce fresh evidence was granted, and held that it was not open to the appellant to impose such obligations on the Attorney General. The court did not, therefore, call on the Quebec respondents to reply to the constitutional submissions. Consequently, like Esson C.J.S.C., the court acted on the basis that the Quebec Act was valid.

This, Gibbs J.A. stated, led to conflict between the public policies of British Columbia as reflected in the *Rules of Court* and the Quebec statute. He noted that Esson C.J.S.C. had resolved that conflict by applying the doctrine of comity as between the provinces. That view, Gibbs J.A. thought, was supported by this Court's decision in *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077. Gibbs J.A. ruled that the principles of comity developed in that case applied as much to the "recognition of, and deference to, validly enacted legislation of a province by the courts of another province" (p. 369).

Nevertheless Gibbs J.A. stated that the courts of one province might refuse to "give cognizance to an enactment of another province designed to intrude into the exclusive legislative field of the first province" (p. 369). Citing the decision of this Court in *Reference re Upper Churchill Water Rights Reversion Act*, [1984] 1 S.C.R. 297, he stated that a court must determine the pith and sub-

si, comme en l'espèce, le refus de communiquer des documents reposait sur une prohibition légale.

*Cour d'appel de la Colombie-Britannique* (1991), 56 B.C.L.R. (2d) 365

Le juge Gibbs a accepté, au nom de la Cour d'appel à l'unanimité, la décision du juge en chef Esson voulant que les tribunaux de la Colombie-Britannique n'aient pas compétence pour se prononcer sur la constitutionnalité d'une loi québécoise et qu'on ne puisse lui reprocher de ne pas instruire l'affaire sans entendre le procureur général du Québec. Le juge Gibbs a fait remarquer que, pour être entendu en appel, le Procureur général devrait demander d'être constitué intervenant et accepter le dossier de l'instance inférieure, à moins d'avoir la permission de présenter de nouveaux éléments de preuve, et il a conclu qu'il n'était pas loisible à l'appelant d'imposer de telles obligations au Procureur général. En conséquence, la cour n'a pas demandé aux intimées du Québec de répondre aux arguments d'ordre constitutionnel. Elle a donc, à l'instar du juge en chef Esson, tenu pour acquis que la loi québécoise était valide.

D'après le juge Gibbs, il en est résulté un conflit entre les politiques générales de la Colombie-Britannique, reflétées dans les *Rules of Court*, et la loi québécoise. Il a souligné que le juge en chef Esson avait réglé le conflit en appliquant la théorie de la courtoisie interprovinciale. Selon le juge Gibbs, ce point de vue était appuyé par l'arrêt de notre Cour *Morguard Investments Ltd. c. De Savoye*, [1990] 3 R.C.S. 1077. Il a décidé que les principes de la courtoisie établis dans cet arrêt s'appliquaient tout autant à la [TRADUCTION] «reconnaissance et [au] respect par les tribunaux d'une province des lois validement adoptées par une autre province» (p. 369).

Néanmoins, le juge Gibbs a affirmé que les tribunaux d'une province pourraient refuser de [TRADUCTION] «reconnaître une loi d'une autre province qui est conçue pour empiéter sur son champ de compétence législative exclusive» (p. 369). Citant le *Renvoi relatif à la Upper Churchill Water Rights Reversion Act* de notre Cour, [1984] 1 R.C.S. 297, il a dit qu'un tribunal doit déterminer

stance of the impugned statute. He reasoned that the Quebec statute had been enacted over 30 years ago, and that the incidental or consequential effect on the appellant now, in British Columbia, did not render the Act *ultra vires*.

On the other issues raised, the Court of Appeal agreed with the reasons and conclusions of Esson C.J.S.C. It agreed that the Act constituted an absolute prohibition, and that there was no bad faith by the Quebec companies in seeking orders preventing discovery.

The Act

For a full understanding of the issues, it is useful to examine the provisions of the Act in more detail. I, therefore, set forth its provisions at length:

**1.** In this act, the following words mean:

(*a*) "document": any account, balance sheet, statement of receipts and expenditure, profit and loss statement, statement of assets and liabilities, inventory, report and any other writing or material forming part of the records or archives of a business concern;

(*b*) "concern": any business concern in Québec;

(*c*) "requirement": any demand, direction, order, subpoena or summons.

**2.** Subject to section 3, no person shall, pursuant to or under any requirement issued by any legislative, judicial or administrative authority outside Québec, remove or cause to be removed, or send or cause to be sent, from any place in Québec to a place outside Québec, any document or résumé or digest of any document relating to any concern.

**3.** The prohibition enacted in section 2 shall not apply in the case of the removal or sending of a document out of Québec

(*a*) by an agency, branch, company or firm carrying on business in Québec, to a principal, head office, affiliated company or firm, agency or branch situated outside Québec, in the ordinary course of their business;

le caractère véritable de la loi attaquée. Il a indiqué que la loi québécoise avait été adoptée il y a plus de 30 ans et que son effet accessoire ou ses répercussions sur l'appelant aujourd'hui, en Colombie-Britannique, ne la rendaient pas inconstitutionnelle.

Quant aux autres questions soulevées, la Cour d'appel a accepté les motifs et les conclusions du juge en chef Esson. Elle a convenu que la Loi établissait une interdiction absolue et que ce n'était pas de mauvaise foi que les sociétés québécoises avaient demandé des ordonnances empêchant la communication de documents.

La Loi

Pour bien comprendre les questions en litige, il est utile d'examiner les dispositions de la Loi plus en détail. Voici donc le texte intégral de ces dispositions:

**1.** Dans la présente loi, les mots suivants désignent:

*a*) «document»: un compte, un bilan financier, un état des recettes et des dépenses, un état des profits et pertes, un état de l'actif et du passif, un inventaire, un rapport et tout autre écrit ou pièce faisant partie des dossiers ou archives d'une entreprise d'affaires;

*b*) «entreprise»: toute entreprise d'affaires au Québec;

*c*) «réquisition»: une demande, une instruction, un ordre, un subpoena ou une sommation.

**2.** Sous réserve de l'article 3, nul ne peut, à la suite ou en vertu d'une réquisition émanant d'une autorité législative, judiciaire ou administrative extérieure au Québec, transporter ou faire transporter, ou envoyer ou faire envoyer, d'un endroit quelconque au Québec à un endroit situé hors de celui-ci, aucun document ou résumé ou sommaire d'un document relatif à une entreprise.

**3.** La prohibition stipulée à l'article 2 ne s'applique pas dans le cas de transport ou d'envoi d'un document hors du Québec

*a*) par une agence, une succursale, une compagnie ou une maison d'affaires exerçant son activité au Québec, à un principal, un siège social, une compagnie ou une maison d'affaires affiliée, une agence ou une succursale située hors du Québec, dans le cours ordinaire de leurs affaires;

(*b*) by or on behalf of a company or person, as defined by the Securities Act, (chapter V-1) carrying on business in Québec, to a territory subject to another political jurisdiction in which the sale of the securities of such company or person has been authorized;

(*c*) by or on behalf of any such company or person carrying on business in Québec as a broker, security issuer or salesman within the meaning of the Securities Act, to a territory subject to another political jurisdiction in which any such company or person has been registered or is otherwise authorized to carry on business as broker, security issuer or salesman, as the case may be;

(*d*) whenever such removal or sending is authorized by any law of Québec or of the Parliament of Canada, in accordance with their respective jurisdictions.

**4.** Whenever there is reason to believe that a requirement has been or is likely to be made for the removal or sending out of Québec of a document relating to a concern, the Attorney General may apply to a judge of the Court of Québec, in the judicial district where the concern in question is located, for an order requiring any person, whether or not designated in the requirement, to furnish an undertaking or security to ensure that such person will not remove or send out of Québec the document mentioned in the said requirement.

The application to the judge of the Court of Québec shall be made by summary petition. In case of urgency, it may be filed and presented to the judge without prior service. The judge may however order the service thereof within such delay, in such manner and on such conditions as he may consider expedient.

Every person having an interest in a concern may exercise the rights contemplated in this section.

**5.** Every person who, having received notice of a petition to a judge of the Court of Québec under section 4, infringes the provisions of section 2, shall be guilty of contempt of court and liable to one year's imprisonment.

Every person who has furnished, or has received from the judge an order to furnish, an undertaking or security and who infringes the provisions of section 2 shall be guilty of contempt of court and liable to one year's imprisonment, without prejudice to any penalty or obligation provided by the undertaking or security furnished or ordered by the judge.

*b*) par ou de la part d'une compagnie ou personne, telles que définies par la Loi sur les valeurs mobilières (chapitre V-1), faisant affaires au Québec, dans un territoire soumis à une autre juridiction politique dans lequel la vente des valeurs mobilières de cette compagnie ou de cette personne a été autorisée;

*c*) par ou de la part d'une telle compagnie ou d'une telle personne faisant affaires au Québec comme courtier, émetteur de valeurs mobilières ou vendeur au sens de la Loi sur les valeurs mobilières, dans un territoire soumis à une autre juridiction politique dans lequel une telle compagnie ou personne a été enregistrée ou autrement autorisée à exercer le commerce de courtier, émetteur de valeurs mobilières ou vendeur, selon le cas;

*d*) lorsqu'un tel transport ou envoi est autorisé par une loi du Québec ou du parlement du Canada, suivant leur juridiction respective.

**4.** Lorsqu'il y a lieu de croire qu'une réquisition a été ou sera probablement faite pour le transport ou l'envoi hors du Québec d'un document relatif à une entreprise, le procureur général peut s'adresser à un juge de la Cour du Québec, dans le district judiciaire où est située l'entreprise en question, pour obtenir une ordonnance enjoignant à toute personne, désignée ou non dans la réquisition, de fournir un engagement ou un cautionnement pour garantir qu'elle ne transportera ni n'enverra hors du Québec le document mentionné dans ladite réquisition.

La demande au juge de la Cour du Québec se fait par requête sommaire. Au cas d'urgence, elle peut être produite et présentée au juge sans signification préalable. Le juge peut toutefois en ordonner la signification dans tel délai, de telle manière et à toute condition qu'il juge à propos de déterminer.

Toute personne intéressée dans une entreprise peut exercer les prérogatives prévues au présent article.

**5.** Toute personne qui, après avoir reçu un avis d'une requête adressée à un juge de la Cour du Québec en vertu de l'article 4, contrevient aux dispositions de l'article 2, est coupable d'outrage au tribunal et passible d'un an d'emprisonnement.

Toute personne qui a fourni, ou qui a reçu du juge l'ordre de fournir, un engagement ou un cautionnement et qui contrevient aux dispositions de l'article 2 est coupable d'outrage au tribunal, et passible d'un an d'emprisonnement, sans préjudice de toute peine ou obligation stipulée dans l'engagement ou le cautionnement fourni ou ordonné par le juge.

As can be seen, s. 2 (as construed pursuant to the definition in s. 1) provides a general prohibition, subject to exceptions in s. 3 not applicable here, against the removal from the province to any place outside the province of any business document relating to any business concern in Quebec, in pursuance of any requirement, i.e., demand, direction, order, subpoena or summons, of, *inter alia*, a judicial authority outside the province. Section 4 then provides that the Attorney General, or any person interested in the concern, may apply to a Quebec court in the judicial district where the concern is located for an order requiring a person to furnish an undertaking or security to ensure that a document mentioned in s. 2 shall not be removed out of Quebec pursuant to a judicial or other requirement. Finally, s. 5 provides that anyone who, having received a notice of an application under s. 4, or having furnished or been ordered to furnish an undertaking or security under s. 4, infringes s. 2, is guilty of contempt of court and is liable to one year's imprisonment.

The Act, like its counterpart in Ontario upon which it is patterned, was enacted, we were told, as a defence to the extraterritorial reach of United States anti-trust legislation and perhaps other forms of foreign judicial interference. In a colourful passage cited by Esson C.J.S.C. in the court below, the Quebec newspaper *L'Événement* of February 21, 1958, purports to report a speech by the then Premier of Quebec in introducing the Bill which makes it clear that its object was to prevent foreign, and specifically American, intrusions of that kind. The Quebec courts have on a number of occasions asserted that this was indeed the purpose of the legislation. Thus in *Renault v. Bell Asbestos Mines Ltd.*, [1976] C.P. 284, the Quebec Provincial Court expressed the view that the main purpose of the Act is [TRANSLATION] "to protect Canadian businesses or subsidiaries against the implementation of American or foreign anti-trust laws" (p. 287). That cannot be considered the last word

Comme on peut le constater, l'art. 2 (interprété conformément à la définition de l'art. 1) établit une prohibition générale, sujette aux exceptions énoncées à l'art. 3 qui ne sont pas applicables en l'espèce, de transporter du Québec à un endroit quelconque situé hors de cette province tout document relatif à une entreprise au Québec, à la suite d'une réquisition, c'est-à-dire d'une demande, d'une instruction, d'un ordre, d'un subpoena ou d'une sommation émanant notamment d'une autorité judiciaire extérieure au Québec. L'article 4 prévoit ensuite que le Procureur général ou toute personne intéressée dans l'entreprise peut s'adresser à un tribunal du Québec, dans le district judiciaire où est située l'entreprise en question, pour obtenir une ordonnance enjoignant à une personne de fournir un engagement ou un cautionnement pour garantir qu'un document mentionné à l'art. 2 ne sera pas transporté hors du Québec à la suite d'une réquisition émanant d'une autorité judiciaire ou autre. Enfin, l'art. 5 prévoit que toute personne qui contrevient à l'art. 2, après avoir reçu un avis de requête fondée sur l'art. 4 ou après avoir fourni ou reçu l'ordre de fournir un engagement ou un cautionnement en vertu de l'art. 4, est coupable d'outrage au tribunal et passible d'un an d'emprisonnement.

La Loi, tout comme son équivalent ontarien dont elle s'inspire, a été adoptée, nous a-t-on dit, pour faire obstacle à l'application extraterritoriale des lois américaines antitrusts et peut-être à d'autres formes d'ingérence judiciaire étrangère. Dans un passage coloré cité par le juge en chef Esson du tribunal de première instance, le journal québécois *L'Événement* du 21 février 1958 reproduit une allocution que le premier ministre du Québec d'alors aurait prononcée au moment du dépôt du projet de loi et qui établit clairement que ce projet de loi visait à empêcher des ingérences étrangères, et particulièrement américaines, de ce genre. À maintes reprises, les tribunaux du Québec ont affirmé que c'était vraiment là le but de la Loi. Ainsi, dans la décision *Renault c. Bell Asbestos Mines Ltd.*, [1976] C.P. 284, la Cour provinciale du Québec a exprimé l'avis que la Loi a surtout pour but «de protéger les entreprises ou filiales canadiennes à l'encontre de l'application des lois

on the issue, however. The Québec Court of Appeal, [1980] C.A. 370, though it dealt with the case on the assumption that the Provincial Court's conclusion on the point was correct, indicated that this was not expressly stated in the Act and that there was no preamble (p. 372). However, in *Benesh, Friedlandler, Coplan & Aronoff v. Nesmith*, [1983] C.S. 790, at p. 793, it was again held that the objective of the Act "is generally conceded to be the protection of Québec businesses from foreign judicial interference such as anti-trust prosecutions . . .".

