UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

Skky, Inc., Plaintiff, vs. Thumbplay Ringtones, LLC, Defendant.

Case No. 13-CV-2072(PJS/JJG)

St. Paul, Minnesota
March 26, 2014
2:14 p.m.

---

Skky, Inc., Plaintiff, vs. Dada Entertainment, Inc., Defendant.

Case No. 13-CV-2083(PJS/JJG)

---

Skky, Inc., Plaintiff, vs. Manwin USA, Inc., and Manwin Holding, s.ar.l, Defendant.

Case No. 13-CV-2086(PJS/JJG)

---

BEFORE **THE HONORABLE JEANNE J. GRAHAM**
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**HEARING ON PLAINTIFFS' MOTION TO COMPEL AND MOTION FOR PROTECTIVE ORDER**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Skky, Inc., Plaintiff, vs. Vivid Entertainment, LLC, Defendant.

Case No. 13-CV-2087(PJS/JJG)

---

Skky, Inc., Plaintiff, vs. Playboy Enterprises, LLC, Defendant.

Case No. 13-CV-2089(PJS/JJG)

St. Paul, Minnesota
March 26, 2014
2:14 p.m.

---

BEFORE **THE HONORABLE JEANNE J. GRAHAM**
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**HEARING ON PLAINTIFFS' MOTION TO COMPEL AND MOTION FOR PROTECTIVE ORDER**

APPEARANCES:

For the Plaintiff: Robins Kaplan Miller & Ciresi LLP
BECKY R. THORSON, ESQ.
RYAN M. SCHULTZ, ESQ.
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402-2015

And

Parker Rosen LLC
DANIEL N. ROSEN, ESQ.
123 North Third Street, Suite 888
Minneapolis, Minnesota 55401

**DIGITAL RECORDING TRANSCRIBED BY:**

Official Court Reporter: JEANNE M. ANDERSON, RMR-RPR
Suite 146 U.S. Courthouse
316 North Robert Street
St. Paul, Minnesota 55101

APPEARANCES (Continued):

For the Defendants:

Jones Day
TIMOTHY HEVERIN, ESQ.
77 West Wacker
Chicago, Illinois 60601-1692

And

Faegre Baker Daniels LLP
THEODORE M. BUDD, ESQ.
80 S. 7th Street, Suite 2200
Minneapolis, Minnesota 55402-3901

And

Venable LLP
FRANK M. GASPARO, ESQ.
1270 Avenue of the Americas
24th Floor
New York, New York 10020

And

Venable LLP
TAMANY VINSON BENTZ, ESQ.
2049 Century Park East, Suite 2100
Los Angeles, California 90067

And

Berens & Miller PA
JUSTI R. MILLER, ESQ.
80 S. Eighth Street, Suite 3720
Minneapolis, Minnesota 55402

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT: We are here today in related matters of Skky, and then it is versus Thumbplay Ringtones, Dada Entertainment, Manwin, Vivid Entertainment and Playboy, Civil File No. -- well, there are several, 13-2072, 2083, 2086, 2087, 2089, assigned to District Court Judge Pat Schiltz.

I am Jeanne Graham, I am the Magistrate Judge, and we are here today on Plaintiff's Motions to Compel, and Defendant Manwin and Playboy's Motion for a Protective Order.

All right, long introduction. Let's have who is here today. And if you could kind of go a little slowly so I can find your name, and make the mark. All right?

MR. SCHULTZ: Your Honor, my name is Ryan Schultz from Robins Kaplan representing Skky, with me is Becky Thorson from Robins Kaplan. And then Dan Rosen from the Parker Rosen Law Firm.

THE COURT: All right, very good. Thank you. And Thumbplay?

MR. HEVERIN: Your Honor, Tim Heverin for Thumbplay, and Dada Entertainment, those are the Ringtone Defendants, and with me is Ted Budd.

THE COURT: All right, very good. Thank you.

Manwin and/or Playboy?

MR. GASPARO: Well, Your Honor, Frank Gasparo with Venable, counsel for Vivid, Playboy and Manwin.

THE COURT: Okay.

MR. GASPARO: And I am joined by my partner Tamany Bentz and our local counsel Justi Miller.

THE COURT: All right, very good. Thank you.

All right. As I said, we are here for several motions. I really -- we have, as you can see, a lot of papers. So, I want to keep your -- I would like you to keep your comments brief. I may have some questions and or comments, as well. But, we will start with the Motion to Compel, Motions to Compel.

And then I realize on some level it is the flip of the coin. So, what we may do is, frankly, when Manwin and Playboy get up in opposition, just roll that in to your opposition, and then I will give Skky another opportunity to respond to all of that.

Okay. So, who is going to speak on behalf of Skky?

MR. SCHULTZ: I will, Your Honor, Ryan Schultz.

THE COURT: Ryan Schultz, all right.

MR. SCHULTZ: And I will try to provide some organizational structure to make this as quick as possible for the Court.

THE COURT: Sure.

MR. SCHULTZ: Skky's filed an order -- asking for an order compelling responses to Skky's discovery requests identified in the respective motions, because the Defendants have refused to provide relevant information in response to Skky's discovery requests. And those requests have been pending for almost five months.

The issues that I would like to discuss today and welcome any questions from the Court, are five issues. The first one is refusal by all of the Defendants to produce documents pending resolution of the Motion to Disqualify. The second issue is confusion or some concern over the definition of the term "services" within Skky's request. I believe that also applies to all of the Defendants. And then there is an issue, specific to Vivid, alone, regarding production of documents that they -- and information that they assert are in the possession of a third party.

There is the fourth issue, is the supplementation of the interrogatories as to Manwin and Playboy. The fifth issue I would like to talk about is the Quebec Business Concern Records Act. Obviously, I will wait my turn after Manwin and Playboy talk on that topic, so I will not address it here.

In the Motion to Compel, we also raise the issue of the requests for admissions. I don't intend at this time

to talk about the requests for admissions, but if the Court has questions on those, I will gladly help answer any of those questions.

THE COURT: Okay.

MR. SCHULTZ: I want to provide a little bit of background facts for the Court that related to the case and that led up to the Motion to Compel.

Skky was founded by the two inventors, John Mikkelsen and Dr. Friesen. Mikkelsen and Dr. Friesen conceived of the idea of transmitting content rich media, such as images, videos, audio clips to cell phones back in 2000.

Now, we have to keep in mind that this is 2000 and not today. The first smart phone didn't allegedly come out until 2004, the iPhone wasn't released until 2007. So, back in 2000 is when Mikkelsen and Dr. Friesen came up with the idea that they later sought and obtained a patent on, which is the '875 Patent that is at issue here.

Dr. Friesen and John Mikkelsen also created a prototype that demonstrated their device that was claimed in the '875 Patent. So, the claims at issue here are related to a method of compressing this content rich media file, storing the content rich media file, and then transmitting that file to a wireless device means.

And I provide that context because then later when

we get into some of the discovery requests, I think it is helpful to have that background to understand why we are asking for the information that we are, and why not having it is critical to Skky.

As to this case, the facts are that we filed the lawsuit back in July of 2013. We served discovery requests on October 31st, 2013. On December 6th, the Defendants provided responses to those requests. Those responses consisted of: Various objections; and then really no substantive information; and most importantly, no responsive documents.

The parties met and conferred after receiving the discovery requests. The Defendants indicated to us that they were in the process of reviewing and will be producing documents, but would not provide a date certain for any particular production.

The Defendants also raised at the first time the issue of the ESI stipulation. At the time the parties had not agreed to one and the Court hadn't entered an order. And as far as Skky was told by the Defendants, all responsive documents were electronically stored information. Skky found that interesting that there was not a single hard copy document with the Defendants that was responsive to the requests, but since it was early on, there was still time, Skky said we did not raise the issue with the Court at that

time.