Despite this supposed narrow objective, the Quebec courts, as Esson C.J.S.C. noted, have nonetheless given the Act a generous interpretation consistent with its very broad terms. Thus in *Lac d'Amiante, supra,* Kaufman J.A. for the Court of Appeal held that it was not necessary in an order under s. 4 of the Act to set forth the relevant specific documents. Such a course, he stated, would be cumbersome and is unnecessary because s. 2 "in any case prohibits the removal of 'any document . . .'" (p. 236). That case, of course, did not relate to antitrust matters. Again in *Asbestos Corp. v. Eagle-Picher Industries Inc., supra,* also a private civil action, the court interpreted the Act as including evidence taken before a rogatory commission in Quebec.

These cases also reject the notion that the Act is confined to documents demanded by foreign authorities and assert that it applies to demands made by judicial authorities in other provinces as well. This view was most recently applied in *2632-7602 Québec Inc. v. Pizza Pizza Canada Inc.,* [1991] R.J.Q. 2951.

There is one case, *Benesh, supra,* in which the Superior Court, *per* Gomery J., was willing to interpret the Act more narrowly. However, his restriction of the Act to cases involving "consider-

*a*

*b*

*c*

*d*

*e*

*f*

*g*

*h*

*i*

*j*

anti-trust américaines ou d'autres pays étrangers» (p. 287). Toutefois, cela ne saurait être considéré comme le dernier mot sur le sujet. Même si elle a examiné l'affaire en tenant pour acquis que la conclusion de la Cour provinciale sur ce point était exacte, la Cour d'appel du Québec, [1980] C.A. 370, a indiqué que ce n'était pas expressément prévu dans la Loi et qu'il n'y avait pas de préambule (p. 372). Toutefois, dans l'affaire *Benesh, Friedlandler, Coplan & Aronoff c. Nesmith*, [1983] C.S. 790, à la p. 793, on a de nouveau décidé que l'objectif [TRADUCTION] «généralement reconnu [de la Loi] est la protection des entreprises québécoises contre l'ingérence judiciaire étrangère comme, par exemple, les poursuites fondées sur des lois antitrusts . . .».

En dépit de ce prétendu objectif restreint, les tribunaux québécois, comme le juge en chef Esson l'a fait remarquer, ont donné à la Loi une interprétation généreuse conforme à son texte très général. Ainsi, dans l'arrêt *Lac d'Amiante,* précité, le juge Kaufman de la Cour d'appel a décidé qu'il n'était pas nécessaire qu'une ordonnance fondée sur l'art. 4 de la Loi définisse les documents pertinents. Cela, a-t-il dit, serait embarrassant et est inutile puisque l'art. 2 [TRADUCTION] «interdit, de toute façon, le transport de tout «document . . .»» (p. 236). Bien entendu, cette affaire ne portait pas sur des mesures antitrusts. Une fois de plus, dans l'arrêt *Asbestos Corp. c. Eagle-Picher Industries Inc.,* précité, qui portait aussi sur une action privée au civil, la cour a interprété la Loi comme visant les témoignages recueillis devant une commission rogatoire au Québec.

Dans ces affaires, on a aussi rejeté l'idée que la Loi est limitée aux documents exigés par des autorités étrangères, pour affirmer qu'elle s'applique également aux demandes faites par les autorités judiciaires d'autres provinces. Le cas le plus récent où ce point de vue a été appliqué est la décision *2632-7602 Québec Inc. c. Pizza Pizza Canada Inc.,* [1991] R.J.Q. 2951.

Dans l'affaire *Benesh,* précitée, le juge Gomery, s'exprimant au nom de la Cour supérieure, était disposé à donner une interprétation plus restrictive à la Loi. Toutefois, il est loin d'être évident que la

ations of public policy" is far from clear, and the Act does not make it a matter of discretion. Again his notion that the term "documents" does not include letters to third parties would seem doubtful even if the Act were confined to antitrust cases, for that is a common means of proof in such cases. What is more, this approach conflicts with that taken by the Quebec Court of Appeal; see, for example, *Renault, supra*, at p. 371.

One commentator also argues that the Court of Appeal should have given a narrower interpretation to the Act on the basis of another Quebec statute, the *Special Procedure Act*, R.S.Q., c. P-27, and that there is no penalty specifically attached to violating the general prohibition in s. 2 of the Act; see E. Groffier, *Précis de droit international privé québécois* (4th ed. 1990), at p. 234. In the present case, however, there was a court order and in that event a sanction exists under s. 5 of the Act.

While an argument might be mounted against the position taken by the Quebec Court of Appeal, Esson C.J.S.C. and the British Columbia Court of Appeal can scarcely be faulted for accepting the Quebec Court of Appeal's position under the common law rule which holds that the law of another jurisdiction is a question of fact. Whether the British Columbia court could under the provision in the British Columbia *Evidence Act*, R.S.B.C. 1979, c. 116, permitting courts to take judicial notice of the laws of other jurisdictions permit a different approach to issues of foreign law was not argued and I, therefore, refrain from commenting on it. It would in any event be unusual for a British Columbia court to ignore the guidance of the Court of Appeal of Quebec respecting the interpretation of a Quebec statute.

This Court, as I will indicate, is not in the same position as the British Columbia court in dealing

Loi puisse être limitée, comme il l'estime, aux affaires qui mettent en cause des [TRADUCTION] «considérations d'ordre public» et la Loi n'en fait pas une question de pouvoir discrétionnaire. Encore une fois, l'idée qu'il exprime selon laquelle le terme «documents» ne s'entend pas des lettres à des tiers semblerait douteuse même si la Loi était limitée aux affaires portant sur des mesures anti-trusts, car il s'agit d'un moyen de preuve courant dans ce type d'affaires. Qui plus est, son point de vue s'oppose à celui que la Cour d'appel du Québec a adopté; voir, par exemple, l'arrêt *Renault*, précité, à la p. 371.

Un auteur fait également valoir que la Cour d'appel aurait dû interpréter la Loi plus restrictive-ment en fonction d'une autre loi québécoise, la *Loi sur certaines procédures*, L.R.Q., ch. P-27, et que la violation de la prohibition générale de l'art. 2 de la Loi n'est assortie d'aucune peine précise; voir E. Groffier, *Précis de droit international privé québé-cois* (4ᵉ éd. 1990), à la p. 234. En l'espèce, cepen-dant, une ordonnance judiciaire avait été rendue et, en pareil cas, une peine est applicable en vertu de l'art. 5 de la Loi.

Même s'il était possible d'argumenter contre le point de vue adopté par la Cour d'appel du Qué-bec, on ne saurait guère reprocher au juge en chef Esson de la Cour suprême et à la Cour d'appel de la Colombie-Britannique d'accepter le point de vue de la Cour d'appel du Québec, en vertu de la règle de common law voulant que la loi d'un autre ressort est une question de fait. On n'a pas débattu la question de savoir si, en vertu de la disposition de la *Evidence Act*, R.S.B.C. 1979, ch. 116, de la Colombie-Britannique qui permet aux tribunaux de prendre connaissance d'office des lois d'autres res-sorts, le tribunal de la Colombie-Britannique pour-rait permettre d'aborder différemment des ques-tions de droit étranger, et je m'abstiens donc de faire des commentaires à ce sujet. De toute façon, il serait curieux qu'un tribunal de la Colombie-Britannique ne tienne pas compte des directives de la Cour d'appel du Québec au sujet de l'interpréta-tion d'une loi québécoise.

Notre Cour, comme je vais l'expliquer, n'est pas dans la même situation que le tribunal de la

with the laws of another province. But in his argument in this Court, the appellant did not really attack the broad interpretation given to the Act. In fact, during oral argument, counsel for the appellant, the respondents and the intervener the Attorney General of Quebec all supported a broad interpretation. What the appellant really contested in this Court was that the Act was either *ultra vires* the Province of Quebec, as being in relation to a matter outside the province, or inapplicable as it applied to other provinces under the principles set forth by this Court in *Morguard*. Indeed the latter was the principal battleground during oral argument. Because of this, I propose to deal with the case on that basis. While, as I indicated, it may be possible to mount an argument for a narrower application of the Act, that argument was not fully made before this Court. Moreover, the Act is written in very broad terms and a full argument for reading it down might well require a consideration of constitutional requirements in any event.

Colombie-Britannique pour ce qui est d'examiner les lois d'une autre province. Mais dans l'argumentation qu'il a présentée à notre Cour, l'appelant n'a pas vraiment attaqué l'interprétation large donnée à la Loi. En fait, durant leur argumentation orale, les avocats de l'appelant, des intimées et de l'intervenant le procureur général du Québec se sont tous dit en faveur d'une interprétation large. Ce que l'appelant a effectivement fait valoir devant notre Cour, c'est que la Loi outrepasse la compétence de la province de Québec du fait qu'elle se rapporte à une matière hors de la province, ou encore qu'elle est inapplicable aux autres provinces suivant les principes énoncés par notre Cour dans l'arrêt *Morguard*. En fait, c'est surtout sur ce dernier point qu'a porté l'argumentation orale. Voilà pourquoi je me propose d'examiner l'affaire sous cet angle. Bien qu'il soit possible, comme je l'ai indiqué, d'argumenter en faveur d'une interprétation plus restrictive de la Loi, notre Cour n'a pas été saisie pleinement d'une telle argumentation. De plus, la Loi est rédigée en termes très généraux et, de toute façon, une argumentation complète en faveur d'une interprétation atténuée pourrait bien requérir un examen des exigences constitutionnelles.

May the British Columbia Court Consider the Constitutionality of the Quebec Statute?

Le tribunal de la Colombie-Britannique peut-il examiner la constitutionnalité de la loi québécoise?

Before considering the issue of constitutionality, it is necessary to examine a preliminary question raised by the respondents and the Attorney General of Quebec. They submit that this Court has no jurisdiction to consider the constitutionality of this Act. This, they say, flows from the operation of s. 45 of the *Supreme Court Act*, R.S.C., 1985, c. S-26, which, they maintain, restricts this Court's jurisdiction to what the courts below could have done, citing a remark from Beetz J.'s reasons in *Attorney General of Canada v. Canard*, [1976] 1 S.C.R. 170, at p. 216. The courts below, they continue, properly accepted that they had no jurisdiction to rule on the constitutionality of the Quebec statute. Consequently, in their submission, this

Avant d'étudier la question de la constitutionnalité, il est nécessaire d'examiner une question préliminaire soulevée par les intimées et par le procureur général du Québec. Ils soutiennent que notre Cour n'a pas compétence pour examiner la constitutionnalité de la présente Loi. Citant une remarque tirée des motifs du juge Beetz dans l'arrêt *Procureur général du Canada c. Canard*, [1976] 1 R.C.S. 170, à la p. 216, ils affirment que cela découle de l'application de l'art. 45 de la *Loi sur la Cour suprême*, L.R.C. (1985), ch. S-26, qui, selon eux, limite la compétence de notre Cour à ce que les juridictions inférieures auraient pu faire. Ils ajoutent que les juridictions inférieures ont reconnu à bon droit qu'elles n'avaient pas compétence pour statuer sur la constitutionnalité de la loi québécoise. Par conséquent, ils soutiennent que notre Cour n'est pas compétente pour répondre à la

Court lacks jurisdiction to reply to the constitutional question framed by the Chief Justice.

I do not agree with this submission. In my view, the jurisdiction to at least consider the constitutionality of another province's legislation can be found in the right of any superior court to consider and make findings of fact respecting the law of another jurisdiction for the purposes of litigation before it. This jurisdiction to consider the laws of another province seems to me to be even more clearly justified when both jurisdictions are Canadian and governed by our Constitution. I will look at each of these questions in turn, and then address the specific jurisdiction of this Court in the interpretation of the laws of every province and their constitutionality.

Ordinary Power of Courts to Consider the Constitutionality of Foreign Law

I begin by noting that at common law the issue of what is foreign law, which most frequently but not exclusively arises in conflicts law, is a question of fact to be determined by the trial judge. In the present case, the law of Quebec is clearly a material fact for the consideration of whether there was a "lawful excuse" under Rule 2(5) of the British Columbia *Rules of Court* for failing to obey that province's rules for discovery. It is also a material fact in relation to the public policy of British Columbia. Since the Quebec statute is material to these issues, it follows that the validity of that statute, its constitutionality, is equally material.

In determining what constitutes foreign law, there seems little reason why a court cannot hear submissions and receive evidence as to the constitutional status of foreign legislation. There is nothing in the authorities cited by the respondents that goes against this proposition. Quite the contrary, *Buck v. Attorney-General*, [1965] 1 All E.R. 882 (C.A.), holds only that a court has no jurisdiction to make a declaration as to the validity of the constitution of a foreign state. That would violate the

question constitutionnelle formulée par le Juge en chef.

Je ne souscris pas à cet argument. À mon avis, la compétence pour examiner à tout le moins la constitutionnalité d'une loi d'une autre province peut se fonder sur le droit de toute cour supérieure d'examiner la loi d'un autre ressort pour les fins du litige dont elle est saisie et de tirer des conclusions de fait à cet égard. Cette compétence pour examiner les lois d'une autre province me semble être d'autant plus justifiée si les deux ressorts sont canadiens et régis par notre Constitution. Je vais étudier chacune de ces questions à tour de rôle, pour ensuite aborder la compétence particulière que notre Cour possède pour interpréter les lois de chaque province et en examiner la constitutionnalité.

Le pouvoir ordinaire des tribunaux d'examiner la constitutionnalité d'une loi étrangère

Je fais d'abord remarquer qu'en common law la question de ce qui constitue une loi étrangère, qui se pose le plus fréquemment mais non exclusivement en droit international privé, est une question de fait qui doit être tranchée par le juge du procès. En l'espèce, la loi québécoise est clairement un fait pertinent pour ce qui est de savoir s'il y avait une «excuse légitime», au sens du par. 2(5) des *Rules of Court* de la Colombie-Britannique, pour ne pas se conformer aux règles de cette province en matière de communication de la preuve. Elle est aussi un fait pertinent quant à l'ordre public de la Colombie-Britannique. Comme la loi québécoise est pertinente relativement à ces questions, il s'ensuit que la validité de cette loi, sa constitutionnalité, est également pertinente.

Il semble qu'il y ait peu de raisons pour que le tribunal qui cherche à déterminer ce qui constitue une loi étrangère ne puisse pas entendre des arguments et recevoir des éléments de preuve concernant la constitutionnalité d'une telle loi. La jurisprudence citée par les intimées ne va nullement à l'encontre de cette proposition. Au contraire, tout ce que la cour a décidé dans l'arrêt *Buck c. Attorney-General*, [1965] 1 All E.R. 882 (C.A.), c'est qu'un tribunal n'est pas compétent pour rendre un

principles of public international law. But here nobody is trying to challenge the constitution itself. The issue of constitutionality arises incidentally in the course of litigation. The distinction is clearly made by Lord Diplock in *Buck*, at pp. 886-87:

*a*

The only subject-matter of this appeal is an issue as to the validity of a law of a foreign independent sovereign state, in fact, the basic law prescribing its constitution. The validity of this law does not come in question incidentally in proceedings in which the High Court has undoubted jurisdiction as, for instance, the validity of a foreign law might come in question incidentally in an action on a contract to be performed abroad. The validity of the foreign law is what this appeal is about; it is nothing else. This is a subject-matter over which the English courts, in my view, have no jurisdiction.