So then the next -- like I said, with the ESI stip, that eventually did get entered into July of 2013. At that time, then, the Defendants have now raised the issue of the Motion to Disqualify and so that they were not producing irresponsive documents because of the issues related to that.

We are not going to go into the substance of the facts related to that because the Court has already spent plenty of time on that issue. But, that was the third delay tactic that the Defendants had used to not provide responsive documents.

The fourth delay tactic that the Defendants have instituted, at least Manwin and Playboy, was to raise the issue of the Quebec Business Concern Act. They raised this issue for the first time on January 6th. They did not subsequently file a motion for a protective order until they did it on March 13th. At all times the Defendants have refused to provide responsive documents.

So, now I want to focus on the first issue that I had identified, which is the Motion to Disqualify. The Defendants are asserting that they do not have to produce any responsive, confidential or highly confidential information pending the resolution of the Motion to Disqualify.

There simply is no authority or rule for them to provide -- that would provide support for such assertion. If Defendants -- the proper procedure that the Defendants should have done was file the Motion for a Protective Order to preclude them from having to respond to discovery requests until the Court has resolved the Motion to Disqualify. They did not do that. They filed a Motion to Disqualify, which also had a contingent Motion to Amend the Protective Order to preclude the Parker Rosen Law Firm from having any access to confidential or highly confidential information.

Again, there is just simply no authority for them for refusing unilaterally to not respond to discovery requests while the Motion to Disqualify is pending.

There has been a lot of discussion in the motion and in our Motion to Compel and in the Defendants' opposition related to this, what I will call, temporary resolution of the problem where when this was first raised to our attention Robins Kaplan and myself in particular stated in an email to Defendants that we would not share confidential or highly confidential information with the Parker Rosen Law Firm until Your Honor had resolved the Motion to Disqualify.

The Defendants said that was not sufficient. But, Defendants failed to identify any rule, case law or statute

that required us to do more than that. As officers of the Court at Robins Kaplan, we felt that that was sufficient to alleviate their clients' concerns about confidential information being in the hands of Parker Rosen while the Motion to Disqualify was pending. Defendants said, like I said, that was not sufficient.

Defendants then sent Skky a stipulation saying that -- memorializing or reaffirming what I had said in the email. Our position was a stipulation was not necessary for the reasons I just mentioned, but there were other discovery issues that were pending between the parties at the time. So, our thought, for Skky, was to provide a stipulation that resolved all of these discovery issues that were pending between the parties so that the case could move forward.

I mean, this was early February. The case had been pending for five months. No discovery really had occurred from the Defendants. We attempted to resolve those issues. The Defendants thought that was not the right thing to do at the time. So, we said: Fine, we will agree to your stipulation related only to the Parker Rosen Law Firm, but we don't need to enter that stipulation until the day before you are ready to produce confidential or highly confidential information. There is no reason for us to enter the stipulation if Defendants aren't actually going to give confidential or highly confidential information.

Defendants said that we have now attached some contingencies or concerns with that proposal, and in particular Defendants raised that we had asked for them to make a substantial production as part of this agreement. Like I said, the Defendant -- the request has been pending for over five months. Defendants should be in possession of and ready to produce this information at almost a moment's notice when the Court enters the Order on the Motion to Disqualify.

However, it did not seem practical from Skky's perspective to enter the stipulation with no assurances that the Defendants were actually going to follow through and make a production. So --

THE COURT: Then, okay, so in terms of this order, because I just want to explore a little bit about what everyone tried to do to get it resolved. This motion, this particular motion was filed just before or just after that disqualification?

MR. SCHULTZ: It was filed a day before the hearing.

THE COURT: So, my only concern is it appears to be kind of this placeholder, placeholder -- I don't like placeholder motions. So, it appears from at least where I sit that it is like a placeholder, and we don't really -- haven't really met and conferred enough, and it is not

really ripe to know, you know, the motion regarding disqualification is -- then the order is coming out quite soon, I believe, but the fact is that you didn't know when that was going to happen and you still filed this motion ahead of time. So, I am confused about what was happening there, and when all of this discussion happened.

MR. SCHULTZ: So, Your Honor, the parties have been discussing the various, the temporary resolution.

THE COURT: Yeah.

MR. SCHULTZ: Starting back in February.

THE COURT: Okay.

MR. SCHULTZ: And they exchanged various proposals. The Defendants continued to, what we believe, to maintain meritless and baseless reasons for not agreeing to the proposal that we had offered.

THE COURT: And so apart from the proposal where you sent back additional -- because I could see where that might cause a problem. At some point did you say: All right, we agree with you that we will not -- that we will enter the stipulation and not show it to the Parker Rosen attorneys?

MR. SCHULTZ: Correct, Your Honor. So our last proposal to Defendants was, again, we will enter a stipulation almost identical to the one you had proposed (inaudible) whereas (inaudible) were the parties were

negotiating on. But, the thrust of the stipulation was the same, that we would not, Skky would not provide confidential or highly confidential information to the Parker Rosen Law Firm until the Court had ruled on the Motion to Disqualify.

THE COURT: And you entered into that stipulation just before they were ready to give you this document?

MR. SCHULTZ: Correct.

THE COURT: All right, go ahead.

MR. SCHULTZ: So, again, to sum up on this topic, Skky does not believe that the Motion to Disqualify is a basis to withhold responsive documents. If the Defendants really were concerned about that, what they should have done was move for a protective order and had brought that issue to the Court's attention.

As for the stipulation, again, Your Honor, for the temporary resolution, we don't believe that since we have already given in writing from Robins Kaplan that we will abide by that agreement, that should be sufficient to alleviate any Defendants clients' concerns on the issue.

But, if the Court was looking at these to vet, the proposal we would offer was the one we made to the Defendants. We will enter the stipulation on the day before they are ready to produce the confidential and highly confidential information.

THE COURT: Okay.

MR. SCHULTZ: The next issue I want to talk about is related to the definition of services. In our interrogatories, and I have one set here, I don't know if it is one of the various copies of the same motions that Your Honor has up there on your desk, but in Manwin's Motion to Compel for Manwin, which is in case number --

THE COURT: I have 2086.

MR. SCHULTZ: 2086, yes. Docket 51, Exhibit 4, which is the interrogatory to them, you will see that the definition of services we define for Defendants is a defined term in the rog. And it says that the services includes a couple of websites that are identified by their web address.

And then we included language that said, and other websites that may be identified either by Defendants through the litigation, or in Skky's infringement contentions.

What I think is critical to look at is our first interrogatory that we have asked of all Defendants so we can look Manwin, in particular, is to identify websites that they own or operate. Defendants are the ones who are in the possession of that information. So, we have asked Defendants in the first interrogatory: Please define all of the websites you own. And then having that information, use that, those websites when you are responding to the other interrogatories that talk about services.

Now, Defendants have raised an objection and in

their opposition articulate that they don't know which websites we are talking about. Well, it is a little bit of a chicken in an egg that they are asking us to do. First, it is wrong because we have actually identified some websites in the definition of services.

Second, the Defendants are in possession of the list of websites that they do own.

Third, to the extent that Defendants are going to argue that this is publicly-available information, Skky has done that. Skky has gone out, looked at the publicly-available information, and attempted to identify all of the websites that it can ascertain with publicly-available information that are owned by each Defendant. And Skky did that. Skky provided infringement contentions based on the websites that they were able to identify.

And in particular, what is interesting is in response to the infringing contentions Defendants served on Monday, in particular Manwin states that some of the websites we identified, they don't actually own.