*b*

*c*

*d*

Similarly in *Manuel v. Attorney General*, [1982] 3 All E.R. 786 (Ch. D.), while it was asserted that the courts of one country should not pronounce on the validity of a statute of another, the case where the question arises merely incidentally is expressly excepted.

*e*

*f*

The policy reasons for allowing consideration of constitutional arguments in determining foreign law that incidentally arises in the course of litigation are well founded. The constitution of another jurisdiction is clearly part of its law, presumably the most fundamental part. A foreign court in making a finding of fact should not be bound to assume that the mere enactment of a statute necessarily means that it is constitutional. Formal determination of constitutionality is often purely fortuitous. It is often dependent on there happening to be parties interested in challenging the statute. This is unlikely to happen where, as in this case, most of the parties affected are outside the enacting jurisdiction. In this case, the Quebec statute has never been challenged by Quebec litigants because it does not arise in normal litigation in the province, and in extraprovincial litigation, Quebec defendants benefit while Quebec plaintiffs are normally

*g*

*h*

*i*

*j*

jugement déclaratoire sur la validité de la Constitution d'un État étranger. Cela violerait les principes du droit international public. Mais, en l'espèce, personne n'essaie d'attaquer la Constitution elle-même. La question de la constitutionnalité est accessoire au litige. Dans l'arrêt *Buck*, lord Diplock fait clairement cette distinction, aux pp. 886 et 887:

[TRADUCTION] Le seul objet du présent appel est une question relative à la validité d'une loi d'un État étranger souverain et indépendant, en fait, de la loi fondamentale qui en prescrit la Constitution. La validité de cette loi n'est pas mise en doute accessoirement dans des procédures à l'égard desquelles la Haute Cour est indubitablement compétente étant donné, par exemple, que la validité d'une loi étrangère pourrait être mise en doute accessoirement dans une action relative à un contrat devant être exécuté à l'étranger. La validité de la loi étrangère est ce dont il est exclusivement question dans le présent appel. À mon avis, il s'agit là d'un sujet sur lequel les tribunaux anglais n'ont pas compétence.

De même, bien que, dans l'affaire *Manuel c. Attorney General*, [1982] 3 All E.R. 786 (Ch. D.), la cour ait affirmé que les tribunaux d'un pays ne devaient pas statuer sur la validité d'une loi d'un autre pays, une exception est expressément prévue pour le cas où la question n'est soulevée qu'accessoirement.

Il existe de bonnes raisons de principe de permettre l'examen d'arguments d'ordre constitutionnel pour statuer sur une loi étrangère qui est soulevée accessoirement dans un litige. La Constitution d'un autre ressort fait clairement partie de son droit et en constitue vraisemblablement la partie la plus fondamentale. Le tribunal étranger qui tire une conclusion de fait ne devrait pas être tenu de présumer qu'une loi est constitutionnelle du simple fait de son adoption. C'est souvent par pur hasard que la constitutionnalité fait l'objet d'une décision formelle, laquelle dépend souvent de l'existence de parties qui ont intérêt à contester la loi en question. Il est peu probable que cela se produira dans un cas où, comme en l'espèce, la plupart des parties touchées sont à l'extérieur du ressort dans lequel la loi en cause a été adoptée. Dans la présente affaire, la loi québécoise n'a jamais été contestée par des justiciables québécois parce qu'elle n'est normale-

unaffected. Why should a litigant not be able to argue constitutionality in the course of litigation that directly raises the issue? As a practical matter, it is not much more difficult to determine constitutionality than any other aspect of foreign law.

The fact that there is no mandatory provision for advising the appropriate Attorney General does not make the procedure invalid. Nor do I see it as resulting in great inconvenience. Situations like this are rare and the findings, essentially of a factual nature, are not binding on the courts of other provinces. And if the constitutional issue is raised in this Court, there are provisions for advising the appropriate Attorney General.

The British Columbia courts in this case were commendably, but in my view excessively, cautious in refusing to consider constitutionality even in this limited sense, at the potential price of injustice to the plaintiff. With respect, I therefore find that the lower courts were in error in believing that the rules of conflicts law prevented consideration of the constitutionality of the laws of another jurisdiction.

The British Columbia courts in this case, therefore, did possess at least the normal court power to consider and make findings of fact as to the constitutionality of the laws of another jurisdiction. Such findings would have affected their conclusions on lawful excuse, comity and public policy. To simply ignore the constitutional issues was an error of law that vitiated their findings. Moreover, there is an additional factor that reinforces and possibly augments the powers of the superior courts to consider the constitutional issues, namely, that both jurisdictions in question are part of the same Canadian federation and governed by the same Constitution. I shall now turn to that issue.

ment pas soulevée dans les litiges engagés dans la province et que, dans les litiges extraprovinciaux, les défendeurs québécois en profitent alors que les demandeurs québécois ne sont normalement pas touchés. Pourquoi une partie ne pourrait-elle pas débattre la question de la constitutionnalité dans le cadre d'un litige où la question se pose directement? En pratique, il n'est pas beaucoup plus difficile de statuer sur la constitutionnalité que sur tout autre aspect d'une loi étrangère.

L'absence de disposition obligeant à aviser le procureur général compétent ne rend pas la procédure invalide. Je ne vois pas non plus de grave inconvénient à cela. Les situations comme la présente sont rares et les conclusions qui sont essentiellement de nature factuelle ne lient pas les tribunaux d'autres provinces. Et si la question constitutionnelle est soulevée devant notre Cour, il existe des dispositions qui prévoient que le procureur général compétent doit être avisé.

En l'espèce, les tribunaux de la Colombie-Britannique ont fait preuve de prudence louable mais, selon moi, excessive en refusant d'examiner la constitutionnalité même dans ce sens limité, au risque d'être injustes envers le demandeur. En toute déférence, je conclus donc que les tribunaux d'instance inférieure ont commis une erreur en croyant que les règles du droit international privé empêchaient d'examiner la constitutionnalité des lois d'un autre ressort.

Par conséquent, les tribunaux de la Colombie-Britannique avaient au moins, en l'espèce, le pouvoir normal d'examiner la constitutionnalité des lois d'un autre ressort et de tirer des conclusions de fait à cet égard. Ces conclusions auraient influé sur leurs conclusions en matière d'excuse légitime, de courtoisie et d'ordre public. En ignorant simplement les questions constitutionnelles, ils ont commis une erreur de droit qui a vicié leurs conclusions. Par surcroît, un autre facteur vient renforcer et peut-être augmenter les pouvoirs qu'ont les cours supérieures d'examiner les questions constitutionnelles: les deux ressorts en question font partie de la même fédération canadienne et sont régis par la même constitution. C'est le point que je vais maintenant étudier.

## Impact of the Canadian Constitution

It is well established that a range of Canadian courts and tribunals in Canada are empowered to consider the constitutionality of the laws they apply. In doing so, they are applying the principle of the supremacy of the Constitution confirmed by s. 52(1) of the *Constitution Act, 1982*. This Court has had to deal with the implications of this provision on a number of occasions in different contexts. Thus in *Douglas/Kwantlen Faculty Assn. v. Douglas College*, [1990] 3 S.C.R. 570, and *Cuddy Chicks Ltd. v. Ontario (Labour Relations Board)*, [1991] 2 S.C.R. 5, this Court found that administrative tribunals expressly empowered by their enabling statutes to interpret or apply any law necessary to reach their findings had the power to apply the *Canadian Charter of Rights and Freedoms*. Similarly, the Court has ruled that some administrative tribunals are competent to consider issues of the division of powers; see, for example, *Northern Telecom Canada Ltd. v. Communication Workers of Canada*, [1983] 1 S.C.R. 733. The latter decision also held that the Federal Court in the exercise of its statutory jurisdiction had the power and duty to review legislation for constitutionality in determining issues arising before them; see *Northern Telecom, supra*, at p. 740.

The same principle applies with, if anything, more force to the provincial superior courts. These are the ordinary courts of the land having inherent jurisdiction over all matters, both federal and provincial, unless a different forum is specified; see *Ontario (Attorney General) v. Pembina Exploration Canada Ltd.*, [1989] 1 S.C.R. 206, at pp. 217-18. Estey J. felicitously put the matter in *Attorney General of Canada v. Law Society of British Columbia* (the *Jabour* case), [1982] 2 S.C.R. 307. He stated, at pp. 326-27:

There is, however, another and more fundamental aspect to this issue. The provincial superior courts have always occupied a position of prime importance in the

## L'impact de la Constitution canadienne

Il est bien établi qu'une gamme de tribunaux judiciaires et administratifs canadiens sont habilités à examiner la constitutionnalité des lois qu'ils appliquent. Ce faisant, ils appliquent le principe de la primauté de la Constitution confirmé par le par. 52(1) de la *Loi constitutionnelle de 1982*. Notre Cour a eu à examiner la portée de cette disposition à un certain nombre de reprises et dans différents contextes. Ainsi, dans les arrêts *Douglas/Kwantlen Faculty Assn. c. Douglas College*, [1990] 3 R.C.S. 570, et *Cuddy Chicks Ltd. c. Ontario (Commission des relations de travail)*, [1991] 2 R.C.S. 5, notre Cour a conclu que les tribunaux administratifs qui sont expressément investis, par leur loi habilitante, du pouvoir d'interpréter ou d'appliquer toute loi nécessaire pour tirer leurs conclusions ont le pouvoir d'appliquer la *Charte canadienne des droits et libertés*. De même, la Cour a décidé que certains tribunaux administratifs sont compétents pour examiner des questions de partage des compétences; voir, par exemple, l'arrêt *Northern Telecom Canada Ltée c. Syndicat des travailleurs en communication du Canada*, [1983] 1 R.C.S. 733. Dans ce dernier arrêt, elle a également décidé que la Cour fédérale a, dans l'exercice de sa compétence légale, le pouvoir et l'obligation de vérifier si une loi est constitutionnelle en tranchant des questions qui lui sont soumises; voir *Northern Telecom*, précité, à la p. 740.

Le même principe s'applique avec encore plus de force aux cours supérieures des provinces. Celles-ci constituent les tribunaux de droit commun du pays qui ont une compétence inhérente sur toutes les matières relevant de la compétence fédérale ou provinciale, sauf si un autre tribunal est désigné; voir l'arrêt *Ontario (Procureur général) c. Pembina Exploration Canada Ltd.*, [1989] 1 R.C.S. 206, aux pp. 217 et 218. Le juge Estey a bien exposé ce point dans l'arrêt *Procureur général du Canada c. Law Society of British Columbia* (l'arrêt *Jabour*), [1982] 2 R.C.S. 307. Il dit, aux pp. 326 et 327:

Cette question revêt cependant un autre aspect plus fondamental. Les cours supérieures des provinces ont toujours occupé une position de premier plan à l'inté-

constitutional pattern of this country. They are the descendants of the Royal Courts of Justice as courts of general jurisdiction. They cross the dividing line, as it were, in the federal-provincial scheme of division of jurisdiction, being organized by the provinces under s. 92(14) of the *Constitution Act* and are presided over by judges appointed and paid by the federal government (sections 96 and 100 of the *Constitution Act*).

This approach, as he noted, is supported by previous cases from as early as *Valin v. Langlois* (1879), 3 S.C.R. 1, where Ritchie C.J. emphasized that these courts "are not mere local courts for the administration of the local laws" (p. 19) but "are the Queen's Courts, bound to take cognizance of and execute all laws, whether enacted by the Dominion Parliament or the Local Legislatures" (p. 20) (emphasis added). See also Pigeon J. in *R. v. Thomas Fuller Construction Co. (1958) Ltd.*, [1980] 1 S.C.R. 695, at p. 713.

This jurisdiction must include a determination of whether the laws sought to be applied are constitutionally valid. In Laskin J.'s words in *Thorson v. Attorney General of Canada*, [1975] 1 S.C.R. 138, at p. 151: "The question of the constitutionality of legislation has in this country always been a justiciable question." This was also referred to in *Northern Telecom, supra*, where Estey J. stated, at pp. 741-42:

It is inherent in a federal system such as that established under the *Constitution Act*, that the courts will be the authority in the community to control the limits of the respective sovereignties of the two plenary governments, as well as to police agencies within each of these spheres to ensure their operations remain within their statutory boundaries. Both duties of course fall upon the courts when acting within their own proper jurisdiction. The *Jabour* case, *supra*, was concerned with the superior courts of general jurisdiction in the provinces, but the same principles apply to courts of subordinate jurisdiction when they are acting within their limited jurisdiction as described by their constituting statute. Such courts must, in the application of the laws of the land whether they be federal or provincial statutes, determine, whether the issue arises, the constitutional integ-

rieur du régime constitutionnel de ce pays. Ces cours de compétence générale sont les descendantes des cours royales de justice. Constituées par les provinces en vertu du par. 92(14) de la *Loi constitutionnelle* et présidées par des juges nommés et rémunérés par le gouvernement fédéral (les art. 96 et 100 de la *Loi constitutionnelle*), elles franchissent, pour ainsi dire, la ligne de partage des compétences fédérale et provinciale.

Ce point de vue, comme il l'a fait remarquer, s'appuie sur des précédents qui remontent jusqu'à l'arrêt *Valin c. Langlois* (1879), 3 R.C.S. 1, où le juge en chef Ritchie a souligné que ces cours [TRADUCTION] «ne sont pas de simples tribunaux locaux chargés de l'application des lois locales» (p. 19), mais «sont les tribunaux de la Reine, tenus de prendre connaissance de toutes les lois et de les appliquer, soit qu'elles aient été adoptées par le Parlement du Canada ou par les législatures locales» (p. 20) (je souligne). Voir aussi les motifs du juge Pigeon dans l'arrêt *R. c. Thomas Fuller Construction Co. (1958) Ltd.*, [1980] 1 R.C.S. 695, à la p. 713.