The Defendants have put us in a situation where they won't tell us the websites they do own, but then when we identify websites, they say: Some yes, some no. But they are still refusing to produce information related to all of the websites that they do own. The reason why we

need to know the websites, as I mentioned earlier during the background of the claim, the claim talks about using a website to transmit these content rich media files, like images, videos, audio files to a cell phone. So, we have to determine which websites the Defendants own, in order to ascertain which ones are practicing the claimed method.

The next issue I would like -- if Your Honor has no questions on that one?

THE COURT: No, go ahead.

MR. SCHULTZ: All right. The next issue I would like to talk about is related simply to Vivid in their response to interrogatories and requests for production. Vivid has supplemented their interrogatories and -- well, they supplemented their interrogatories.

And in their interrogatories they stated that a third party, this Webquest, Incorporated, operates their website. Therefore, they cannot respond to interrogatories or requests for production that ask for documents related to the operation of the websites.

We believe that Vivid is in possession, custody and control of this information of Webcast (SIC), because Webcast (SIC) -- or Webquest, I'm sorry. Webquest is the agent of it.

Webquest, as far as we can ascertain right now -- we have just learned this information recently, provides the

service to Vivid to operate the websites. But Vivid provides all of the content and structure of the website to Webquest, and Webquest has the servers -- I mean, some of this is speculation, but my understanding upon information and belief is Webquest provides the servers and the other infrastructure to make the website available on laptops or devices or anything that can access the internet.

So, under this Court's decision in *Prokosch versus Catalina Lighting*, which the cite is 193 FRD 633, this Court held that when a third party is an agent of a producing party, the producing party is required to provide the information that the third party has.

This is not a situation where Webquest is a simple purchaser of goods offered by Vivid. You know, this is not a situation where there is a manufacturer of a hammer, and then they sell it to Home Depot. And you are trying to get information about sales of the hammer at Home Depot through the manufacturer of the hammer.

This is a situation where Webquest provides a service at Vivid's direction to make its websites, make Vivid's websites available to the public. So, we believe that Vivid should have to supplement responses with the information that is located at the third party, rather than the alternative which Vivid has proposed, is that we should subpoena the third party for the documents.

THE COURT: Okay.

MR. SCHULTZ: And then the last one should be -- is the shortest one. It is the supplementation of the interrogatories as to Manwin and Playboy. In our Motion to Compel for each of those Defendants, we sought supplementation of Interrogatories No. 1, 3, 6 and 7.

Defendants in their opposition said this will be moot because they will supplement their responses to those interrogatories prior, I imagine, to the hearing. However, the Defendants only supplemented responses to Interrogatories 2, 4 and 5.

So, again, the Defendants haven't offered any reason why we can't supplement as to Interrogatories 1, 3, 6 and 7, and we believe that an order should be entered having Manwin and Playboy supplement those responses.

And as I mentioned earlier, there is an issue related to the RFAs. I am not going to spend any time on that unless the Court has a particular question on that.

THE COURT: I do not.

MR. SCHULTZ: Thank you, Your Honor.

THE COURT: Thank you. All right, who's -- what we will do is I will have you come up and make sure you do the announcement on the record so the record is clear.

MR. HEVERIN: Good afternoon, Your Honor. My name is Tim Heverin, and I am appearing on behalf of Dada and

Thumbplay, the Ringtone Defendants.

THE COURT: Okay.

MR. HEVERIN: I think it important here, and counsel referred to Defendants quite often in his argument, there are different -- there's different relief being requested from the different Defendants. So, in large part we can't group all of the Defendants together. I am just speaking on behalf of the Ringtone Defendants.

THE COURT: Okay.

MR. HEVERIN: Some of my argument will apply to the others, as well.

So, counsel raised four or five different issues. The first one, as he characterized it, was Defendants' refusal to produce documents pending resolution of the Disqualification Motion with the confidentiality issues involved in that, as well. That is the only issue that affects the ringtone clients, parties.

The only motion that has been brought has been to compel the production of documents, not interrogatories, not requests for admissions, just documents. And that is the only issue that applies to Dada and Thumbplay.

THE COURT: Can you do me a favor and raise the podium a little bit? The podium -- there is a button on the front -- see the little button? And that will help with the audio. Thank you.

 MR. HEVERIN: Yeah, I don't really fit anywhere.

THE COURT: There you go, thanks.

MR. HEVERIN: Does that work?

THE COURT: Yes.

MR. HEVERIN: So, Your Honor, Skky's motion is premature, and it will be mooted by the resolution of the confidentiality issues that were raised in the Disqualification Motion. I won't reargue those. You are aware of those. If you have questions, I am happy to answer them.

THE COURT: I guess kind of the general question that everyone I suppose can answer is, sort of -- number one, it is sort of hard to imagine that every single document is related to the disqualification piece, but even if it is, what about the -- were you involved in -- was it the Ringtone Defendants involved in kind of an attempt to have a temporary solution?

MR. HEVERIN: Yes, and I am happy to answer questions and walk you through that. I disagree with that characterization by counsel.

THE COURT: I see, okay.

MR. HEVERIN: And to answer your first question, all of the documents aren't wrapped up in the DQ, the Disqualification Motion, just the confidential ones.

THE COURT: Yes.

MR. HEVERIN: We have already made a production of nonconfidential documents. We do not believe that we have any other nonconfidential documents. What is left is the confidential documents.

THE COURT: Okay.

MR. HEVERIN: We have produced 7,000 documents, again nonconfidential documents. So, if I can walk you through the stipulation to the extent you can -- you care to listen to it --

THE COURT: You know, it is one of those things I am not sure it is completely dispositive, but it just drives me crazy to try to -- because it seems like there should have been a solution to this. So, I do want to at least explore it. So, go ahead.

MR. HEVERIN: I agree, and I believe there should have been a solution, as well.

So, when the confidentiality issues and the disqualification issues were emerging at the same time that we were finishing the ESI stipulation and getting ready for these documents, and the issue became that the Defendants didn't have confidentiality protection. We were just essentially back door to the Protective Order. We felt like we were not protected under the Protective Order from Skky's business executives seeing confidential information.

So, the suggestion was made to have only Robins

Kaplan see the documents. We said: Fine, that is a good suggestion. We drafted a stipulation which fits into the moving papers. We included it in the briefs. And as you can see, there are suggestions, as well, which was a very vanilla, straightforward, you know, posturing of positions taken, a stipulation, which said basically until the resolution by the Court of these confidentiality issues, Parker Rosen will be shielded from confidential information that will go forward.

So, we suggested that. We sent a new stipulation, gave them deposition dates for witnesses, as well, at the same time. The Plaintiff then sent back, and this is in the papers, again, sent back an alternative stipulation that was loaded with what we thought were unfair statements and unnecessary statements and requirements, and that wouldn't work for us.

We suggested again just a plain vanilla stipulation and we would go forward. We weren't delaying. It was Thumbplay, one of the Ringtone Defendants, actually, that made a representation that we would produce documents within 14 days of entering that vanilla stipulation.

Skky came back again with another stipulation. This time it was less loaded up than the first one, but still had objectionable content on it, had additional content to it; and that wouldn't work. That was the week or

so before the hearing on the Disqualification Motion.

THE COURT: Okay.

MR. HEVERIN: After that hearing, and this is a week -- it could have been two weeks ago -- with the Motion to Compel pending, that motion was filed on the eve of the DQ hearing, and it really addresses the same issues as in the DQ hearing, at least the motion as to us.

So, after that, and this is a week or two ago, there was another suggestion from Robins Kaplan for a stipulation. We need some procedure to, you know, enter a stipulation; but, again, it was the same stipulation as before.