Cette compétence doit inclure le pouvoir de décider si les lois que l'on cherche à appliquer sont constitutionnelles. Pour reprendre les propos du juge Laskin dans l'arrêt *Thorson c. Procureur général du Canada*, [1975] 1 R.C.S. 138, à la p. 151: «La question de la constitutionnalité des lois a toujours été dans ce pays une question réglable par les voies de justice.» Cela a également été mentionné dans l'arrêt *Northern Telecom*, précité, où le juge Estey affirme, aux pp. 741 et 742:

Il est essentiel, dans un régime fédéral comme celui que crée la *Loi constitutionnelle*, que les tribunaux soient, dans la société, l'autorité qui contrôle les bornes de la souveraineté propre des deux gouvernements pléniers et celle qui surveille les organismes à l'intérieur de ces sphères pour vérifier que leurs activités demeurent dans les limites de la loi. Ces deux rôles appartiennent, cela va de soi, aux tribunaux selon leurs compétences respectives. L'arrêt *Jabour*, précité, visait les cours supérieures de compétence générale dans les provinces, mais les mêmes principes s'appliquent aux cours de juridiction inférieure lorsqu'elles agissent dans les limites de leur compétence qui est définie par leur loi constitutive. Ces cours doivent, pour appliquer les lois du pays, que ces lois soient fédérales ou provinciales, déterminer la valeur constitutionnelle de la mesure en

rity of the measure in question. Such a court of limited jurisdiction must, of course, be responding to a cause properly before it under its statute.

That is scarcely cause for surprise.

As noted in *Cuddy Chicks, supra*, at p. 14, the source of this jurisdiction is not technically s. 52(1) itself, which is silent on the jurisdictional point *per se*. Rather, the source of the jurisdiction to consider such questions for administrative tribunals is their enabling statutes. The superior courts in the provinces, however, have inherent jurisdiction to enforce the provisions of the Constitution Acts as binding the governments in Canada. Many constitutional challenges arise in the course of "normal" private litigation, and the work of the courts would be stymied if they could not deal with the issue. As B. Strayer has noted (*The Canadian Constitution and the Courts* (3rd ed. 1988), at p. 145), there is little standing issue because

[i]n such cases the individual is seeking to assert some right for himself. In the process of establishing this right he contends that legislation or an administrative act which would interfere with it is invalid. This is an incidental and collateral attack on the legislation or act in the process of claiming a right peculiar to the claimant.

In principle, I see no reason why there should be a categorical rule to prevent a judge from dealing with a constitutional issue that incidentally arises in the ordinary course of litigation. As this Court observed in *Morguard, supra*, the guiding element in the determination of an appropriate forum must be principles of order and fairness. In considering these principles, some of the considerations set forth in *Morguard* bear repeating. At page 1103, the following statement appears:

Why should a plaintiff be compelled to begin an action in the province where the defendant now resides, whatever the inconvenience and costs this may bring, and whatever degree of connection the relevant transaction may have with another province? And why should

cause si le problème se pose. Ces cours qui ont une compétence d'exception doivent, cela va de soi, se prononcer sur une affaire qui est légalement de leur ressort.

Cela n'est guère étonnant.

Comme la Cour le souligne, à la p. 14 de l'arrêt *Cuddy Chicks*, précité, techniquement, la source de cette compétence ne se trouve pas dans le par. 52(1) lui-même, lequel est silencieux sur la question de compétence comme telle. La source de la compétence des tribunaux administratifs pour examiner ces questions se trouve plutôt dans leur loi habilitante. Toutefois, les cours supérieures des provinces sont investies d'une compétence inhérente pour appliquer les dispositions des lois constitutionnelles qui lient les gouvernements au Canada. Bien des contestations constitutionnelles se produisent dans le cadre de litiges privés «normaux» et les travaux des tribunaux seraient bloqués s'ils ne pouvaient pas statuer sur la question. Comme l'a fait remarquer B. Strayer, dans *The Canadian Constitution and the Courts* (3e éd. 1988), à la p. 145, la question à trancher a une portée restreinte, étant donné que

[TRADUCTION] [e]n pareils cas, le particulier cherche à faire valoir qu'il y a un certain droit. Pour établir l'existence de ce droit, il prétend que la loi ou un acte administratif qui y porterait atteinte est invalide. C'est une attaque accessoire ou indirecte contre la loi ou l'acte au cours de la revendication d'un droit propre au réclamant.

En principe, je ne vois aucune raison pour laquelle une règle catégorique devrait empêcher un juge de statuer sur une question constitutionnelle qui se pose accessoirement dans le cours normal d'un litige. Comme notre Cour l'a fait observer dans l'arrêt *Morguard*, précité, ce sont les principes d'ordre et d'équité qui doivent nous guider dans le choix d'un tribunal compétent. En examinant ces principes, il vaut la peine de répéter certaines des considérations énoncées dans *Morguard*. À la page 1103, on lit ce qui suit:

Pourquoi un demandeur devrait-il être tenu d'intenter une action dans la province où le défendeur réside présentement, quels que soient les inconvénients et le coût que cela puisse entraîner et quelle que soit la mesure dans laquelle l'opération pertinente peut avoir un lien

the availability of local enforcement be the decisive element in the plaintiff's choice of forum?

I recognize, of course, and this was mentioned in *Morguard*, that these considerations must be weighed against the need for fairness to the defendant as well. This, as is there noted at p. 1103, "requires that the judgment be issued by a court acting through fair process and with properly restrained jurisdiction".

So far as the first of these conditions is concerned, it is difficult to question the basic fairness of the process given the essentially unitary nature of the Canadian court system; see *Pembina, supra*, at p. 215. I would reiterate here what was said in *Morguard, supra*, at pp. 1099-1100:

The Canadian judicial structure is so arranged that any concerns about differential quality of justice among the provinces can have no real foundation. All superior court judges — who also have superintending control over other provincial courts and tribunals — are appointed and paid by the federal authorities. And all are subject to final review by the Supreme Court of Canada, which can determine when the courts of one province have appropriately exercised jurisdiction in an action and the circumstances under which the courts of another province should recognize such judgments.

It may, no doubt, be advanced that courts in the province that enacts legislation have more familiarity with statutes of that province. It must not be forgotten, however, that courts are routinely called to apply foreign law in appropriate cases. It is thus only the fact that a constitutional issue is raised that differentiates this case. But all judges within the Canadian judicial structure must be taken to be competent to interpret their own Constitution. In a judicial system consisting of neutral arbiters trained in principles of a federal state and required to exercise comity, the general notion that the process is unfair simply is not legally sustainable, all

avec l'autre province? Et pourquoi la possibilité de faire exécuter le jugement dans le ressort devrait-elle être l'élément déterminant du choix du tribunal par le demandeur?

Je reconnais bien sûr, et cela est mentionné dans l'arrêt *Morguard*, qu'il faut également soupeser ces considérations en fonction du besoin d'équité envers le défendeur. Cela, peut-on lire, à la p. 1103 de cet arrêt, «exige que le jugement soit rendu par un tribunal qui agit avec équité et avec retenue dans l'exercice de sa compétence».

Quant à la première de ces conditions, il est difficile de mettre en doute l'équité fondamentale du processus, étant donné la nature essentiellement unitaire du système judiciaire canadien; voir l'arrêt *Pembina*, précité, à la p. 215. Je reprendrais ici les propos qu'on peut lire aux pp. 1099 et 1100 de l'arrêt *Morguard*, précité:

Le système judiciaire canadien est organisé de telle manière que toute crainte de différence de qualité de justice d'une province à l'autre ne saurait être vraiment fondée. Tous les juges de cour supérieure — qui ont également un pouvoir de contrôle sur d'autres tribunaux judiciaires et administratifs provinciaux — sont nommés et rémunérés par les autorités fédérales. De plus, toutes les cours de justice sont sujettes à l'examen en dernier ressort de leurs décisions par la Cour suprême du Canada qui peut décider si les cours d'une province ont à bon droit exercé leur compétence dans une action et dans des circonstances où les cours d'une autre province devraient reconnaître ces jugements.

On peut sans doute affirmer que les cours d'une province connaissent mieux les lois adoptées par cette province. Il ne faut pas oublier, cependant, que les tribunaux judiciaires sont couramment appelés à appliquer des lois étrangères lorsque cela est indiqué. Ainsi, la présente affaire n'est différente que du fait qu'une question constitutionnelle y est soulevée. Mais tous les juges du système judiciaire canadien doivent être considérés comme compétents pour interpréter leur propre Constitution. Dans un système judiciaire composé d'arbitres neutres formés dans les principes d'un État fédéral et tenus de faire preuve de courtoisie, l'idée générale que le processus est inéquitable ne saurait simplement pas tenir sur le plan juridique, d'autant

the more so when the process is subject to the supervisory jurisdiction of this Court.

This approach is even more persuasive where, as here, the issue relates to the constitutionality of the legislation of a province that has extraprovincial effects in another province. This is especially true where the constitutionality of the other province's legislation has never been challenged in the other province's courts, and where moreover, as here, such a challenge is unlikely. Where the violation is as much a violation against the Constitution of Canada, then the superior courts which must legitimately face the issue should be able to deal with the question. Against this position, it was observed that most of the parties interested in the question as interveners would be in the province whose statute is impugned. That may be, but where the alleged violation relates to extraterritorial effect, many of the interested parties are also outside Quebec. Above all, it is simply not just to place the onus on the party affected to undertake costly constitutional litigation in another jurisdiction.

I agree that, because of the far-reaching impact of such rulings, the courts should restrict themselves to hearing constitutional challenges to the legislation of other provinces only where there is a real interest affected in their province. Unfortunately, there are intractable "chicken and egg" problems: if the extraterritorial effects of the law are themselves a prerequisite to the British Columbia court taking jurisdiction, then who is to determine that such extraterritorial effects exist in a particular case? The process must begin somewhere, and we must rely on the good sense of our superior courts in the respective provinces to not gratuitously assume jurisdiction.

The problem in the end, then, involves issues of jurisdiction and whether that jurisdiction should be exercised. The British Columbia courts in related litigation (*Hunt v. T&N*, *supra*), we saw, dismissed a challenge to jurisdiction, and leave to this Court was refused. That is scarcely surprising. The case would appear to be similar to *Moran v. Pyle*

plus que le processus est soumis au pouvoir de surveillance de notre Cour.

Ce point de vue est encore plus convaincant si, comme en l'espèce, le point litigieux se rapporte à la constitutionnalité d'une loi provinciale qui a des effets dans une autre province. Cela est particulièrement vrai quand la constitutionnalité d'une loi d'une autre province n'a jamais été attaquée devant ses tribunaux et quand, de plus, comme en l'espèce, il est peu probable qu'une telle contestation aura lieu. Si la violation est autant une violation de la Constitution du Canada, alors les cours supérieures qui doivent légitimement faire face à la question en litige devraient être en mesure de la trancher. À l'encontre de ce point de vue, on a fait observer que la plupart des parties ayant un intérêt dans la question en qualité d'intervenants se trouveraient dans la province dont la loi est contestée. C'est possible, mais si la violation alléguée concerne l'effet extraterritorial, bien des parties intéressées sont aussi à l'extérieur du Québec. Avant tout, il n'est simplement pas juste d'imposer à la partie touchée le fardeau d'engager une action constitutionnelle coûteuse dans un autre ressort.

Je conviens qu'en raison de l'impact considérable de ces décisions, les tribunaux devraient se limiter à n'entendre les contestations constitutionnelles des lois d'autres provinces que si un intérêt véritable est touché dans leur province. Malheureusement, cela pose des problèmes insolubles de cause et d'effet: si les effets extraterritoriaux de la loi sont eux-mêmes une condition préalable de la compétence du tribunal de la Colombie-Britannique, alors qui va déterminer que de tels effets extraterritoriaux existent dans un cas donné? Le processus doit commencer quelque part et nous devons compter que nos cours supérieures, dans chacune des provinces, auront le bon sens de ne pas présumer sans motif qu'elles ont compétence.

En définitive, il faut donc, pour régler le problème, trancher des questions de compétence et décider si cette compétence devrait être exercée. Nous avons vu que les tribunaux de la Colombie-Britannique ont, dans un litige connexe (*Hunt c. T&N*, précitée), rejeté une contestation de compétence et que l'autorisation de pourvoi devant notre

*National (Canada) Ltd.*, [1975] 1 S.C.R. 393, where a corporation that had in one province manufactured goods that were defective was sued in a province where the plaintiff suffered damage as a result. As here, the manufacturer must be taken to have known that the goods would be used outside the province of manufacture in the manner they were. Given the significant connection with the province where the injury took place, it is difficult to see how it could be said to offend the principles of order and fairness for the British Columbia courts to take jurisdiction. A court might, I suppose, also be asked to consider whether it should decline jurisdiction on the basis of the doctrine of *forum non conveniens*. Indeed the court in *Hunt v. T&N, supra*, was asked to decline jurisdiction. But in my view the court was right to refuse to do so. The additional factor that the case involved the British Columbia court in considering the interpretation and constitutional validity of the Quebec statute is not, given the considerations that weigh in favour of the British Columbia court's exercising jurisdiction, sufficient to make a court of that province a *forum non conveniens*.

I do not deny that there are practical inconveniences, but actions dealing with activities having extraprovincial effects must necessarily impose difficulties on one party or the other. Counsel, however, argued that certain systemic inconveniences were involved. There was, he stated, no mandatory provision to advise the Attorneys General, including that of the province whose statute was attacked. Undoubtedly, the representations of the Attorneys General are useful, but I see no reason why this should be fatal. The requirement of such notice is a matter for statutory enactment in each jurisdiction; see B. Strayer, *supra*, at pp. 73-86. It may be a factor to consider but it is just that. The courts and counsel for the parties, who are after all principally affected, must be taken to have competence to deal with the issues. At all events, the courts of other provinces are not bound by the determination, and it is subject to review by this Court when the Attorneys General are required to

Cour a été refusée. Ce n'est guère étonnant. L'affaire semblerait analogue à l'arrêt *Moran c. Pyle National (Canada) Ltd.*, [1975] 1 R.C.S. 393, dans lequel une société qui avait fabriqué des produits défectueux dans une province était poursuivie dans une autre province où le demandeur avait subi un préjudice du fait de ces produits. Comme en l'espèce, il fallait présumer que le fabricant savait que les produits seraient utilisés de la manière qu'ils l'ont été, à l'extérieur de la province où ils avaient été fabriqués. Vu le lien important avec la province où le préjudice a été causé, il est difficile de voir comment on pouvait dire qu'il était contraire aux principes d'ordre et d'équité que les tribunaux de la Colombie-Britannique se déclarent compétents. Je suppose qu'un tribunal pourrait aussi être appelé à décider s'il devrait se déclarer incompétent selon le principe du *forum non conveniens*. En réalité, on demandait à la cour de se déclarer incompétent dans l'affaire *Hunt c. T&N*, précitée. Mais, à mon avis, la cour a refusé à bon droit de le faire. Le fait additionnel que, dans cette affaire, il était question que le tribunal de la Colombie-Britannique interprète la loi québécoise et en examine la constitutionnalité n'est pas suffisant pour en faire un *forum non conveniens*, étant donné les considérations qui militent en faveur de l'exercice de sa compétence.