So, counsel has represented that, you know, they agreed to the stipulation. They also said that, of course, there was additional language and it was substantially the same. The fact is it wasn't the same. The stipulations are in the moving papers. You can see those, Your Honor.

You know, at the same time, what was going on -- we are not here on a Defendant's Motion to Compel. We had a meet and confer with Plaintiff because other than some basic patent documents, Skky hasn't produced documents in this case. And we didn't think it was proper to bring a motion to compel on it.

They have agreed to produce documents in the near future. And we think they will. And when they do, you

know, we will see. And if it is sufficient, then we will go from there. If it is insufficient, we will try to work it out.

The second attempt at a stipulation, part of it was that we would do a stipulation and we would work on them with this idea of timing, the idea that it had to be filed a day before we produced documents, we think that is a little bit unnecessary and we don't understand the reasoning for it. But, that is okay, we can do that.

What the agreement was, what we suggested is we just put in the vanilla stipulation, and then the parties could do a mutual exchange on a mutually acceptable date. We could work out a date and we'd go forward. And we asked them to withdraw the Motion to Compel because there is no impasse here, Your Honor. They refused to do it. And so, we are here before you today.

Can I answer -- you know, I don't know if I was clear on the stipulations. Can I answer anything else about those stipulations?

THE COURT: No, that is good.

MR. HEVERIN: I think, in sum, we want the vanilla stipulation. We think that their stipulations were loaded up, inappropriately.

So, despite the only impasse here being as to confidentiality, despite all of the parties knowing that

this would be resolved with the resolution of the Disqualification Motion, even given that we tried, but we couldn't get a stipulation on file to move forward, Skky brought the motion, brought the motion on the eve of the disqualification hearing, we think in part to bolster their argument in the disqualification hearing. But, there is no new issue brought by the Motion to Compel against us that hasn't been covered in the disqualification and the confidentiality -- the Disqualification Motion that discusses the confidential issues.

I want to make it very clear, the Ringtone Defendants were not refusing to produce documents, and we will do it as soon as confidentiality protection is restored. But, I want to make one more point, which is that we have objections to their document requests. We think they are wildly broad. We think they are fishing for documents that aren't even close to being relevant, and we will make our production subject to our objections. We don't think it will be an issue.

To the extent that they disagree with that and they think the production is insufficient, then at that point we can go through and they can say: You didn't produce this type of document, and we can have a meet and confer. But, that hasn't happened to date, and that isn't addressed in their Motion to Compel.

So, because the resolution of the confidentiality issue moots the Motion to Compel as to Ringtone Defendants, we would ask Your Honor to deny the motion as moot.

THE COURT: All right, thank you.

MR. HEVERIN: Thank you.

THE COURT: On behalf of -- are we going to have one speaker or two on behalf of the other? Two?

MS. BENTZ: Your Honor, I will address the discovery issues. My partner Frank Gasparo is going to address the NPE and the protective issues.

THE COURT: Okay, come on up to the podium on discovery, then. And go ahead and make your appearance again.

MS. BENTZ: I am not quite as tall as Mr. Heverin, so I am going to lower this. And I apologize, I am suffering from a bit of a scratchy voice.

THE COURT: All right.

MS. BENTZ: So hopefully it holds out.

THE COURT: As long as you just stay over there we are going to do fine.

MR. BENTZ: That's right. So, I am Tamany Vinson Bentz. I'm counsel for Manwin, Playboy and Vivid in this action. There's a bit of a housekeeping matter for Your Honor, and I think for Plaintiffs, as well, that Manwin has gone through a corporate renaming. It is now a company

called MindGeek. So, to the extent Mr. Gasparo or I refer to Manwin as MindGeek, it is in fact the same company.

So, as Mr. Heverin pointed out, Plaintiff's Motion to Compel is a little bit different with respect to my clients, in that we have addressed interrogatories and RFAs. If Your Honor has any questions about the RFAs, I am happy to answer those. But, I won't run through our arguments since Mr. Schultz did not run through their arguments.

THE COURT: Fine.

MS. BENTZ: But I think it is laid out nicely in the papers.

THE COURT: I agree.

MR. BENTZ: So, as for the interrogatories, for Vivid and Playboy and Manwin, they are in a little bit of a different situation with respect to the interrogatories, so I will take Vivid first.

We spoke with Mr. Schultz before they filed their Motion to Compel, told him that it had supplemental interrogatories drafted, that we were getting ready to serve those as soon as the client had signed off on them.

We in fact did that. Service of the supplemental interrogatories was done, I believe, 3 or 4 days after they filed their Motion to Compel. We supplemented all of the interrogatories, not just the ones at issue in their motion.

Vivid provided all of the information that it had

in its possession, custody or control, pointed out some additional witnesses that were in Vivid's control that were responsive to the interrogatories, and then also pointed out that additional information on these topics could be found with our vendor, who is Webquest.

Since briefing the motion, Plaintiff has, in response to the supplemental interrogatories, has raised the issue that Vivid is somehow obligated to produce information or documents on behalf of Webquest. This is not an issue that has been briefed before Your Honor. So, to the extent it is news to you, it probably truly is news to you. It was not in the motion papers.

But, very briefly --

THE COURT: I feel bad, we usually have water, but I had another hearing in front of this and we just didn't get the --

MR. BENTZ: That's okay. So, as I said, Webquest is actually a vendor of Vivid's, separate company. There is no corporate relationship between the two. They have an arm's length contractual relationship regarding the operation of the websites.

Vivid actually has no legal claim to information or documents from Webquest, or any ability to force Webquest to provide it, information, other than actually the information that it has provided through its supplemental

interrogatory requests, or agreed that it would produce confidentially once the Motion to Disqualify is resolved.

So, actually, from Vivid's perspective, to the extent they have access to the information or have the right to get it from Webquest, they are willing to provide that. But, there is information that Webquest is going to have that Vivid has no control over.

Whether Vivid actually has control over Webquest is a contested issue in this case and an issue of liability for Vivid. So, part of Plaintiff's claims rely on joint infringement or induced infringement, which is going to require that Vivid have some level of control over Webquest in order for them to be liable.

So, it is not as easy as Mr. Schultz stands up and says: Vivid has control of Webquest. That is actually a contested issue on a question that needs to be proved in this case.

For purposes of discovery, though, they have no ability to -- you know, let's verify the veracity of information that they get from Webquest, because it is a true third party. So, from an evidentiary and a discovery perspective, the best practice would be to serve a subpoena on Webquest and get the information directly from them. And we provided contact information for Webquest in the initial disclosures.

To the extent Plaintiff needs more or needs some additional information on how to do that, we are happy to provide that information.

Okay. Does Your Honor have any questions about that --

THE COURT: I do not.

MR. BENTZ: -- issue?

All right. So, back to the interrogatories for MindGeek and for Playboy. One primary issue in all of the interrogatories that they've moved on, which is 1, 3, 6 and 7, is that they rely on this term "services" and Mr. Schultz touched on this.

The way services is defined, it includes this term websites which Plaintiff also defined. Plaintiff defined websites as anything with a top level domain. Every single thing you can see on the internet has a top level domain. The Court's website has a top level domain. Venable's website has a top level domain.

THE CLERK: Thank you, madam clerk, you heard from afar.

MR. BENTZ: Thank you, Yes. So, websites is anything on the internet.

When you are looking at -- we define services as basically anything on the internet, now. MindGeek is an international tech company. It operates websites for third

parties, it operates its own websites. When you define it that broadly, asking them to create a list of websites, when you define it that way is a burdensome task.