Je ne nie pas qu'il existe des inconvénients pratiques, mais les actions portant sur des activités qui ont des effets extraprovinciaux doivent nécessairement causer des difficultés à l'une ou l'autre des parties. Toutefois, l'avocat a soutenu que des inconvénients systémiques étaient en cause. D'après lui, aucune disposition n'obligeait à aviser les procureurs généraux, notamment celui de la province dont la loi était contestée. Les observations des procureurs généraux sont sans doute utiles, mais je ne vois pas pourquoi cela devrait être fatal. Il appartient à chaque ressort de prescrire légalement un tel avis; voir B. Strayer, *op. cit.*, aux pp. 73 à 86. C'est peut-être un facteur à prendre en considération, mais ce n'est que cela. Il faut considérer que les tribunaux et les avocats des parties, qui sont après tout les principaux intéressés, ont compétence pour traiter de ces questions. De toute façon, la décision ne lie pas les tribunaux des autres provinces et elle est susceptible de contrôle

be advised as, of course, they were in the present case.

The respondents also argued that this may lead to differing holdings on the constitutionality of the statute in different provinces. It must be remembered, however, that this is not uncommon in respect of federal statutes or identical statutes in different provinces. And in the rare cases where this could cause a party difficulty, this could be dealt with by this Court. As Black and Swan, "New Rules for the Enforcement of Foreign Judgments: *Morguard Investments Ltd. v. De Savoye*" (1991), 12 *Advocates' Q.* 489, note, commenting on our decision in *Bank of Montreal v. Metropolitan Investigation & Security (Canada) Ltd.*, [1975] 2 S.C.R. 546, it would likely do so in view of the fact that the division of powers status of provincial legislation would be at stake.

I, therefore, conclude that the courts of British Columbia had jurisdiction to deal with the constitutional issue and, consequently, so has this Court. It is thus not strictly necessary to consider the specific powers of this Court to consider constitutional questions, but since this issue was seriously debated, it would be wise to say a few words about it.

## The Jurisdiction of the Supreme Court of Canada

There are several factors that suggest that the Supreme Court of Canada is not restricted to the identical powers and procedures of the lower courts from which an appeal is made. An important qualification is that the laws of a province other than that from the courts of which an appeal is taken are not required to be proved as a fact. An early case in support is *John Morrow Screw and Nut Co. v. Hankin* (1918), 58 S.C.R. 74, in which this Court held that it could take judicial notice of the statutory or other laws prevailing in provinces of Canada other than that in which the action originated. Anglin J. quotes from the older case of

par notre Cour lorsque les procureurs généraux doivent être avisés, comme ils l'ont d'ailleurs été en l'espèce.

Les intimées ont également soutenu que cela peut, dans des provinces différentes, conduire à des décisions différentes sur la constitutionnalité de la loi en cause. Il faut cependant se rappeler qu'il n'est pas rare que cela se produise dans le cas de lois fédérales ou de lois identiques dans des provinces différentes. Et dans les rares cas où cela pourrait causer des difficultés à une partie, notre Cour pourrait y remédier. Comme le font observer Black et Swan, dans leur article «New Rules for the Enforcement of Foreign Judgments: *Morguard Investments Ltd. v. De Savoye*» (1991), 12 *Advocates' Q.* 489, note, au sujet de notre arrêt *Banque de Montréal c. Metropolitan Investigation & Security (Canada) Ltd.*, [1975] 2 R.C.S. 546, elle le ferait probablement étant donné que la situation de la loi provinciale au regard du partage des compétences serait en jeu.

Je conclus donc que les tribunaux de la Colombie-Britannique étaient compétents pour statuer sur la question constitutionnelle et que, par conséquent, notre Cour l'est aussi. Il n'est donc pas absolument nécessaire d'examiner les pouvoirs précis, que possède notre Cour, d'examiner des questions constitutionnelles, mais comme cette question a été débattue sérieusement, il me semblerait avisé de dire quelques mots à ce sujet.

## La compétence de la Cour suprême du Canada

Plusieurs facteurs semblent indiquer que la compétence de la Cour suprême du Canada n'est pas limitée aux pouvoirs et procédures identiques des tribunaux d'instance inférieure dont les décisions sont portées en appel. Une importante réserve veut que les lois d'une province autre que celle des tribunaux dont la décision fait l'objet d'un pourvoi ne sont pas des faits qui doivent être prouvés. À l'appui de cette affirmation, on peut citer l'arrêt antérieur *John Morrow Screw and Nut Co. c. Hankin* (1918), 58 R.C.S. 74, dans lequel notre Cour a décidé qu'elle pouvait prendre connaissance d'office des lois et autres règles de droit des provinces

*Logan v. Lee* (1907), 39 S.C.R. 311, at p. 313, where then Chief Justice Fitzpatrick "announces":

. . . after having consulted with my brother judges, that this court, constituted as an appellate tribunal for the whole Dominion of Canada, requires no evidence as to what laws may be in force in any of the provinces or territories of Canada. This court is bound to follow the rule laid down by the House of Lords in the case of *Cooper* v. *Cooper*, [(1888), 13 App. Cas. 88], and to take judicial notice of the statutory or other laws prevailing in every province and territory in Canada, *suo motû*, even in cases where such statutes or laws may not have been proved in evidence in the courts below, and although it might happen that the views as to what the law might be, as entertained by the members of this court, might be in absolute contradiction of any evidence upon those points adduced in the courts below.

This direct power of the Court to consider the laws of the provinces has continued to be acknowledged. For example, in *Pettkus v. Becker*, [1980] 2 S.C.R. 834, at pp. 853-54, Dickson J. approved of *Cooper v. Cooper* (1888), 13 App. Cas. 88, and stated that this Court would take judicial notice of all laws prevailing in every province, even in cases where such laws may not have been proved in evidence in the courts below, so long as such laws had been pleaded in the first instance.

The Court can thus play a "unifying jurisdiction" over the provincial courts; see *Bank of Montreal v. Metropolitan Investigation & Security (Canada) Ltd.*, *supra*, at p. 556, *per* Laskin C.J. This is consistent with the mandate given it under the *Supreme Court Act* which establishes it as "a General Court of Appeal for Canada" as authorized by s. 101 of the *Constitution Act, 1867*. The remarks of Beetz J. in *Canard*, *supra*, were made in a context involving the respective jurisdictions of the federal and provincial courts, and they can hardly be taken to have been intended to restrict the operation of these cases. This would run against the trend of recent cases which have mandated an expansive reading of other provisions of the *Supreme Court Act* (s. 40(1)) (formerly

canadiennes autres que celle où l'action avait pris naissance. Le juge Anglin cite l'arrêt ancien *Logan c. Lee* (1907), 39 R.C.S. 311, à la p. 313, dans lequel le juge en chef Fitzpatrick [TRADUCTION] «annonce»:

[TRADUCTION] . . . après avoir consulté mes collègues, notre Cour, qui est un tribunal d'appel pour l'ensemble du pays, n'exige pas que l'on prouve quelles lois peuvent être en vigueur dans une province ou un territoire du Canada. Notre Cour est tenue de suivre la règle énoncée par la Chambre des lords dans l'arrêt *Cooper* c. *Cooper* [(1888), 13 App. Cas. 88] et, de sa propre initiative, de prendre connaissance d'office des lois et autres règles de droit de chaque province et territoire du Canada, même dans les cas où celles-ci n'ont pas fait l'objet d'une preuve devant les tribunaux d'instance inférieure, et même s'il pouvait arriver que la perception de ce que la loi peut être, qu'ont les membres de notre Cour, soit en complète contradiction avec la preuve relative à ces points qui a été produite devant les tribunaux d'instance inférieure.

On a continué de reconnaître que notre Cour a ce pouvoir direct d'examiner les lois des provinces. Par exemple, dans l'arrêt *Pettkus c. Becker*, [1980] 2 R.C.S. 834, aux pp. 853 et 854, le juge Dickson approuve l'arrêt *Cooper c. Cooper* (1888), 13 App. Cas. 88, et affirme que notre Cour prendrait connaissance d'office de toutes les lois de chaque province, même dans les cas où ces lois n'ont pas fait l'objet d'une preuve devant les tribunaux d'instance inférieure, pourvu qu'elles aient été invoquées en première instance.

La Cour peut donc exercer une «juridiction unificatrice» sur les tribunaux des provinces; voir l'arrêt *Banque de Montréal c. Metropolitan Investigation & Security (Canada) Ltd.*, précité, à la p. 556, motifs du juge en chef Laskin. Cela est compatible avec le mandat confié à la Cour par la *Loi sur la Cour suprême* qui l'établit comme «une cour générale d'appel pour le Canada», conformément à l'art. 101 de la *Loi constitutionnelle de 1867*. Les remarques du juge Beetz dans l'arrêt *Canard*, précité, s'inscrivaient dans le contexte des compétences respectives des tribunaux fédéraux et provinciaux, et elles ne sauraient guère être interprétées comme visant à restreindre l'application de cette jurisprudence. Cela irait à l'encontre de la tendance de la jurisprudence récente qui

s. 41(1)) "the better to enable this Court to dis-
charge its role at the apex of the Canadian judicial
system, as the court of last resort for all Canadi-
ans"; see *R. v. Gardiner*, [1982] 2 S.C.R. 368, *per*
Dickson J. (later C.J.), at p. 404; see also *Argentina
v. Mellino*, [1987] 1 S.C.R. 536, at pp. 545-47.

donne, à d'autres dispositions de la *Loi sur la Cour
suprême* (par. 40(1)) (auparavant par. 41(1)), une
interprétation plus libérale «qui permet à cette
Cour de remplir son rôle au sommet du système
judiciaire canadien en tant que cour de dernier res-
sort pour tous les Canadiens»; voir l'arrêt *R. c.
Gardiner*, [1982] 2 R.C.S. 368, le juge Dickson,
plus tard Juge en chef, à la p. 404; voir aussi l'arrêt
*Argentine c. Mellino*, [1987] 1 R.C.S. 536, aux
pp. 545 à 547.

### The Constitutional Issue

I shall begin by considering the constitutional
basis advanced to support the Quebec statute. The
respondents and the intervener the Attorney Gen-
eral of Quebec submit that the Act falls within pro-
vincial legislative competence by virtue of
ss. 92(13), (14) and (16), which empower a prov-
ince to legislate in relation to the following matters
in the province: property and civil rights, the
administration of justice, including the creation
and organization of provincial courts and the pro-
cedure in civil matters, and matters of a merely
local or private nature. These provisions, they say,
empower a province to legislate respecting the
enforcement of judicial and other orders emanating
from another province. For this, they cite *Attorney
General for Ontario v. Scott*, [1956] S.C.R. 137,
upholding the power of a province to enforce judg-
ments of other countries pursuant to reciprocal
enforcement arrangements. A necessary inference,
they say, is that the province has legislative juris-
diction to prevent the enforcement in its jurisdic-
tion of any order in relation to property located in
the province, even if that affects rights recognized
outside the province.

### La question constitutionnelle

Je vais d'abord examiner le fondement constitu-
tionnel invoqué à l'appui de la loi québécoise. Les
intimées et l'intervenant le procureur général du
Québec soutiennent que la Loi relève de la compé-
tence législative provinciale en vertu des par.
92(13), (14) et (16) qui habilitent la province à
légiférer relativement aux matières suivantes dans
la province: la propriété et les droits civils, l'admi-
nistration de la justice, y compris la constitution et
l'organisation de tribunaux provinciaux, de même
que la procédure en matière civile, et les matières
d'une nature purement locale ou privée. Selon eux,
ces dispositions habilitent une province à légiférer
relativement à l'exécution d'ordonnances judi-
ciaires et autres, émanant d'une autre province. À
ce propos, ils citent l'arrêt *Attorney General for
Ontario c. Scott*, [1956] R.C.S. 137, où la Cour a
confirmé le pouvoir d'une province d'exécuter des
jugements d'autres pays conformément à des
ententes de réciprocité en matière d'exécution. Il
faut nécessairement en conclure, d'après eux, que
la province a la compétence législative pour empê-
cher l'exécution sur son territoire de toute ordon-
nance concernant des biens situés dans la province,
même si cela touche des droits reconnus à l'exté-
rieur de la province.

This position, of course, raises issues about the
extent to which a province may give extraterrito-
rial effect to legislation, issues that have tradition-
ally been considered in the context of the limita-
tion in every head of provincial power to
legislation "in the province". As well, so far as the
extraterritorial application of judicial pronounce-
ments in another province is concerned, it raises
issues concerning whether the doctrine pro-

Il va sans dire que ce point de vue soulève des
questions au sujet de la mesure dans laquelle une
province peut donner un effet extraterritorial à une
loi, questions qui ont traditionnellement été étu-
diées dans le contexte de la limitation de chaque
chef de compétence provinciale aux lois «dans la
province». De même, en ce qui concerne l'applica-
tion extraterritoriale de décisions judiciaires ren-
dues dans une autre province, il soulève des ques-

pounded in *Morguard* is of a constitutional character and whether that doctrine applies in the circumstances. Before turning to these extraterritorial concerns, however, I should observe that I have considerable reservations about some of the suggested constitutional justifications for the Act. First, it is difficult to view the Act as concerned with the administration of justice in Quebec pursuant to s. 92(14). That section relates to the creation of courts in the province and their procedures. The impugned Act does not, however, relate to the administration of justice or procedure in the courts in Quebec; rather it purports to control property in the province that might be affected by proceedings outside the province. It has nothing to do with the court procedure in Quebec. It is instead concerned with impeding legal processes of courts outside the province by preventing their enforcement in the province.

Similarly, s. 92(16) seems an implausible head of power under which the Act could be authorized because the refusal to allow discovery of documents related to court orders or legislative acts emanating from outside the province is hardly a matter of a "merely local or private Nature in the Province". Rather the Act is specifically concerned with orders and acts from outside the province, and the response of parties in Quebec to them.

The most promising constitutional basis for the Act is s. 92(13), as it relates to the substantive property and civil rights in the province. The documents and information in question may certainly form the subject of legislation as property in the province of Quebec. This indeed was the basis principally relied on by those seeking to uphold the Act. The purpose of the Act, it was said, was to prohibit execution of decisions made outside the province that affected the communication of records of business concerns located in the province.

tions quant à savoir si la théorie proposée dans l'arrêt *Morguard* est de nature constitutionnelle et si elle s'applique dans les circonstances. Avant d'aborder ces questions d'extraterritorialité, je devrais toutefois faire remarquer que j'ai beaucoup de doutes au sujet de certaines justifications constitutionnelles proposées à l'égard de la Loi. Premièrement, il est difficile de considérer la Loi comme relative à l'administration de la justice au Québec, conformément au par. 92(14). Cette disposition se rapporte à la création de tribunaux dans la province et à leur procédure. Cependant, la loi attaquée ne se rapporte pas à l'administration de la justice ou à la procédure des tribunaux du Québec; elle a plutôt pour objet de contrôler les biens dans la province qui pourraient être touchés par des procédures à l'extérieur de la province. Elle n'a rien à voir avec la procédure des tribunaux québécois. Elle vise plutôt à faire obstacle aux actes de procédure de tribunaux hors de la province en empêchant leur exécution dans la province.

De même, il semble peu vraisemblable que le par. 92(16) puisse constituer un chef de compétence en vertu duquel la Loi pourrait être permise, parce que le refus de permettre la communication de documents relatifs à des ordonnances judiciaires ou à des actes législatifs émanant de l'extérieur de la province n'est guère une matière «d'une nature purement locale ou privée dans la province». La Loi porte plutôt sur des ordonnances et des actes de l'extérieur de la province et sur la réponse donnée à ceux-ci par des parties au Québec.