You are talking about many, many, many, many websites, some of which may have no relevance whatsoever to their actual patent claims or to the activities that are alleged to have infringed.

We asked them through meet and confers to work to narrow that, and so far they have not. So, MindGeek is in somewhat of an impossible position of, you know, you are asking us to basically put in an interrogatory on an entire business. One, that's burdensome. Two, if we are going to do that, we would like to make sure we do it after the disqualification motion is decided.

THE COURT: Is the scope issue -- you know, is it temporal? Is it subject matter? Is it -- I am not even sure what to ask. But, how would you narrow it?

MR. BENTZ: So, as I understand their patent and their claims, it deals with the transmission of images or video or audio. So, one way to do it is to tie it to your patent claims and talk about websites that actually do that. Then, at least, maybe we are not taking -- let's say MindGeek has an internal website that can only be accessed by employees. Venable has one. It's called Intersect. Let's say MindGeek has a version of Intersect. Is that

website-related issue in their case? My read of their patents is no. Maybe their read is yes, and we need to have that conversation.

But, as long as it is this broad definition of websites and services, it becomes rather impossible for MindGeek to respond to it in terms of an interrogatory.

THE COURT: Okay. Is that the same as to Playboy or is that strictly as to MindGeek.

MR. BENTZ: Playboy is somewhat tied to MindGeek because MindGeek operates Playboy's websites. So, for Playboy to respond, it has to get the information from MindGeek.

THE COURT: Okay.

MR. BENTZ: Your Honor, that is all that I had to address in the interrogatories. Does Your Honor have any other questions on that?

THE COURT: No.

MR. BENTZ: Okay. I think Mr. Gasparo will address the NPE issue --

THE COURT: Quebec?

MR. BENTZ: Quebec, yes.

THE COURT: Come on up.

MR. GASPARO: Good afternoon, Your Honor. I am Frank Gasparo, and I represent Vivid, MindGeek and Playboy. As Your Honor knows, Playboy and MindGeek filed a Motion for

Protective Order. Playboy and MindGeek are two distinct companies.

Playboy is located in California. And as Ms. Bentz explained, the reason that Playboy is implicated is because Manwin operates accused Playboy websites.

MindGeek's Canadian entity does business under the name of MindGeek, Canada. And they are located in Quebec. MindGeek, Canada develops and operates various MindGeek websites, as well as Playboy websites, and other websites for unrelated parties.

It is a successful, cutting-edge technology company which has recently been burdened by U.S. non-practicing entity patent litigation. They currently have three unrelated -- I will refer to them as NPE litigations. And because of that, they sought this Canadian Quebec judgment, just to give you some context, Your Honor, as to why they did it.

So, we are here today because MindGeek obtained that judgment from a Quebec Court. And MindGeek is bound by that judgment.

I thought I would just very, very briefly -- I know it is in the papers -- go through just some of the language in the judgment. But, the judgment expressly prohibits MindGeek from producing documents to Skky from Quebec, and I quote, "that relate to any business concern in

 Quebec," closed quote.

The judgment is grounded in statutory authority, namely the Quebec Business Concerns Records Act that prohibits the removal from Quebec of any, quote, "document or resume or digest of any document relating to any concern. The Defendants face penal sanctions if they violate its judgment.

As Your Honor knows, there is a long history of U.S. Courts recognizing Canadian judgments under the principles of comity. Also, this District has recognized foreign judgments, and we cite those cases in our moving papers.

THE COURT: Does this relate much to discovery, though? I think that is the thing that I am struggling with a little bit. I certainly understand if there is a final judgment on something, but --

MR. GASPARO: You know, I haven't memorized all of the cases. My understanding is there were, but I can't stand here right now and tell you the facts of the particular cases, unfortunately.

THE COURT: Okay.

MR. GASPARO: Skky devotes much of its opposition on the argument that there shouldn't be comity.

And just this week, Your Honor, coincidentally, Judge Kessler of the District Court of the District of

Columbia denied a motion to compel on the same two cases heavily relied on by Skky in its opposition.

And those two cases are the Supreme Court decision in *Societe Nationale*, and the *Lyons* case which came out of the District of South Carolina. We actually have, Your Honor, copies of the decision, if you would like it. And I have the cite of the case, or the docket number of the case that I can read into the record. Would you prefer either or neither?

THE COURT: What do you mean recite the docket? The docket number?

MR. GASPARO: Well, I have the case name and I can give you the --

THE COURT: Oh, yeah, please do.

MR. GASPARO: So the case is *Reuven*, R-e-u-v-e-n, *Gilmore versus the Palestinean Interim Self-Government Authority*, Docket No. 01-CV-00853, and it is actually document number 365.

THE COURT: Okay.

MR. GASPARO: And Judge Kessler actually found that although the Defendant was not a, quote, unquote, state, principles of comity still applied. His opinion quotes the Supreme Court in *Societe Nationale.* And I would like to read that quote from the Supreme Court.

Quote, "American courts should therefore take care

to demonstrate due respect for any special problem confronted by a foreign litigant on account of his nationality or the location of its operations. And for any sovereign interests expressed by a foreign state. We do not articulate specific rules to guide this delicate task of adjudication." Closed quote. And that is the Supreme Court speaking.

Your Honor, we are actually joined today by Mr. Patrick Ferland. He is sitting in the audience, Mr. Ferland is a distinguished member of the Quebec Bar. He submitted a Declaration in our moving papers.

He is also the Quebec attorney who procured the judgment. And I mean, he is available, Your Honor, for any questions that you may have. We thought out of caution we would bring him along. So, he is here.

Upon receiving the judgment, we promptly notified the Court and opposing counsel. And contrary to what Skky is not even implying, expressly stated, we are not trying to block all discovery here. We are -- despite this judgment, since early January, while Playboy and MindGeek have repeatedly tried to cooperate with Skky to work around this judgment, and in five significant ways that I would like to sort of go through.

The first way, the first workaround that we have proposed, Playboy and MindGeek both have offered numerous

deposition dates in Quebec during the month of February. Skky ignored those offers. Had Skky taken those depositions and signed the neutral stipulation that Mr. Heverin referred to, it would have obtained by now technical information that we believe they are very much seeking. I think, tellingly, Skky has also failed to provide any alternative dates for any of the depositions that we offered. As such, no depositions have taken place to date, nor any even scheduled.

The second, what I will call, workaround alternative means of discovery, as Ms. Bentz explained, Playboy and MindGeek have -- we have meaningfully supplemented our interrogatory responses with nonconfidential information because of the pending DQ issue.

For instance, on March 13th, Playboy and MindGeek have supplemented interrogatory responses to identify additional individuals with knowledge about specific subject matter. We are designating and identifying people that have answers and, you know, not some straw person.

The third workaround, we have produced all currently known nonconfidential documents, which is approximately 7,000 pages of documents, which is also approximately double Skky's production. And once, Your Honor, this DQ issue is resolved, we can then begin producing confidential documents -- well, Playboy

 confidential documents and MindGeek confidential documents that are not located in Quebec.

Regarding Skky's doc request, I think Your Honor will remember that on January 13th, during a telephone conference call about the judgment, Your Honor asked, I believe, to see if the parties could -- let me rephrase. See if Skky could narrow and clarify its document request so that we can truly determine what the implication is of the judgment.

We had some meet and confers and they have been unsuccessful. Skky has refused to narrow and clarify. They sent us some reworded document requests which were just as broad and ambiguous as the first ones. They were of no help and we've walked through those with them.

And so, to answer -- we still do not have an answer to Your Honor's question of the implication. But, I think that we have recently sort of got a little bit of a -- a little bit of an insight into that, which I will explain in a moment.