Le fondement constitutionnel le plus prometteur pour cette loi est le par. 92(13) étant donné qu'il touche la propriété et les droits civils substantiels dans la province. Les documents et les renseignements en question peuvent certainement faire l'objet d'une loi relative à la propriété dans la province de Québec. C'est en effet le fondement qu'ont principalement invoqué ceux qui demandent le maintien de la Loi. Selon ces derniers, l'objet de la Loi était d'interdire l'exécution de décisions de l'extérieur de la province qui touchaient la communication de dossiers d'entreprises situées dans la province.

CASE 0:13-cv-02086-PJS-HB   Document 69-1   Filed 03/20/14   Page 51 of 62

This argument is understandable in terms of traditional approaches to private international law as it operates between foreign states. It is well established that judgments and orders of a state must be recognized and enforced in order to have effect in a foreign jurisdiction. But the traditional conflicts rules, which were designed for an anarchic world that emphasized forum independence, must be assessed in light of the principles of our constitutional law mentioned above. First, the statute must conform to the requirement that it be "in the Province" as required by s. 92, a requirement that involves a balancing under the "pith and substance" approach to determine if it exceeds provincial jurisdiction to enact legislation with extraprovincial effect. Secondly, the courts must consider appropriate policy in relation to recognition and enforcement of judgments issued in other provinces in light of the legal interdependence under the scheme of confederation established in 1867. It is the latter issue I now wish to explore.

## The *Morguard* Decision

It was the situation of total autonomy over recognition and enforcement, and the consequent disruption it could cause for any litigation involving interprovincial or international elements, that was the concern of this Court's decision in *Morguard*, *supra*. *Morguard* was concerned with tempering this source of unfairness and inconvenience to litigants in conformity with the changing nature of the world community and, in particular, in light of the Canadian constitutional structure.

A central idea in that judgment was comity. But as I stated, at p. 1098, "I do not think it much matters whether one calls these rules of comity or simply relies directly on the reasons of justice, necessity and convenience" that underlie them. In my view, the old common law rules relating to recognition and enforcement were rooted in an outmoded conception of the world that emphasized sovereignty and independence, often at the cost of

Cet argument peut s'expliquer par les façons traditionnelles d'aborder le droit international privé qui s'applique entre les États étrangers. Il est bien établi que, pour s'appliquer dans un ressort étranger, les jugements et ordonnances d'un État doivent être reconnus et exécutés. Mais les règles traditionnelles du droit international privé qui ont été conçues pour un monde anarchique qui mettait l'accent sur l'indépendance du tribunal saisi, doivent être évaluées en fonction des principes de notre droit constitutionnel mentionnés plus haut. Premièrement, la loi doit satisfaire à l'exigence de situation «dans la province» imposée par l'art. 92, laquelle comporte une évaluation, selon la méthode du «caractère véritable», visant à déterminer si l'adoption d'une mesure législative ayant un effet extraprovincial excède la compétence de la province. Deuxièmement, les tribunaux doivent réfléchir à la ligne de conduite qu'il convient d'adopter sur le plan de la reconnaissance et de l'exécution des jugements rendus dans d'autres provinces, compte tenu de l'interdépendance juridique qui existe sous le régime de confédération établi en 1867. C'est cette dernière question que je souhaite maintenant examiner.

## L'arrêt *Morguard*

C'étaient la situation d'autonomie totale en matière de reconnaissance et d'exécution et la perturbation qu'elle pouvait causer dans tout litige comportant des éléments interprovinciaux ou internationaux, qui préoccupaient notre Cour dans l'arrêt *Morguard*, précité. Dans cet arrêt, la Cour était soucieuse de tempérer cette source d'injustice et d'inconvénient pour les parties à un litige conformément au caractère changeant de la communauté internationale et, particulièrement, en fonction de la structure constitutionnelle canadienne.

Au centre de cet arrêt, il y avait la notion de courtoisie. Mais comme je l'ai dit, à la p. 1098, «je ne crois pas qu'il importe qu'on les qualifie de règles de courtoisie ou qu'on ne fasse qu'appel directement aux motifs de justice, de nécessité et de commodité» qui les sous-tendent. À mon avis, les anciennes règles de common law relatives à la reconnaissance et à l'exécution avaient leur origine dans une conception périmée du monde qui mettait

unfairness. Greater comity is required in our modern era when international transactions involve a constant flow of products, wealth and people across the globe.

In any event, I indicated, at p. 1099, that the traditional rules emphasizing sovereignty seem to "fly in the face of the obvious intention of the Constitution to create a single country". Among the factors I identified that would also support a more cooperative spirit in recognition and enforcement were (1) common citizenship, (2) interprovincial mobility of citizens, (3) the common market created by the union as reflected in ss. 91(2), 91(10), 121 and the peace, order and good government clause, and (4) the essentially unitary structure of our judicial system with the Supreme Court of Canada at its apex to which I have earlier referred. The following passage, at p. 1099 of *Morguard*, sets out these factors:

In any event, the English rules seem to me to fly in the face of the obvious intention of the Constitution to create a single country. This presupposes a basic goal of stability and unity where many aspects of life are not confined to one jurisdiction. A common citizenship ensured the mobility of Canadians across provincial lines, a position reinforced today by s. 6 of the *Charter*; see *Black v. Law Society of Alberta*, [1989] 1 S.C.R. 591. In particular, significant steps were taken to foster economic integration. One of the central features of the constitutional arrangements incorporated in the *Constitution Act, 1867* was the creation of a common market. Barriers to interprovincial trade were removed by s. 121. Generally trade and commerce between the provinces was seen to be a matter of concern to the country as a whole; see *Constitution Act, 1867*, s. 91(2). The Peace, Order and Good Government clause gives the federal Parliament powers to deal with interprovincial activities (see *Interprovincial Co-Operatives Ltd. v. The Queen*, [1976] 1 S.C.R. 477; as well as my reasons in *R. v. Crown Zellerbach Canada Ltd.*, [1988] 1 S.C.R. 401 (dissenting but not on this point); see also *Multiple Access Ltd. v. McCutcheon*, [1982] 2 S.C.R. 161). And

*a* l'accent sur la souveraineté et l'indépendance, souvent au détriment de l'équité. Une plus grande courtoisie est nécessaire à l'époque moderne où les opérations internationales impliquent une circulation constante de produits, de richesses et de personnes partout dans le monde.

*b* De toute façon, j'ai indiqué, à la p. 1099, que les règles traditionnelles qui mettent l'accent sur la souveraineté semblent —absolument contraires à l'intention manifeste de la Constitution d'établir un seul et même pays». Parmi les facteurs que j'ai *c* identifiés, qui justifieraient aussi un esprit de coopération plus étroite en matière de reconnaissance et d'exécution figuraient, premièrement, la citoyenneté commune, deuxièmement, la mobilité interprovinciale des citoyens, troisièmement, le *d* marché commun créé par l'union, qui se reflète dans les par. 91(2) et 91(10) et à l'art. 121, ainsi que dans la disposition relative à la paix, à l'ordre et au bon gouvernement, et quatrièmement, la structure essentiellement unitaire de notre système *e* judiciaire dont le sommet est occupé par la Cour suprême du Canada, comme je l'ai déjà mentionné. Ces facteurs sont énoncés dans l'extrait suivant de la p. 1099 de l'arrêt *Morguard*:

*f* De toute façon, les règles anglaises me semblent absolument contraires à l'intention manifeste de la Constitution d'établir un seul et même pays. Cela présuppose un objectif fondamental de stabilité et d'unité où de nombreux aspects de la vie ne sont pas confinés à *g* un seul ressort. La citoyenneté commune assure aux Canadiens la mobilité d'une province à l'autre, ce qui est aujourd'hui renforcé par l'art. 6 de la *Charte*; voir l'arrêt *Black c. Law Society of Alberta*, [1989] 1 R.C.S. 591. Plus précisément, d'importantes mesures ont été *h* prises pour favoriser l'intégration économique. L'un des principaux éléments des arrangements constitutionnels incorporés dans la *Loi constitutionnelle de 1867* était la création d'un marché commun. L'article 121 a écarté les obstacles aux échanges interprovinciaux. Dans l'ensemble, les échanges et le commerce interprovinciaux *i* étaient considérés comme un sujet qui intéressait le pays dans son ensemble; voir le par. 91(2) de la *Loi constitutionnelle de 1867*. La disposition relative à la paix, à l'ordre et au bon gouvernement confère au Parlement fédéral la compétence sur les activités interprovinciales *j* (voir *Interprovincial Co-Operatives Ltd. c. La Reine*, [1976] 1 R.C.S. 477, et aussi mes motifs de jugement

the combined effect of s. 91(29) and s. 92(10) does the same for interprovincial works and undertakings.

These arrangements themselves speak to the strong need for the enforcement throughout the country of judgments given in one province. But that is not all. [The judgment then goes on, at pp. 1099-1100, with the passage cited *supra* regarding the essentially unitary structure of the Canadian court system, which allays any concerns about differential quality of justice among the provinces.]

The importance of adapting the traditional procedural limits of common law rules in light of the demands of the structural requirements of the Canadian Constitution was not something invented in *Morguard*. For example, I noted then, and repeat now, what was said by Estey J. in *Aetna Financial Services Ltd. v. Feigelman*, [1985] 1 S.C.R. 2, at pp. 34-35, in relation to *Mareva* injunctions designed to prevent the removal of assets from one jurisdiction to another:

All the foregoing considerations, while important to an understanding of the operation of this type of injunction, leave untouched the underlying and basic question: do the principles, as developed in the United Kingdom courts, survive intact a transplantation from that unitary state to the federal state of Canada?

He concluded that the rules intended to deal with the removal of assets and "fend off the depredations of shady mariners operating out of far-away havens, usually on the fringe of legally organized commerce" were not applicable to situations where a corporate defendant was seeking to move assets for legitimate business purposes to another jurisdiction in Canada. Similarly, I do not think litigation engendered against a corporate citizen located in one province by its trading and commercial activities in another province should necessarily be subject to the same rules as those applicable to international commerce. In particular, when a corporate citizen situate in one province chooses to engage in trading and commercial activities in other provinces, the rules governing consequential litigation, specifically rules for the recognition and

dans l'arrêt *R. c. Crown Zellerbach Canada Ltd.*, [1988] 1 R.C.S. 401 (où j'étais dissident, mais sur un autre point); voir aussi *Multiple Access Ltd. c. McCutcheon*, [1982] 2 R.C.S. 161). Et il en est de même pour les entreprises et ouvrages interprovinciaux en raison de l'effet conjugué des par. 91(29) et 92(10).

Ces arrangements mêmes répondent à la nécessité impérieuse de pouvoir faire exécuter partout au pays les jugements obtenus dans une province. Mais ce n'est pas tout. [On trouve ensuite, aux pp. 1099 et 1100, le passage précité concernant la structure essentiellement unitaire du système judiciaire canadien, qui dissipe toute crainte de différence de qualité de justice d'une province à l'autre.]

L'importance d'adapter les limites procédurales traditionnelles des règles de common law en fonction des exigences structurelles de la Constitution canadienne n'a pas été inventée dans l'arrêt *Morguard*. Par exemple, j'y ai souligné, et je reprends ici, ce qu'a dit le juge Estey dans l'arrêt *Aetna Financial Services Ltd. c. Feigelman*, [1985] 1 R.C.S. 2, aux pp. 34 et 35, relativement aux injonctions *Mareva* conçues pour empêcher le transfert de biens d'un ressort à l'autre:

Toutes les considérations qui précèdent, bien qu'importantes pour comprendre le fonctionnement de ce genre d'injonction, laissent sans réponse la question fondamentale sous-jacente: les principes dégagés par les tribunaux anglais restent-ils intacts une fois transplantés de cet État unitaire dans l'État fédéral qu'est le Canada?

Il a conclu que les règles conçues pour empêcher le transfert de biens et pour «parer les déprédations de marins véreux opérant à partir de refuges lointains et habituellement à la limite du commerce légalement organisé» ne s'appliquaient pas aux situations dans lesquelles une société défenderesse cherchait à transférer, à des fins commerciales légitimes, des biens dans un autre ressort canadien. De même, je ne pense pas que l'action intentée contre une société située dans une province en raison des activités d'échanges et de commerce auxquelles elle se livre dans une autre province devrait nécessairement être assujettie aux mêmes règles que celles qui s'appliquent au commerce international. En particulier, si une société située dans une province choisit de se livrer à des activités d'échanges et de commerce dans d'autres pro-

324    CASE 0:13-cv-02086-PJS-HB   Document 69-1   Filed 03/20/14   Page 54 of 62   [1993] 4 S.C.R.

HUNT *v.* T&N PLC    *La Forest J.*

enforcement of judgments, should be adapted to the specific nature of the Canadian federation. And it is difficult to believe that ordinary individuals moving across Canada in the exercise of their common right of citizenship should be treated differently; see *Black v. Law Society of Alberta*, [1989] 1 S.C.R. 591.

*Morguard* was not argued in constitutional terms, so it was sufficient there to infuse the constitutional considerations into the rules that might otherwise have governed issues of enforcement and recognition of judgment. But the issue was very clearly raised in this case and in fact a constitutional question was framed. Now, as perusal of the last cited passage from *Morguard* reveals, the constitutional considerations raised are just that. They are constitutional imperatives, and as such apply to the provincial legislatures as well as to the courts, as the Attorney General for Ontario conceded and as a number of commentators have maintained; see, for example, P. Hogg, *Constitutional Law of Canada* (3rd ed. 1992), at p. 335; V. Black and J. Swan, "New Rules for the Enforcement of Foreign Judgments: *Morguard Investments Ltd. v. De Savoye*", *supra*. In short, to use the expressions employed in *Morguard*, at p. 1100, the "integrating character of our constitutional arrangements as they apply to interprovincial mobility" calls for the courts in each province to give "full faith and credit" to the judgments of the courts of sister provinces. This, as also noted in *Morguard*, is inherent in the structure of the Canadian federation, and, as such, is beyond the power of provincial legislatures to override. This does not mean, however, that a province is debarred from enacting any legislation that may have some effect on litigation in other provinces or indeed from enacting legislation respecting modalities for recognition of judgments of other provinces. But it does mean that it must respect the minimum standards of order and fairness addressed in *Morguard*. I turn briefly then to the relevant principles after

vinces, les règles régissant les litiges qui s'ensuivent, particulièrement les règles relatives à la reconnaissance et à l'exécution des jugements, devraient être adaptées à la nature spécifique de la fédération canadienne. Et il est difficile de croire que les personnes ordinaires qui se déplacent au Canada dans l'exercice de leur citoyenneté commune devraient être traitées différemment; voir *Black c. Law Society of Alberta*, [1989] 1 R.C.S. 591.