The fourth workaround, Skky has been informed more than once that third parties should have much of the technical information that they are seeking. Skky seems to clearly acknowledge this as highlighted throughout their infringement contentions to both MindGeek and Playboy, that we recently received.

Specifically, Skky's infringement theory for both Playboy and MindGeek is a string of third party technology, starting with a third-party compression algorithm, and moving over to third-party servers that store information, moving over to third-parties cellular carriers, they identify Verizon. Then going over to end users. And for certain accused websites, they even refer to content that is created by -- just into the consumers.

So, that leads me to believe, Your Honor, that whatever implication this judgment has on technical discovery seems to have gotten a whole lot less because of what appears to be some very, very relevant third-party information that they are going to need to prove their case.

And lastly, the workaround, as we have been, you know, we have been meaningfully supplementing our initial disclosures, we have done it not once, not twice, but three times for both Playboy and Manwin.

I mean the thrust of Skky's argument is that these workarounds are just not -- just inadequate. In query, Your Honor, how would they know that if they haven't taken a single deposition, they haven't received a single confidential document which is forthcoming that is not located in Quebec, nor have they subpoenaed a single third party that they, themselves, identify in their infringement contentions.

Approximately three months have passed since MindGeek received this judgment. And Skky has not appealed. They haven't sought the revocation of, they haven't otherwise challenged or even asked for clarification of the Quebec judgment, which they are free to do in Quebec, you know, challenging a foreign judgment is not unusual in an intellectual property case. And I have been personally involved in a few which has caused me to go down to Brazil and then in other countries.

So, Your Honor, we respectfully ask your Court to please recognize the Canadian, the Quebec judgment, and to allow the parties to proceed in a way that is fair to both sides and works around that judgment.

THE COURT: I guess one kind of just general -- I guess it would almost be a policy question. That is, it is somewhat hard for me to believe that an entity like Playboy could -- as long as it is attached to a company, let's say, in Canada or another foreign judicial system where that company could get ordered, that Playboy could, you know, basically not be obligated to follow the U.S. Court system discovery process; that seems to me like that is just too easy of a way to just never have to do discovery. You just always attach yourself to someone in some other foreign country where you can get some sort of order like that and then you can just wave your hand and say, well, you can't

get that order. So tell me about that, kind of as a policy.

MR. GASPARO: I think that is an excellent policy point. Playboy is headquartered in California. They have an office. They have people moving around. They conduct business from California. They have many relationships for all sorts of things ranging from consumer goods to, you know, to websites.

And so, MindGeek is only one of many, many, many third-party relationships. Actually, Playboy's, now, business model is licensing. So they have reduced their hard assets. So, they have got many, many relationships and MindGeek is just part of that new business model that was launched about two, three years ago.

There is at least one person that I am aware of in L.A. that can be deposed, which doesn't fall within the scope of the Quebec judgment.

We will produce any and all confidential documents out of Playboy, L.A., and I anticipate there will be some once the DQ issue is resolved. So, by no means did Playboy hide behind, you know, a Quebec company anticipating something like this. Your Honor is not implying that. But, you know, there is a brick and mortar operation in California. There is discovery to be had from Playboy out in California, and we are just not sure how much of what MindGeek does for Playboy in Quebec is implicated here at

this point.

THE COURT: Okay. And then I also -- I may have asked this on -- I vaguely remember asking this on the phone, but I notice that your order said that the Defendant -- or proposed order, that Defendant shall not be compelled to produce or provide for inspection. So, I have a big question about that, "provide for inspection."

Why can't they go there? Does the order preclude it? And while I welcome and certainly respect your colleague from Quebec that is here, I don't think I can actually have him come up and talk, because he is not -- you know, what is the word I want?

THE COURT: Yes, thank you very much. I have a question about that. Why can't they just go there?

MR. GASPARO: I am not a Canadian lawyer. And so, I am a bit limited on this. But, my understanding --

ALL COUNSEL: Because he is here?

THE COURT: Yes, thank you very much. But, I have a question about that. Why can't they just go there?

MR. GASPARO: I am not a Canadian lawyer, so I am a bit limited on this. But, my understanding --

THE COURT: And what I will allow you to do, by the way, is talk to him to get the information after, so you can -- because that -- not that they want that as the solution, I am not suggesting that. But that I have this

big question mark there on your proposed order, because I didn't understand why it couldn't be provided for inspection.

MR. GASPARO: That would be wonderful. If I could take a moment to actually confer with him?

THE COURT: Sure.

MR. GASPARO: But, regardless of the answer, we remain open. Any proposals that Your Honor has, or Skky -- and Skky hasn't presented one. We will listen to them.

I mean, what we are trying to do here is we are trying to recognize the judgment and still give Skky what they need to try to develop their case. So, we are open. We are open to work around as long as we at least walk the line. And so, if I could just shelf that question for a moment?

THE COURT: You may.

MR. GASPARO: Great. Thank you, Your Honor.

THE COURT: All right? Good. And what I will do is I will take an opportunity to hear from the other side first and then we will take just a brief few minutes and you guys can talk and then I will take your answer.

Okay. Mr. Schultz on behalf of Skky?

I would suggest to Mr. Heverin that maybe if he doesn't take back his water bottle, that that was very nice of you to supply it. But, now we have water for anybody in

here. All right, go ahead.

MR. SCHULTZ: I might address the Protective Order first since that was the most recent thing raised. Your Honor, the issue that Defendants are raising with this Motion For Protective Order is this issue of comity. This is, as counsel has recognized, an important issue.

What is woefully deficient in their motion is any analysis under what the rules of comity actually are. And in fact, the cases cited by Defendants identify the analysis that must occur in order to determine if comity should apply.

And there are two issues. First is an issue of comity related to the Quebec statute. The second issue is related to the Canadian judgment. It is unclear to me right now which one they are moving under, if it is just the order or the statute or both. Since the order relies on the statute, I am willing to address that, as well.

As to the Quebec statute being entitled to the comity analysis, it should be first noted that it is a Blocking Statute. What it is designed to do is prevent discovery in foreign or even inter-Providence litigation. Courts have analyzed this statute and they have found that comity doesn't apply because it is not a law of the nation.

So, when the Supreme Court talks about a sovereign state in the *Societe National* case, they are talking about

laws of the nation. In other words, they are talking about laws of Canada. They are not talking about laws of the states, or providence like Quebec. The reverse would be the law from the state of Minnesota isn't necessarily entitled to comity in Canada because it is the law of the state, not the law of the United States. So, on that ground, alone, the statute has provided no comity analysis, and no deference, and should be rejected right there.

In particular, the Supreme Court in *Societe Nationale* in a footnote: No, it said, there should be no deference to Blocking Statutes. The Supreme Court in Footnote 29 indicates that Blocking Statutes frustrate the goal and need not be given the same deference by Courts of the United States if substantive rules of law are at variance with the laws of the United States.

Defendants provide no distinction or make no attempt to collect -- to distinguish the rationale and statements in the controlling authority from the Supreme Court on this issue. We also note in our opposition that the Supreme Court of Canada has addressed this Quebec statute and has found it unconstitutional in regards to discovery in inter-providence litigation. And as we provide in the motion, the Supreme Court of Canada provides heavy question to even the constitutionality in general to the statute. They didn't reach the issue, but there was

significant language in there that we cite in our brief that demonstrates that this is nothing more than a frustrated litigation.

Defendants again failed to address that. And I will make note that the cases relied on from Canada cited, you know, as exhibits to their Canadian lawyer are all "pre" the Supreme Court of Canada case that we cite in our opposition. So, to the extent those cases are controlling at all, I question whether or not they have any precedent or weight, given that the Supreme Court of Canada appears to have overruled them.