L'affaire *Morguard* n'ayant pas été plaidée sur le plan constitutionnel, il suffisait d'insuffler les considérations constitutionnelles dans les règles qui auraient pu, par ailleurs, régir les questions de reconnaissance et d'exécution de jugements. Mais la question a été très clairement soulevée en l'espèce et, en fait, une question constitutionnelle a été formulée. Or, comme il ressort d'une lecture attentive du dernier passage cité de l'arrêt *Morguard*, les considérations constitutionnelles soulevées sont précisément cela. Elles sont des impératifs constitutionnels et elles s'appliquent, en tant que telles, autant aux législatures provinciales qu'aux tribunaux, comme l'a concédé le procureur général de l'Ontario et comme l'ont soutenu un certain nombre d'auteurs; voir, par exemple, P. Hogg, *Constitutional Law of Canada* (3ᵉ éd. 1992), à la p. 335; V. Black et J. Swan, «New Rules for the Enforcement of Foreign Judgments: *Morguard Investments Ltd. v. De Savoye*», *loc. cit.* Bref, pour reprendre les propos tenus à la p. 1100 de l'arrêt *Morguard*, le «caractère unificateur de nos arrangements constitutionnels, pour autant que ceux-ci visent la mobilité interprovinciale», exige de la part des tribunaux de chaque province la «reconnaissance totale» des jugements des tribunaux des autres provinces. Il s'agit là, comme on l'a aussi fait remarquer dans l'arrêt *Morguard*, d'une caractéristique inhérente de la fédération canadienne et les législatures provinciales ne peuvent y passer outre. Cela ne veut pas dire, toutefois, qu'il est interdit à une province d'adopter une loi qui peut avoir un effet sur les litiges dans d'autres provinces, voire d'adopter une loi concernant les modalités de reconnaissance des jugements d'autres provinces. Mais cela signifie qu'elle doit respecter les normes minimales d'ordre et d'équité abordées dans l'arrêt

which I shall consider whether the statute impugned in this case offends these standards.

The basic thrust of *Morguard* was that in our federation a greater degree of recognition and enforcement of judgments given in other provinces was called for. *Morguard* was careful to indicate, however, that a court must have reasonable grounds for assuming jurisdiction. One must emphasize that the ideas of "comity" are not an end in themselves, but are grounded in notions of order and fairness to participants in litigation with connections to multiple jurisdictions.

In *Morguard*, a more accommodating approach to recognition and enforcement was premised on there being a "real and substantial connection" to the forum that assumed jurisdiction and gave judgment. Contrary to the comments of some commentators and lower court judges, this was not meant to be a rigid test, but was simply intended to capture the idea that there must be some limits on the claims to jurisdiction. Indeed I observed (at p. 1104) that the "real and substantial connection" test was developed in *Indyka v. Indyka*, [1969] 1 A.C. 33, in a case involving matrimonial status (where sound policy demands generosity in recognition), and that in a personal action a nexus may need to be sought between the subject-matter and the territory where the action is brought. I then considered the test developed in *Moran v. Pyle National (Canada) Ltd.*, *supra*, for products liability cases as an example of where jurisdiction would be properly assumed. The exact limits of what constitutes a reasonable assumption of jurisdiction were not defined, and I add that no test can perhaps ever be rigidly applied; no court has ever been able to anticipate all of these. However, though some of these may well require reconsideration in light of *Morguard*, the connections relied on under the traditional rules are a good place to start. More than this was left to depend on the gradual accumulation of connections defined in accordance with the broad principles of order and fairness; V. Black, "The Other Side of *Morguard*:

*Morguard*. Je vais me pencher brièvement sur les principes pertinents, pour ensuite examiner la question de savoir si la loi contestée en l'espèce enfreint ces normes.

L'idée essentielle de l'arrêt *Morguard* était que, dans notre fédération, il était nécessaire d'avoir une meilleure reconnaissance et exécution des jugements rendus dans d'autres provinces. Dans cet arrêt, on a toutefois pris soin d'indiquer que les tribunaux doivent avoir des motifs raisonnables de se déclarer compétents. Il faut souligner que les idées de «courtoisie» ne sont pas une fin en soi, mais reposent sur des notions d'ordre et d'équité envers les parties à un litige qui a des liens avec plusieurs ressorts.

Selon l'arrêt *Morguard*, une façon plus conciliante d'aborder la reconnaissance et l'exécution reposait sur l'existence d'un «lien réel et substantiel» avec le tribunal qui s'est déclaré compétent et a rendu jugement. Contrairement à ce qu'ont fait remarquer certains auteurs et certains juges de tribunaux d'instance inférieure, cela ne se voulait pas un critère rigide, mais visait simplement à exprimer l'idée que les revendications de compétence doivent être assujetties à certaines limites. En effet, j'ai fait remarquer (à la p. 1104) que le critère du «lien réel et substantiel» a été établi dans l'arrêt *Indyka c. Indyka*, [1969] 1 A.C. 33, qui portait sur l'état matrimonial (en pareil cas, la logique commande une reconnaissance généreuse), et que, dans une action personnelle, il peut être nécessaire de chercher un lien entre l'objet de l'action et le ressort où elle est intentée. J'ai ensuite étudié le critère énoncé dans l'arrêt *Moran c. Pyle National (Canada) Ltd.*, précité, à l'égard d'affaires de responsabilité du fabricant, comme un exemple de situation où un tribunal pourrait à bon droit se déclarer compétent. Les limites de ce qui constitue une déclaration raisonnable de compétence n'ont pas été déterminées et j'ajoute qu'aucun critère ne pourra peut-être jamais être appliqué rigidement; aucun tribunal n'a jamais pu prévoir tous ces cas. Toutefois, même s'il peut bien être nécessaire d'en réexaminer certains à la lumière de l'arrêt *Morguard*, les liens invoqués aux termes des règles traditionnelles constituent un bon point de départ. On

New Limits on Judicial Jurisdiction" (1993), 22 *Can. Bus. L.J.* 4. But I think that the general approach was solidly based.

Since the matter has been the subject of considerable commentary, I should note parenthetically that I need not, for the purposes of this case, consider the relative merits of adopting a broad or narrow basis for assuming jurisdiction and the consequences of this decision for the use of the doctrine of *forum non conveniens*; see the opposing views of V. Black in the article just cited, and P. Finkle and C. Labrecque, "Low-Cost Legal Remedies and Market Efficiency: Looking Beyond *Morguard*" (1993), 22 *Can. Bus. L.J.* 58. Whatever approach is used, the assumption of and the discretion not to exercise jurisdiction must ultimately be guided by the requirements of order and fairness, not a mechanical counting of contacts or connections. Here, the courts below found that there was, on the authorities, jurisdiction, and that there was no reason to apply the doctrine of *forum non conveniens*. In light of commentaries on *Morguard*, I should perhaps also add that I need not consider the implications, if any, of *Morguard* on choice of law and other aspects of conflicts law.

Finally, I noted in *Morguard* (at p. 1100) that a number of commentators had suggested that the federal Parliament had power to legislate respecting the recognition and enforcement of judgments, and in my view that suggestion is well founded. This issue is ultimately related to the rights of the citizen, trade and commerce and other federal legislative powers, including that encompassed in the peace, order and good government clause. But subject to these overriding powers, I see no reason why the provinces should not be able to legislate in the area, subject, however, to the principles in *Morguard* and to the demands of territoriality as

a laissé plus que cela dépende de l'accumulation progressive de liens définis conformément aux principes généraux d'ordre et d'équité; V. Black, «The Other Side of *Morguard*: New Limits on Judicial Jurisdiction» (1993), 22 *Can. Bus. L.J.* 4. Mais je pense que la solution générale reposait sur une base solide.

Comme la question a fait l'objet de nombreux commentaires, je ferais remarquer, entre parenthèses, que je n'ai pas, aux fins de la présente affaire, à examiner les avantages relatifs de l'adoption d'un motif général ou strict de se déclarer compétent, ni les conséquences de cette décision sur le recours au principe du *forum non conveniens*; voir les points de vue contraires de V. Black dans l'article précité et de P. Finkle et C. Labrecque, «Low-Cost Legal Remedies and Market Efficiency: Looking Beyond *Morguard*» (1993), 22 *Can. Bus. L.J.* 58. Peu importe le point de vue adopté, la déclaration de compétence et le pouvoir discrétionnaire de ne pas l'exercer doivent en fin de compte être subordonnés aux exigences d'ordre et d'équité, et non à un calcul mécanique de rapports ou de liens. En l'espèce, les tribunaux d'instance inférieure ont conclu que, d'après la jurisprudence, il y avait compétence et qu'il n'y avait aucune raison d'appliquer le principe du *forum non conveniens*. Compte tenu des commentaires relatifs à l'arrêt *Morguard*, je devrais peut-être ajouter que je n'ai pas à tenir compte des répercussions, s'il en est, de l'arrêt *Morguard* sur le choix de la loi applicable et d'autres aspects du droit international privé.

Finalement, j'ai fait remarquer dans l'arrêt *Morguard* (à la p. 1100) qu'un certain nombre d'auteurs ont affirmé que le Parlement fédéral avait le pouvoir de légiférer en matière de reconnaissance et d'exécution des jugements et, selon moi, cette affirmation est bien fondée. Cette question a trait, en fin de compte, aux droits des citoyens et à la compétence législative que le Parlement possède notamment en matière d'échange et de commerce, y compris celle comprise dans la disposition relative à la paix, à l'ordre et au bon gouvernement. Mais sous réserve de ces pouvoirs prépondérants, je ne vois pas pourquoi les provinces ne devraient

expounded in the cases, most recently in *Reference re Upper Churchill Water Rights Reversion Act, supra*.

## Application of *Morguard* Principles to the Impugned Statute

I now turn to the issue whether the impugned statute is consistent with the principles I have just set forth. I say at the outset that I do not think it is. A province undoubtedly has an interest in protecting the property of its residents within the province, but it cannot do so by unconstitutional means. Here the means chosen are intended to unconditionally refuse recognition to orders and thereby impede litigation, not only in foreign countries but in other provinces. At least when a court order is sought, if not before, a judicial order in another province will be denied effect. There are no qualifications. No discretion is given so it can scarcely be said that the Act respects the principles of order and fairness which must, under the *Morguard* principle, inform the procedures required for litigation having extraprovincial effects. Apart from the legislative aspect, the situation in *Morguard* differed in that the appellant there sought refusal of recognition after the judgment was rendered. But the constitutional mandate cannot be avoided by a preemptive strike. The whole purpose of a blocking statute is to impede successful litigation or prosecution in other jurisdictions by refusing recognition and compliance with orders issued there. Everybody realizes that the whole point of blocking statutes is not to keep documents in the province, but rather to prevent compliance, and so the success of litigation outside the province that that province finds objectionable. This is no doubt part of sovereign right, but it certainly runs counter to comity. In the political realm it leads to strict retaliatory laws and power struggles. And it discourages international commerce and efficient allocation and conduct of litigation. It has similar effects on the interprovincial level,

pas être en mesure de légiférer en la matière, sous réserve toutefois des principes énoncés dans l'arrêt *Morguard* et des exigences de territorialité exposées dans la jurisprudence et, tout dernièrement, dans le *Renvoi relatif à la Upper Churchill Water Rights Reversion Act*, précité.

## Application des principes de l'arrêt *Morguard* à la loi contestée

J'aborde maintenant la question de savoir si la loi contestée est compatible avec les principes que je viens d'énoncer. J'affirme, dès maintenant, que je ne le crois pas. Une province a sans doute intérêt à protéger les biens de ses résidents sur son territoire, mais elle ne peut pas le faire par des moyens inconstitutionnels. En l'espèce, les moyens choisis visent à refuser inconditionnellement la reconnaissance d'ordonnances et à faire ainsi obstacle aux litiges non seulement dans des pays étrangers, mais dans d'autres provinces. À tout le moins lorsqu'une ordonnance de la cour est sollicitée, si ce n'est avant, on refusera de mettre à exécution une ordonnance judiciaire rendue dans une autre province. Aucune réserve n'est prévue. Aucun pouvoir discrétionnaire n'est conféré de sorte qu'on ne saurait guère dire que la Loi respecte les principes d'ordre et d'équité qui doivent, suivant le principe de l'arrêt *Morguard*, sous-tendre les procédures requises pour les litiges qui ont des effets extraprovinciaux. Hormis l'aspect législatif, la situation dans l'arrêt *Morguard* était différente du fait que l'appelant, dans cette affaire, avait demandé au tribunal de refuser la reconnaissance après que le jugement eut été rendu. Mais on ne peut pas éviter les prescriptions constitutionnelles par une attaque préventive. Une loi qui prohibe la communication de documents a précisément pour objet d'empêcher qu'il y ait des litiges ou des poursuites couronnés de succès dans d'autres ressorts en refusant de reconnaître et de respecter les ordonnances qui y sont rendues. Chacun se rend compte que, tout bien considéré, de telles lois ont pour objet non pas de garder des documents dans la province, mais plutôt d'empêcher le respect d'ordonnances et ainsi le succès de litiges hors de la province, que cette dernière juge inacceptables. Ces mesures font sans doute partie de la souveraineté, mais elles

effects that offend against the basic structure of the Canadian federation.

As a matter of legislative history, we were told, the Ontario and Quebec statutes were precipitated by the aggressively extraterritorial, "long arm" antitrust statutes of the United States. Unfortunately, these blocking statutes are a blunt response, and themselves have become like long arm statutes that haphazardly end up harming individuals who were not in the jurisdiction and are not pursuing the actions against which the blocking statutes were allegedly originally aimed.

This could, no doubt, be defended on the basis of sovereignty. Indeed the federal Parliament is expressly permitted by our Constitution to legislate with internationally extraterritorial effect. But this appeal is concerned with the provinces within Confederation. *Morguard* requires that the rules of private international law must be adapted to the structure of our federation. In a federation, we assume that there is more commonality as to what is acceptable action; we have many common procedures. We even have similar conflicts rules, related, for example, to jurisdiction and deference, and to procedures regarding the *lex fori*. And courts are required, by constitutional restraints, to assume jurisdiction only where there are real and substantial connections to that place. In terms of policy, the presence of such blocking statutes is an anachronism, not even, so we were told, aimed at interprovincial litigation at its inception in the 1940s, but definitely inimical to such litigation if applied on the interprovincial level.

*a*

*b*

*c*

*d*

*e*

*f*

*g*

*h*

*i*

*j*

vont certainement à l'encontre de la courtoisie. Dans le domaine politique, il en résulte des mesures de représailles strictes sur le plan législatif, ainsi que des luttes de pouvoir. Et cela décourage le commerce international ainsi que la répartition et la conduite efficaces des litiges. Les effets, sur le plan interprovincial, sont semblables et portent atteinte à la structure fondamentale de la fédération canadienne.

Au sujet de l'historique de ces lois, on nous a dit que l'adoption des lois ontarienne et québécoise a été précipitée par l'adoption aux États-Unis de lois antitrusts agressives à longue portée extraterritoriale. Malheureusement, ces lois qui prohibent la communication de documents constituent une réponse brutale et sont devenues elles-mêmes des lois à longue portée qui finissent par causer, de manière fortuite, un préjudice à des particuliers qui n'étaient pas dans le ressort et qui ne sont pas engagés dans les actions que ces lois étaient censées viser au départ.