Nevertheless, there are four -- there are five factors that Defendants would have to analyze in order to show that comity to the statute is applicable. The first one is the importance to the litigation the documents or other information requested. These documents are highly relevant. They are the technical documents of how the websites operate, which is, it goes to the heart of the claimed method. I should note, Defendants have no analysis to these factors in their motion. They just say, comity applies, please find for us.

The second element is the degree of specificity of their request. We believe that our requests are specific enough to identify documents related to the creation of the content, the storage of the content, the accessibility or

transmission of the content. And again, Defendants have not challenged that. Defendants rather just make conclusory statements that they are just overbroad, without telling us where, which ones, and why.

The third factor, whether the information originated in the United States. We have no facts to suggest one way or the other. It would seem to suggest that Playboy being a brick and mortar company in California likely provided some of the information that went to MindGeek or Manwin up in Canada.

However, Playboy and Manwin, USA, are USA companies, so we would think there is at least a strong inference that some of the information originated here.

The fourth element is the availability of alternative means for securing information.

THE COURT: So, why not do the depos and find out if there is an alternative?

MR. SCHULTZ: Excellent question, Your Honor.

The proposal that Defendants have offered is that we can take depositions of people based solely on their personal knowledge. Moreover, we cannot ask questions that would reveal the content of information that is found in business records.

The proposal that Defendants are offering is not workable. It would be impossible for Skky to ask a question

that was solely on the person's personal knowledge. That also doesn't reveal information that is found in a business record.

For example, if I ask somebody: Tell me where file X, Y, Z is located. Where is it stored in memory? The deponent likely can't answer that because that information will be listed somewhere on a business record.

Skky will be almost completely hand-tied by the alternatives that the Defendants have posed. Moreover, we are only limited to their personal knowledge. The damages period for this patent extends back to 2009. And MindGeek and Playboy -- or I mean, especially with MindGeek, they say they operate hundreds -- lots of websites. They would be requesting that we would have to take, out of countless depositions to find the person who has personal knowledge of a particular website for the entire period that we needed to conduct the discovery. That is contrary to Federal Rule of Civil Procedure one, just inexpensive and speedy resolution of the trial.

The alternative as to the deposition just is not a workable -- is not a solution for the problem, to the extent there is a problem there.

And now I will discuss -- there are a few other factors that counsel didn't raise about their proposed workaround that provides some issues. I just want to make a

note for them, for the last issue, to the extent there is noncompliance with the request would undermine important interests in the United States. Skky has been issued a U.S. Patent. It has intellectual property rights here in the United States it is attempting to enforce. By allowing the Blocking Statute to stay in and prevent Skky from conducting discovery on highly relevant information will severely hinder Skky's ability to enforce its intellectual property rights here in the U.S..

Now, the issue whether or not there is comity to the judgment --

THE COURT: And when we say judgment, in our courts it would probably be called an order, so everyone is clear about that. Go ahead.

MR. SCHULTZ: Right, order. I can use order, that is fine.

THE COURT: Well, it is entitled judgment, I believe on there; but, okay, go ahead.

MR. SCHULTZ: So, as to the judgment, again, the Supreme Court has addressed this issue of comity and judgments from foreign jurisdictions on numerous occasions going all the way back to the early days of the Supreme Court.

However, the Supreme Court has said in *Hilton -v- Guyot*, 159 US 113, pages 202 to 203, "The extension of

comity to a foreign judgment is neither a matter of absolute obligation on the one hand, nor a mere courtesy and goodwill upon the other."

In other words, it is not just because a judgment has been obtained that therefore you have to apply comity and abide by that judgment. Rather, the *Hilton*, again, case cited by the Defendants in their motion where they provide no analysis sets forth four principles for the Court to consider when deciding whether or not a judgment should be obtained, a foreign judgment should be given comity here in the U.S..

The first element is an opportunity for a full and fair trial abroad before a court of competent jurisdiction. That didn't even occur, here. The Defendants didn't even tell Skky that they were attempting to get an order from the Canadian Court. I mean, the facts are according to the motion, we have a meet and confer on December 18th. No mention by Manwin's counsel that they are attempting to seek this order in Canada, or that the Canadian statute is an issue.

Rather, December 19th, they go out and file an ex parte application for the order and provide that to Skky two weeks later. There was not an opportunity -- there was no full and fair trial for Skky and Manwin to resolve the issue.

The next element is conducting the trial upon regular proceedings. Again, it was an ex parte application. There was no trial. Skky was not there. The trial has given voluntary appearance of the other party. Again, no mention to Skky, no indication that they were filing, seeking this relief.

And the last element is under a system of jurisprudence likely to secure an impartial administration of justice between citizens of its own country and those of ours. And again, it was an ex parte application to which Skky had no knowledge of and they obtained a judgment. None of the factors they are required to analyze under *Hilton*, the U.S. Supreme Court case on comity to final judgments suggests that comity should be applied here to this judgment.

I will note that the cases cited by the Defendants in the long string cite don't involve this situation. Not a single case involved the Protective Order in the Quebec Business Concerns Record Act. None of those cases are on point. What those cases stand for is the general proposition of comity as related to foreign judgments is that you don't get this res judicata. If the issue has been decided by a foreign court, you don't get to come into the U.S. and relitigate the issue. That is the purpose and principles behind what comity arises for. That is not the

case here.

Skky was not a party to that, that proceeding. It didn't resolve the issues. It talks in general terms of technical documents. There is no descriptiveness, there is no specificity within it to say there is res judicata now here on the issue because of the foreign -- because of the Canadian judgment.

Now, I want to get to the last issue, which is the workaround. Now, counsel for Manwin and Playboy mentioned a few things that he described as a workaround, but are not workarounds. And I will just take them in the order that I have them in my notes, here.

First, the depo dates in February. Skky attempted to obtain deposition dates prior to its infringement contentions in the hopes that at the same time we would receive documents. Both efforts were frustrated. And in fact, during the conversations that I was having with counsel regarding the scheduling of these depositions which we noted originally in December for sometime in January, knowing that there is always scheduling between counsel and the witness and it takes a little time to get on there and get a date that works for everyone, Skky told Defendants now and Playboy here, since they are at issue, that dates the week of February 17th, the week before our infringement contentions were due, were not acceptable. It would not

give us sufficient time to process the information and learn in the deposition, just to provide that information in our infringement contentions. So, we needed dates prior to that.

Defendants refused. The dates that they finally provided after a month of prodding were February 18th and 19th. Those dates were not going to work for that. Notwithstanding that the Canadian issue had really not been fully vetted at the time, so I am not even sure how the fact that we could have taken depos in February is a workaround of the current problem before the Court.

Next they say that they have supplemented their interrogatories of people. Again, as I mentioned before, if the depositions are limited in such a nature as they are proposing in their motion, that I can only ask questions related to their personal knowledge, that also can be information that is found in a business record, that the deposition is almost worthless. I will not be able to obtain -- Skky will not be able to obtain hardly any relevant information that it needs.

Again, Defendants continue to cite that they produced all nonconfidential documents. I am not going to belabor the point, but that is misleading. Defendants have produced prior art that they are going to rely on to attempt to invalidate the patent. They have not produced a single

nonconfidential document from the Defendants. All it is is prior art that is in the public. Skky's request did not ask for their prior art. We anticipate that they were going to give their prior art in their initial disclosures, because they are going to rely on it at trial in their Rule 26.

So, the continued statement that they have produced nonconfidential information to the Defendants is misleading. But again, not a workaround. Again, it is not clear to me why that is a proposed workaround. The other is a narrow -- they asked us to narrow our request to see if there is a way to clarify what we are seeking.