Cela pourrait sans doute se défendre en invoquant la souveraineté. En effet, notre Constitution autorise expressément le Parlement fédéral à adopter des lois qui ont un effet extraterritorial. Mais le présent pourvoi concerne les provinces qui font partie de la Confédération. L'arrêt *Morguard* exige que les règles de droit international privé soient adaptées à la structure de notre fédération. Dans une fédération, nous supposons qu'il y a une plus grande communauté de points de vue quant à ce qui constitue une action acceptable; un bon nombre de nos procédures sont communes. Nous avons même des règles de droit international privé semblables en matière, par exemple, de compétence et de retenue ainsi que de procédures concernant la *lex fori*. Et les tribunaux sont tenus, en vertu de contraintes constitutionnelles, de ne se déclarer compétents que s'il y a des liens réels et substantiels avec cet endroit. En principe, l'existence de telles lois prohibant la communication de documents est un anachronisme; lors de leur avènement dans les années 1940, elles ne visaient même pas, nous a-t-on dit, les litiges interprovinciaux, mais elles sont certainement défavorables à ces litiges si on les applique au niveau interprovincial.

If blocking statutes of the type now in effect in both Ontario and Quebec were possible under the Constitution, they would have the potential of affecting the rights of litigants in all the other provinces, whenever the defendant was a Quebec or Ontario business. Discovery is a very important tool of civil litigation. It is especially important in cases of this type, where there are allegations of some sort of product liability. The ultimate plaintiff must have a tool to access the otherwise internal documents, especially of large corporate monoliths. And given that there are allegations of civil conspiracy in this case, it is all the more necessary. That British Columbia, despite what was stated in the courts below, considers discovery central is evident in that refusal to comply with a demand is one of the few procedural violations that will result in a default judgment in the province. Most other instances of non-compliance with *Rules of Court* are treated as irregularities that can be remedied; see Rule 2. Moreover, the trend of the case law on Rule 26 is to emphasize the importance of the right to discovery, even at the cost of considerable loss of confidentiality. In *Boxer v. Reesor* (1983), 43 B.C.L.R. 352, McEachern C.J.S.C. (as he then was) confirmed the fundamental importance of discovery as emphasized long ago in the English case of *Cie Financière et Commerciale du Pacifique v. Peruvian Guano Co.* (1882), 11 Q.B.D. 55 (C.A.).

It may be that the only reason that these blocking statutes have not caused more problems in the past is that most defendants assumed that they had no basis to claim that they barred the production of documents in situations like the present, and voluntarily produced the documents. But future defendants, once aware of this strategy for avoiding discovery, will only be too happy to avail themselves of the operation of the statute. The

Si des lois qui prohibent la communication de documents, comme celles qui sont aujourd'hui en vigueur en Ontario et au Québec, étaient permises en vertu de la Constitution, elles risqueraient de toucher les droits des parties à un litige dans toutes les autres provinces, chaque fois que le défendeur serait une entreprise québécoise ou ontarienne. La communication de la preuve est un outil très important dans les procès au civil. Elle revêt une importance particulière dans des cas comme la présente affaire, où on allègue un certain genre de responsabilité du fabricant. Le demandeur ultime doit disposer d'un moyen d'accéder à des documents par ailleurs internes, spécialement ceux d'importantes sociétés monolithiques. Et cela s'impose d'autant plus qu'il y a, en l'espèce, des allégations de complot civil. Il est évident que, malgré ce qui a été dit devant les tribunaux d'instance inférieure, la communication de la preuve est considérée comme fondamentale en Colombie-Britannique, car le refus d'obtempérer à une demande de communication est l'une des rares violations procédurales qui entraînent un jugement par défaut dans la province. La plupart des autres cas de non-respect des *Rules of Court* sont considérés comme des irrégularités auxquelles il est possible de remédier; voir l'art. 2. De plus, dans la jurisprudence relative à l'art. 26, on a tendance à souligner l'importance du droit à la communication de la preuve, même au prix d'une perte considérable de confidentialité. Dans l'affaire *Boxer c. Reesor* (1983), 43 B.C.L.R. 352, le juge en chef McEachern de la Cour suprême (maintenant Juge en chef de la Colombie-Britannique) a confirmé l'importance fondamentale de la communication de la preuve qui a été soulignée il y a longtemps dans l'arrêt anglais *Cie Financière et Commerciale du Pacifique c. Peruvian Guano Co.* (1882), 11 Q.B.D. 55 (C.A.).

Il se peut que la seule raison pour laquelle ces lois qui prohibent la communication de documents n'ont pas causé plus de problèmes dans le passé est que la plupart des défendeurs ont présumé qu'ils n'étaient pas fondés à faire valoir qu'elles interdisaient le dépôt de documents dans des situations comme la présente et qu'ils ont produit de plein gré les documents. Mais à l'avenir, les défendeurs qui connaîtront cette stratégie pour éviter la com-

impact of this bad practice can already be seen in the case of *2632-7602 Québec Inc. v. Pizza Pizza Canada Inc.*, *supra*, where the trial judge in Quebec refused to order discovery with respect to Ontario defendants claiming a prohibition under the equivalent Ontario statute, misguidedly relying on *Morguard*. If constitutionally permissible, this approach would effectively immunize the business concerns located in Quebec and Ontario from ever having to produce documents sought for the purposes of litigation in other provinces. All they, or their shareholders, would need to do to escape discovery would be to simply seek an order as provided in the Act. When one considers that Ontario and Quebec are the headquarters for many of the largest corporations in this country, many of which will properly be subject to tort and other actions in other provinces, the impact would be serious. The essential effect then, and indeed the barely shielded intent, is to impede the substantive rights of litigants elsewhere. It would force parties to conduct litigation in multiple fora and compel more plaintiffs to choose to litigate in the courts of Ontario and Quebec. Other provinces could, of course, follow suit. It is inconceivable that in devising a scheme of union comprising a common market stretching from sea to sea, the Fathers of Confederation would have contemplated a situation where citizens would be effectively deprived of access to the ordinary courts in their jurisdiction in respect of transactions flowing from the existence of that common market. The resultant higher transactional costs for interprovincial transactions constitute an infringement on the unity and efficiency of the Canadian marketplace (see Finkle and Labrecque, *supra*), as well as unfairness to the citizen.

The lack of order and fairness in the present situation is evident in a further incongruity. It is that full rights of discovery are available to parties in the civil procedure of Ontario and Quebec. It is not as if these jurisdictions have a totally different tra-

*a*

*b*

*c*

*d*

*e*

*f*

*g*

*h*

*i*

*j*

munication de la preuve ne seront que trop heureux de se prévaloir de l'effet de la loi. L'impact de cette mauvaise pratique peut déjà être constaté dans l'affaire *2632-7602 Québec Inc. c. Pizza Pizza Canada Inc.*, précitée, où le juge québécois de première instance s'est fondé à mauvais escient sur l'arrêt *Morguard* pour refuser d'ordonner la communication dans le cas de défendeurs ontariens qui invoquaient une prohibition contenue dans la loi ontarienne équivalente. Si cette méthode était permise par la Constitution, les entreprises situées au Québec ou en Ontario n'auraient jamais à produire des documents demandés aux fins de litiges dans d'autres provinces. Pour se soustraire à la communication, il leur suffirait, à elles ou à leurs actionnaires, de demander une ordonnance aux termes de la Loi. Compte tenu du fait que l'on trouve en Ontario et au Québec les sièges sociaux de maintes sociétés canadiennes parmi les plus importantes, dont bon nombre pourront à bon droit être l'objet d'actions en responsabilité délictuelle ou d'autres actions dans les autres provinces, l'impact serait considérable. Ainsi, l'effet essentiel, et en fait l'intention à peine voilée, est de faire obstacle à l'exercice des droits substantiels des parties à des litiges à l'extérieur de la province. Cela forcerait des parties à engager des litiges dans plusieurs ressorts et obligerait plus de demandeurs à opter pour une action devant les tribunaux ontariens et québécois. Il va sans dire que d'autres provinces emboîteraient le pas. Il est inconcevable qu'en établissant un régime d'union comprenant un marché commun qui s'étendrait d'un océan à l'autre, les Pères de la Confédération aient envisagé une situation où les citoyens seraient effectivement privés de l'accès aux tribunaux ordinaires de leur province ou territoire relativement à des opérations découlant de l'existence de ce marché commun. L'augmentation du coût des activités interprovinciales qui en résulte compromet l'unité et l'efficacité du marché canadien (voir Finkle et Labrecque, *loc. cit.*) et est inéquitable pour le citoyen.

Une autre absurdité traduit le manque d'ordre et d'équité de la situation actuelle. Les parties à une instance civile en Ontario ou au Québec ont pleinement droit à la communication de la preuve. Ce n'est pas comme si ces provinces possédaient une

dition of civil procedure. If the litigation was proceeding in either of those provinces there would be full discovery. And if both parties to the action had been from British Columbia there would be discovery. But somehow, because of the fortuitous combination of litigation in British Columbia involving a defendant from Quebec or Ontario, the discovery process is barred.

In light of the foregoing, I conclude that the Quebec *Business Concerns Records Act* is constitutionally inapplicable to other provinces, and consequently in the present case.

Other Issues

In view of the fact that I have found the impugned Act constitutionally inapplicable because it offends against the principles enunciated in *Morguard*, it becomes unnecessary for me to consider whether it is wholly unconstitutional because, in pith and substance, it relates to a matter outside the province. Nor is it necessary to consider whether the statute could properly be "read down" to permit its application to jurisdictions outside the country, nor to consider the issue of public policy raised by the appellant.

One subsidiary issue, however, does require attention. It was argued on behalf of Lac d'Amiante that since it was prohibited by an order of the Quebec court in a separate proceeding from responding to a demand for discovery in British Columbia, in a practical effect that order was *res judicata*. I have difficulty with this proposition. The order was not one determining rights past and closed. Rather it purports to direct future action which the court has no jurisdiction to do. This seems to me to be all the more cogent when the order is sought to be applied in another action.

*a*

*b*

*c*

*d*

*e*

*f*

*g*

*h*

*i*

*j*

tradition de procédure civile tout à fait différente. Si le litige était entendu dans l'une ou l'autre de ces provinces, il y aurait communication complète de la preuve. Et si les deux parties à l'action avaient été de la Colombie-Britannique, il y aurait communication de la preuve. Mais curieusement, parce que le hasard a voulu que le litige se déroule en Colombie-Britannique et que le défendeur soit du Québec ou de l'Ontario, le processus de communication est entravé.

Compte tenu de ce qui précède, je conclus que la *Loi sur les dossiers d'entreprises* québécoise est constitutionnellement inapplicable aux autres provinces et, en conséquence, inapplicable en l'espèce.

Autres questions en litige

Comme j'ai conclu que la Loi contestée est constitutionnellement inapplicable parce qu'elle est contraire aux principes énoncés dans l'arrêt *Morguard*, je n'ai pas à examiner la question de savoir si elle est entièrement inconstitutionnelle parce que, de par son caractère véritable, elle se rapporte à une matière à l'extérieur de la province. Il n'est pas nécessaire non plus d'examiner si on pourrait à bon droit donner à la loi une interprétation «atténuée» de manière à en permettre l'application à l'étranger, ou encore d'étudier la question de l'ordre public soulevée par l'appelant.

Il est cependant nécessaire d'examiner une question subsidiaire. On a soutenu au nom de la société Lac d'Amiante que, puisqu'une ordonnance du tribunal québécois dans une autre instance lui interdisait d'accéder à une demande de communication de la preuve présentée en Colombie-Britannique, cette ordonnance avait, en pratique, force de chose jugée. Il m'est difficile d'accepter cette proposition. L'ordonnance n'a pas déterminé des droits passés et terminés. Elle a plutôt pour objet d'ordonner une action future, ce que le tribunal est incompétent pour faire. Cela me semble d'autant plus pertinent quand on cherche à faire appliquer l'ordonnance dans une autre action.

## Disposition

For these reasons, I would allow the appeal with costs throughout and order the respondents to produce for inspection within 30 days, in British Columbia, copies of all documents in their possession and control relating to the matters in question in this action, regardless of whether those documents are located inside or outside the province of Quebec. I would answer the constitutional question by saying that the Act should be read as not applying to the provinces since such application would be *ultra vires* under the constitutional principle set forth in the *Morguard* case.

*Appeal allowed with costs.*

*Solicitors for the appellant: Camp Church & Associates, Vancouver.*

*Solicitors for the respondent Lac d'Amiante du Québec Ltée: Russell & DuMoulin, Vancouver.*

*Solicitors for the respondents Asbestos Corporation Limited, Atlas Turner Inc. and Bell Asbestos Mines Limited: Farris, Vaughan, Wills & Murphy, Vancouver.*

*Solicitors for the respondent JM Asbestos Inc.: Lindsay Kenney, Vancouver.*

*Solicitors for the respondent the Quebec Asbestos Mining Association: Lang Michener, Vancouver.*

*Solicitors for the respondent National Gypsum Co.: Arvay, Finlay, Victoria.*

*Solicitor for the intervener the Attorney General for Ontario: George Thomson, Toronto.*

*Solicitors for the intervener the Attorney General of Quebec: Jean-Yves Bernard and Alain Gingras, Ste-Foy.*

## Dispositif

Pour ces motifs, je suis d'avis d'accueillir le pourvoi, avec dépens dans toutes les cours, et d'ordonner aux intimées de produire, pour fins d'examen, dans les 30 jours, en Colombie-Britannique, des copies de tous les documents relatifs aux sujets en cause dans la présente action, qui sont en leur possession et sous leur contrôle, peu importe que ces documents se trouvent à l'intérieur ou à l'extérieur de la province de Québec. Je répondrais à la question constitutionnelle en disant qu'il y a lieu de considérer que la Loi ne s'applique pas aux provinces étant donné que pareille application serait inconstitutionnelle en vertu du principe de droit constitutionnel énoncé dans l'arrêt *Morguard*.

*Pourvoi accueilli avec dépens.*

*Procureurs de l'appelant: Camp Church & Associates, Vancouver.*

*Procureurs de l'intimée Lac d'Amiante du Québec Ltée: Russell & DuMoulin, Vancouver.*

*Procureurs des intimées Société Asbestos Limitée, Atlas Turner Inc. et Bell Asbestos Mines Limited: Farris, Vaughan, Wills & Murphy, Vancouver.*

*Procureurs de l'intimée JM Asbestos Inc.: Lindsay Kenney, Vancouver.*

*Procureurs de l'intimée l'Association des mines d'amiante du Québec: Lang Michener, Vancouver.*

*Procureurs de l'intimée National Gypsum Co.: Arvay, Finlay, Victoria.*

*Procureur de l'intervenant le procureur général de l'Ontario: George Thomson, Toronto.*

*Procureurs de l'intervenant le procureur général du Québec: Jean-Yves Bernard et Alain Gingras, Ste-Foy.*