The Defendants have never told us which requests are too broad. We had a meet and confer, we talked about the time frame. We narrowed the time frame. Outside of that, the Defendants have not identified which parts of our particular request are overly broad. Again, not a workaround for the solution to the problem that we have here.

Now, the issue of third-party documents. The Quebec order states that if you transmit the document outside of Quebec in the ordinary course of business, it's not protected by the statute.

So, if there are third-party documents or third parties that have these documents that are not in Quebec, the protection doesn't apply and they should produce those

documents.

Nevertheless, it is not a workaround because we don't know where those third parties are located. If they are all in Quebec, we have the same issue. It is not a workaround, it is just another layered problem.

Defendants again suggested as a workaround that they supplemented their initial disclosures. Their initial disclosures identified one person from the Defendants. The rest of the people identified are all Skky individuals. They are the inventors. They are shareholders or board members. They are the Parker Rosen Law Firm. The Defendants have only identified one individual in their initial disclosures from their company. Again, I don't know how that is a workaround of the Quebec issue, but Defendants have raised it, so I at least wanted to address it.

Now Defendants have argued that we have had 3 months since the Quebec judgment was given to us and Skky has not gone to appeal it or revoke it. Skky didn't do it because it doesn't feel it is necessary. The Court to decide whether or not the Quebec issue has any relevance to this litigation is this Court. That is why we continually requested that the Defendants file this Motion for a Protective Order, which they finally did 3 months later.

And they indicated in their letter originally to the Court that they should file. This Court is the one that

should decide whether or not this Quebec judgment is entitled to any deference, which it is not.

THE COURT: Okay, let's wrap up soon.

MR. SCHULTZ: Okay, I just want to -- just a couple other things on the depositions, too, Your Honor. Because of this Order that Defendants are seeking requires it only to be personal knowledge basically eliminates the ability of Skky to take a 30(b)(6) deposition, because they can't educate the designee under 30(b)(6) with other information, because it is only limited to their personal information. And to be clear, we noticed those 30(b)(6) depositions in January and February. So, to the extent that they are arguing that was a workaround, or our failure to not workaround it because we didn't take that deposition, that deposition couldn't occur.

And then, lastly, I wanted to -- give me one minute, Your Honor, I just wanted to make sure.

THE COURT: Sure.

MR. SCHULTZ: I just want to make this point to wrap up, here. Now, there is the Defendants' issue of the documents that we could get through the workaround, they said the depositions and then the third-party documents. But, what they are not -- what is not available to Skky are technical documents located solely in Quebec, the source code, and -- well, those are the two big ones.

First, we don't know what technical documents they are referring to. They continue to just say technical documents. They provide no specificity as to what exactly those type of documents are that could be implicated. Second, they offered no workaround for those documents, which is the bulk of the documents. These are what Skky -- is highly relevant to Skky's case.

And as to source code, I want to make the Court aware that in one of the litigations that Manwin is facing down in the Eastern District of Texas against *ExitExchange*, which involves patents related to pop-up advertisements on websites, so it is all about websites, transmission of websites, items from websites. Similar technology.

And in that case, Manwin has agreed to make its source code available at its local office in the Eastern District of Texas. But yet they come here in this Court and say the source code is only in Quebec and is not available under the Quebec statute. That inconsistency is a demonstration of the fact that this motion is baseless. The case law requires that it be denied. And there is no workaround for Skky in order to obtain the evidence that it needs to prosecute its case against the Defendants.

THE COURT: Okay, thank you.

MR. SCHULTZ: Did you want me to address the discovery stuff?

THE COURT: Oh, no, we are done. I mean, no offense, but -- I think I can't absorb anymore.

But, I do -- in fact, if everyone can just hold on, stay here for two more minutes. I do want to just have the -- since I asked the question, if you could ask counsel in the back the question regarding inspection, just so I know?

And you just said three lawsuits. I remember the *Guyot* or something?

MR. SCHULTZ: Guyot.

THE COURT: Guyot, yeah. I don't remember what the other one is. So, those two questions. And if you can just do that now and we will all kind of stay here. We can go off the record for a minute.

(Discussion off the record.)

THE COURT: Back on the record now.

MR. GASPARO: Would Your Honor like to first address the inspection question or the source code -- or sorry, the *ExitExchange* -- the three NPE litigation question.

THE COURT: The inspection first, Mr. Gasparo?

MR. GASPARO: To the best of my understanding, there has been some interpretation of the Act as it relates to inspection documents. And for Playboy documents that are located in Quebec in Manwin's possession, there should not

be any problem with an inspection of those documents, because those documents are related to a Quebec business concern. So, I don't know if that was clear.

THE COURT: Okay.

MR. GASPARO: So, inspection would work for Playboy documents located in Quebec.

THE COURT: Okay.

MR. GASPARO: For Manwin, for MindGeek documents located in Quebec, my understanding is there is case law that says inspecting those documents and presumably taking notes on inspection is basically going against the spirit of the Act. So, it's also prohibited.

THE COURT: Okay.

MR. GASPARO: We reference -- I referenced the reason why MindGeek sought this judgment was because of three NPE litigations, one is the *Guyot* case, one is this *Skky* case, and the third is the *ExitExchange* case that opposing counsel refers to.

I have two very important points to make. The first is, is that Skky has not requested source code from any Defendant in this case, including the ringtone companies. Actually, they have told us that they are not interested in source code. So, that is contrary to what you heard, I think, Your Honor.

And second of all, MindGeek is involved in this

*ExitExchange* case in Texas before Judge Gilstrap. And yes, there was an agreement to produce source code, but contrary to what opposing counsel said, that source code is actually a third party that Manwin does business with that is located in the United States. It is not Manwin's source code from Quebec.

THE COURT: All right. That is all I'm going to hear. All right?

MR. GASPARO: Thank you, Your Honor.

THE COURT: Very good. I am going to take it under advisement. I actually had some thoughts on certain things, and if anyone ever asks, it does make a difference for oral argument. So, I do want to think some of those initial thoughts over.

So, I will take it under advisement and I will get it out as quickly as we can. And to let you folks know, we were actually on, you know, kind of a track of getting out the other motion, the previous motion in a pretty quick order, here. So that should be coming out soon, too.

Ms. Miller?

MS. MILLER: Your Honor, would you have a copy of that D.D.C. case?

THE COURT: Oh, yes, do you have --

MS. MILLER: I do.

THE COURT: Okay, good. Thank you.

This was not cited in -- not correct? So, when something is brought up, I do allow the responding party to do a quick letter if you so feel the need. Do it quickly, though, within the next couple of days so that if there is anything to respond to, just do it in a letter format. And that is awful good, okay?

MR. SCHULTZ: Thank you, Your Honor.

THE COURT: You're welcome. All right. Anything else on behalf of the Plaintiff's side?

MR. SCHULTZ: None, Your Honor.

THE COURT: Anything else, and I hope the answer is no, but for Thumbplay and Dada?

MR. HEVERIN: We can take a hint. We have nothing further.

THE COURT: All right. Anything else on behalf of Manwin, Vivid or Playboy?

MR. GASPARO: No, Your Honor. Thank you.

THE COURT: All right, very good. Safe travels to all. Thank you. We will be in recess.

(Adjournment.)

CERTIFICATE

The foregoing transcript is a transcription of the digital audio recording that was produced in the above matter by Court staff and later submitted to myself, Jeanne M. Anderson, for transcription. An official court reporter was not present to produce a stenographic and verbatim record of the aforementioned proceeding at the time and place specified herein.

Certified by: s/ Jeanne M. Anderson

Jeanne M. Anderson, RMR-RPR
Official Court Reporter